OFFICES OF

# PAVONE & FONNER, LLP

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
600 WEST BROADWAY, SUITE 700
SAN DIEGO, CALIFORNIA  92101
TELEPHONE: 619 224 8885
EMAIL: bpavone@cox.net

ATTORNEYS FOR PLAINTIFF

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | |
|---|---|
| **LAWRENCE BROWN,** and all persons similarly situated,<br><br>Plaintiff and Class Representative,<br>*v.*<br><br>**CALIFORNIA DEPARTMENT OF CORRECTIONS & REHABILITATION**, a Department of the State of California;<br>**ROBERTO AMBRIZ** an SVSP Officer;<br>**SERGIO ARANDA,** an SVSP Officer;<br>**LUIS BALLESTEROS,** a CTF Officer;<br>**BLAKE BARRON,** a CTF Officer;<br>**DREW BITTNER,** an SVSP Officer;<br>**JESUS PEDRO BOJORQUEZ**, a CDCR correctional officer;<br>**CESAR S. BRAVO**, a CDCR officer;<br>**ZACHARY BROWN,** a CTF Officer;<br>**ISAIAS CABRERA,** an SVSP Officer;<br>**ANNA CASTILLO,** an SVSP Officer;<br>**ROBERTO CASTILLO-RUIZ,** an SVSP Officer;<br>**MARISSA CASTILONE,** an OCS Officer; | CASE NO.: 25-cv-04741-JST<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>I.   VIOLATION OF 42 U.S.C. § 1983 (EXCESSIVE FORCE – EIGHTH AMD.)<br><br>II.   CONSPIRACY TO VIOLATE FEDERAL CIVIL RIGHTS - 42 U.S.C. § 1985 (EIGHTH AMENDMENT)<br><br>III.   VIOLATION OF 42 U.S.C. § 1983 (EIGHTH AMENDMENT – DISEASE)<br><br>IV.   CONSPIRACY TO VIOLATE CIVIL RIGHTS - 42 U.S.C. § 1985 (EIGHTH AMENDMENT – DISEASE)<br><br>V.   RACIAL DISCRIMINATION (42 U.S.C. § 2000d)<br><br>VI.   VIOLATION OF STATE RALPH ACT<br><br>VII.   VIOLATION OF STATE BANE ACT<br><br>VIII.   ASSAULT<br><br>IX.   BATTERY<br><br>X.   MASS WEAPONIZATION OF DISEASE (BATTERY CLASS CASE)<br><br>XI.   MASS INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br><br>XI.   NEGLIGENCE<br><br>XIII.   NEGLIGENT SUPERVISION |

**RICHARD MARIO CAVAGNOLO,**
 an OCS Officer;
**IVAN CERVANTES,**
 a CTF Officer;
**MANUEL CERVANTES,**
 an SVSP Officer;
**BRANDON COKER,**
 an OCS Officer;
**GABRIELA CONSTANTINO,**
 an SVSP Officer;
**BRANDON COPE,**
 a KVSP Officer;
**OSCAR COVARRUBIAS,**
 a CTF Officer;
**NOE CRUZ,**
 a DAPO Officer;
**JEFFREY DEANZO,**
 an OCS Officer;
**ENRIQUE GALVAN**,
 a CDCR correctional captain;
**VANESSA GARCIA,**
 a CTF Officer;
**HECTOR GASCA,**
 an SVSP Officer;
**RONALD GLAZE,**
 a CTF Sergeant;
**MICHELLE GREGORY,**
 an OCS Officer;
**JAMES HARDEN,**
 an OCS Officer;
**ANGEL HERNANDEZ,**
 a CTF Officer;
**MARC HERNANDEZ,**
 a CDCR correctional officer;
**JELANI HUNTER,**
 a DAPO Officer;
**JOSEPH INFANTE,**
 an OCS Officer;
**CRAIG ALAN KOENIG**,
 the former CTF warden;
**JESUS G. LOPEZ,**
 a CTF Officer;
**ANA MARIE LUNA**,
 a CDCR correctional lieutenant;
**DERRICK THOMAS MARION**,
 a CDCR Chief;
**DAVID G. MARQUEZ**
 a CDCR Officer
**YOVANI MARTINEZ,**
 a CTF Officer;

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**PATRICK McDONALD**
   a CDCR Officer;
**LATANYA McDOWELL**,
   a CDCR commanding officer;
**CHRISTIAN MELL,**
   a CTF Officer;
**KENNETH MELTON,**
   an SVSP Officer;
**BENJAMIN MENDOZA,**
   an OCS Officer;
**KEITH E. MENSING**,
   a CDCR assistant warden;
**DONNIE G. METCALF, JR.**
   a CDCR correctional captain;
**SERGIO MORA,**
   a CTF Officer;
**JASON MUSSELMAN,**
   an OCS Officer;
**JOHN NIDUAZA,**
   an SVSP Officer;
**HECTOR JAVIER OROZCO**,
   a CTF correctional officer;
**M. ORTEGA,**
   an SVSP Officer;
**JESUS PACHECO,**
   an SVSP Officer;
**CHRISTOPHER PARIS,**
   a CDCR correctional lieutenant,
**JOSHUA KURT PEFFLEY**,
   a CTF correctional sergeant;
**ISIDRO PANTOJA PEREZ**,
   a CDCR correctional officer;
**CORY D. PERRYMAN**,
   an OCS Officer;
**JUSTIN D. PIERCE**,
   an OCS correctional sergeant;
**DAYMON PREWITT,**
   an SVSP Officer;
**ERIC RALLS,**
   a CTF Officer;
**JORGE RAMIREZ,**
   an SVSP Officer;
**EDGAR RAMOS,**
   an OCS Officer;
**JENEE AMIRA REED**
   a CDCR correctional officer;
**ABEL RODRIGUEZ,**
   an SVSP Officer;
**MATTHEW RIUS,**
   an SVSP Officer;

**RONALDO SALAO,**
   an SVSP Officer;
**ROBERT O. SALAS**,
   a CTF correctional officer;
**CHRISTOPHER SALDANA,**
   an SVSP Officer;
**CHRISTOPHER SALOPEK,**
   an SVSP Officer;
**LYDIA SCOTT,**
   a CTF Officer;
**ALEX B. SERRATO**,
   a CDCR commanding officer;
**JESSE DANIEL SESMA,**
   a CDCR correctional officer;
**STEVEN T. SLIMP**,
   an OCS Officer;
**CODY SPANKE,**
   an OCS Officer;
**JOHNNY STREET,**
   an OCS Officer;
**DUSTIN THOMPSON**,
   an OCS Officer;
**MARCELINO VALDEZ,**
   an SVSP Officer;
**ORION VALLES,**
   an SVSP Officer;
**HUMBERTO VERA**,
   a CTF correctional sergeant;
**CARLOS A. VERGARA**,
   a CTF correctional officer;
**RUSSELL VILLALBA**,
   an OCS Officer;
**ARTURO VILLALOBOS**,
   a CDCR correctional sergeant;
**JASON VINSON,**
   an SVSP Officer;
**ANTONIO VIRRUETA,**
   an SVSP Officer;
**LLOYD WALLACE,**
   an OCS Officer;
and an unknown number of additional
state officers identified as Does 1-50,

Defendants.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## **INTRODUCTION**

1.      In what can only be described as one of the most eye-popping racist attacks in recent history, on July 20, 2020, the warden of the California Correctional Training Facility in Soledad, California, along with approximately 50 guards, executed a 3 am raid dubbed "Operation Akili" with the intent and effect of sadistically injuring, terrorizing, and humiliating approximately 100 sleeping African-American inmates.

2.      Not satisfied to merely engage in the nighttime, KKK-style attack, CDCR agents at the same time elected to biologically weaponize the Covid-19 virus by intentionally infecting the Black targets, and expose each of them to each other and guards in close company, to maximize the viral spread of this deadly disease.

3.      Incredibly, and as reported in numerous similar accounts of the language invoked by CTF officials, they openly announced their malevolent intentions:

*By the time this ordeal is over, you niggers will have Covid-19*!

4.      True to their confession, Operation Akili predictably and by design became a "super-spreader" disease event and ultimately resulted in over 2,700 cases of Covid-19 infection traceable to it.

5.      CTF officials effectively murdered over 17 inmates with Covid-19 by engaging in biological warfare.

6.      The spike of infections is illustrated by the following tracking graph published by CDCR for each prison.  As to CTF, it shows how the mass interpersonal exposure on July 20, 2020 introduced and catalyzed a subsequent spike in infections. Before this date, there were no Covid-19 infections in this prison.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101



7.    Plaintiff's **Table 1** inventory of officials' jarring vitriol includes the following partial table of racial slurs that both highlight the extraordinary animus motivating the raid and explains CDCR's infectious strategy with respect to the African-American inmate population:

| TABLE 1 | | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| 1 | Shelton Adams | They told us (Black prisoners): "By the time this ordeal is over, you niggers will have Covid-19!" |
| 2 | Shelton Adams | One of the guards grabbed my hair and put me in a headlock while another guard grabbed my arms pushing them up and calling me a "bitch ass nigger." |
| 3 | Shelton Adams | When I screamed in pain, one of the assailants mocked, "You niggers are soft." |
| 4 | Fred Brinkley | I asked [a guard], can I get some clothing and why were his colleagues not wearing masks and he responded by saying, "I'm not getting shit for you niggers, we don't care about Covid." |
| 5 | Terrence Brownlee | The door swung open and the officers were calling me nigger. I'm six foot three so the officers had a hard time throwing me on the ground but I was not resisting. They were stepping on my neck and head. I was being punched, kicked and called a "nigger." |
| 6 | Dwain Campbell | They said 'shut up, you nigger.' |
| 7 | Chris Cox | They called me a nigger and said "fuck you, black gang bangers." |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**TABLE 1**

| No. | WITNESS | EVIDENCE |
|---|---|---|
| 8 | Santiago Grajeda | Brownlee was screaming in pain and one of the officers called Brownlee a "nigger" and told him to "shut the fuck up!" |
| 9 | Johnathan Hamilton | They just said, "Shut up nigger," and escorted me around with no mask, shoes.  I was in my boxers, and they beat me up. |
| 10 | Johnathan Hamilton | I asked them "what is this about?" And they said, "Shut up! You niggers want to play games." |
| 11 | Antoine Keil | They kept calling us niggers, motherfuckers, and assholes. |
| 12 | Gary Lawless | They just called me and my cellie niggers. We were singled out because we're Black. |
| 13 | Michael McCurty | While being escorted, I observed other inmates being told that "Black Lives Don't Matter Here at CTF" and "All you niggers will learn that sooner or later." |
| 14 | Anthony Oliver | The officers came in his cell yelling and shouting "Don't move Nigger, Black Lives Don't Matter" while snatching Mr. O'Neal from his bed. |
| 15 | Saul Pelayo | "Put your nigga ass hands behind your back." |
| 16 | Marquise Richardson | As I was watching [the raid] from my cell the guard told me "get the fuck on your bunk nigger or else you will be next." |

8.      Most of the inmates, including Plaintiff, were forcefully dragged out of bed, and in the process, pushed, shoved, choked, slammed, beaten, and/or otherwise battered by guards, which resulted in various personal injuries, psychological torment, and other economic and non-economic damage.

## **JURISDICTION**

9.      The California Northern Federal District Court has jurisdiction over this action pursuant 28 U.S.C. §§ 1331 and 1343 because this action involves the infringement on Plaintiff's federal constitutional rights, and CTF Soledad Prison sits within its jurisdictional perimeter.  This Court also possesses pendent jurisdiction for the state claims.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

10.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because at least one of the defendants resides in this district and all defendants reside in the State of California.

## PLAINTIFF

11.      **Plaintiff 1**: Lawrence Brown is a 63-year-old African-American inmate, identified by CDCR Number BJ5119.  He is a raid victim and a person that caught Covid-19.  He serves as the class representative for a class of inmates who contracted Covid-19 at CTF from July 20, 2020 through March 15, 2021.

## DEFENDANT PARTIES
## ENTITY DEFENDANT

12.      **Defendant 1**: Defendant California Department of Corrections and Rehabilitation (CDCR) is an agency of the State of California and like the state, is a state sovereign entity.  CDCR acts through its individual leaders and agents that carried out the raid.  CDCR had custody over the inmates at the time of these events and therefore had a series of protective obligations toward them that are imputed to the Agency and to the State of California.

13.      CDCR is responsible on a vicarious basis for the actions of its individual agents, which to the best of Plaintiff's knowledge, were mostly CTF officials and guards.  Few were wearing their identifying badges and those that were covered them up.  Some may be members of CDCR's Office of Correctional Safety (OCS), which includes its Special Services Unit (SSU).   Other agents may have been from CDCR's Institutional Gang Investigators (IGI, from both Soledad CTF and neighboring Salinas Valley State Prison), as well as CDCR Sacramento, and/or the CDCR Special Services Unit Gang Intel Ops (also known as SSU).  However, to the best of Plaintiff's knowledge, all individual agents were CDCR employees.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**INDIVIDUAL DEFENDANTS**

14.    All individual agents are believed, and on that basis, Plaintiff alleges that they were acting within the scope of their employment within CDCR and the State of California in carrying out Operation Akili.

15.    **Defendant 2, Roberto Ambriz**: On June 6, 2025, CDCR admitted that Correctional Officer Roberto Ambriz, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be either a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

16.    **Defendant 3, Sergio Aranda**: On June 6, 2025, CDCR admitted that Correctional Sergeant Sergio Aranda, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be either a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

17.    **Defendant 4, Luis Ballesteros**: On June 6, 2025, CDCR admitted that Correctional Officer Luis Ballesteros, based out of CTF, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be either a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

18.    **Defendant 5, Blake R. Barron**: On June 6, 2025, CDCR admitted that Correctional Officer Blake R. Barron, based out of CTF, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  CDCR further admitted that Barron initiated a request for OCS assistance, based on a purported "widespread gang attack" supposedly being planned to retaliate for the murder of Hugo Pinell. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

19.    **Defendant 6, Drew Bittner**: On June 6, 2025, CDCR admitted that Correctional Officer Drew Bittner, based at SVSP, was a participant in Operation Akili.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

20.    **Defendant 7, Jesus Pedro Bojorquez**: Correctional Officer Jesus Pedro Bojorquez is believed to be a participant in Operation Akili, because he was named by Berlan Dicey in a 602 dated August 17, 2020 as one the guards involved. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he extracted Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

21.    **Defendant 8, Cesar S. Bravo**: On June 6, 2025, CDCR admitted that Officer Cesar S. Bravo, based out of CTF, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

22. **Defendant 9, Zachary Scott Brown**: On June 6, 2025, CDCR admitted that Commanding Officer Zachary Scott Brown, based out of CTF, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

23. **Defendant 10, Isaias Cabrera**: On June 6, 2025, CDCR admitted that Correctional Officer Isaias Cabrera, based at SVSP, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He

is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

24.     **Defendant 11, Anna Castillo**: On June 6, 2025, CDCR admitted that Correctional Officer Anna Castillo, based at SVSP, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that she was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if she did not, she is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  She is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

25.     **Defendant 12, Roberto Castillo-Ruiz**: On June 6, 2025, CDCR admitted that Correctional Officer Roberto Castillo-Ruiz, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).   He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

26.     **Defendant 13, Marissa Castilone**: On June 6, 2025, CDCR admitted that Marissa Castilone, an OCS officer, was a participant in Operation Akili.  Seeing as

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that she was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  However, she is reportedly an "Associate Governmental Program Analyst."  If she performs that job, she is probably not one of the extracting guards.  However, in that position she does possess duties often involve analyzing data, developing policies, managing budgets, and coordinating programs within the California correctional system.  To the extent she designed, funded, or approved of the policies at work during Operation Akili, she is liable for their cruel, illegal, and negligent nature.  Even if she did not, she is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  She is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

27.     **Defendant 14, Richard Mario Cavagnolo**: On June 6, 2025, CDCR admitted that Correctional Lieutenant Mario Cavagnolo (whose real name is Richard Mario Cavagnolo), an OCS officer, was a participant in Operation Akili.  He was further identified in the *Williams* action as a Correctional Lieutenant with Gang Intelligence Operations in the Office of Correctional Safety.  CDCR further admitted that he was the Operation Akili team leader.  Defendant Cavagnolo is believed to also be responsible for investigating security threat groups and authoring and issuing Security Threat Group Chronos.  Defendant Cavagnolo apparently co-authored a CDCR 128-B5 Chrono recommending that the OCS and Institutional Classification Committee consider validating Inmate Roosevelt Payne, who CDCR admits was one of the inmates targeted during Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

28.     **Defendant 15, Ivan Cervantes**: On June 6, 2025, CDCR admitted that Correctional Officer Ivan Cervantes, based out of CTF, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

29.     **Defendant 16, Manuel Cervantes**: On June 6, 2025, CDCR admitted that Correctional Sergeant Manuel Cervantes, based at SVSP, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. §

1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

30.     **Defendant 17, Brandon Coker**: On June 6, 2025, CDCR admitted that Correctional Sergeant Brandon Coker, an OCS officer, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

31.     **Defendant 18, Gabriela Constantino**: On June 6, 2025, CDCR admitted that Correctional Lieutenant Gabriela Constantino, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that she was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if she did not, she is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  CDCR further admitted that she supervised the

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

interrogations of the inmates. She is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

32.    **Defendant 19, Brandon Nelson Cope**: On June 6, 2025, CDCR admitted that Correctional Sergeant Officer Brandon Nelson Cope was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  CDCR further admitted that he was a "search team leader" although it is unclear whether this refers to searching cells (in the inmates' absence) or extracting the inmates, as CDCR fails to provide any designation to clearly indicate which guards performed the extractions. He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

33.    **Defendant 20, Oscar Covarrubias**:  On June 6, 2025, CDCR admitted that Correctional Sergeant Oscar Covarrubias, based out of CTF, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*,

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

34.    **Defendant 21, Noe Cruz**: On June 6, 2025, CDCR admitted that Parole Agent I Noe Cruz was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he (or she) was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if she did not, she is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  She is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

35.    **Defendant 22, Jeffrey Dane DeAnzo**: On June 6, 2025, CDCR admitted that Correctional Sergeant Jeffrey Dane DeAnzo, an OCS officer, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

36.    **Defendant 23, Enrique Galvan**: Correctional Captain Enrique Galvan, based out of CTF, signed a sworn declaration on April 22, 2024 attesting that he had personal knowledge that "During the security operation [Operation Akili], inmates were removed from their cells to facilitate cell searches; many of these inmates were questioned regarding potential involvement in STG activity. Following the security operation, inmates were returned to their cells. No inmates were harmed during the security operation." He could not possess personal knowledge of these facts without being present for the event. Although Plaintiffs believe that Galvan was committing perjury – that he did not possess personal knowledge of Operation Akili, because he was not in fact there – in an abundance of caution, it is legally plausible that he was telling the truth and that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

37.    **Defendant 24, Vanessa Garcia**: On June 6, 2025, CDCR admitted that Officer Vanessa Garcia, based out of CTF, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that she was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if she did not, she is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). She

is believed to be either a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

38.    **Defendant 25, Hector Gasca**: On June 6, 2025, CDCR admitted that Correctional Officer Hector Gasca, based at SVSP, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

39.    **Defendant 26, Ronald Glaze**: Correctional Sergeant Ronald Glaze was identified by Berlan Dicey as a participant of Operation Akili in an October 2020 602 filing, when he, Glaze, was told by Correctional Lieutenant David Marquez to transport Dicey. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that Glaze was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

40.    **Defendant 27, Michelle Gregory**: On June 6, 2025, CDCR admitted that Special Agent Michelle Gregory, an OCS officer, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that she was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if she did not, she is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  She is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

41.    **Defendant 28, James Harden**: On June 6, 2025, CDCR admitted that Senior Special Agent James Harden was a participant in Operation Akili.  Seeing as CDCR claims that it cannot identify which specific officials present for Operation Akili extracted each inmate, Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

42.    **Defendant 29, Angel Hernandez**: On June 6, 2025, CDCR admitted that Correctional Sergeant Angel Hernandez, based out of CTF, was a participant in Operation Akili.   Seeing as CDCR claimed on June 6, 2025, and continues to claim, that

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

43.     **Defendant 30, Marc Hernandez**: On June 6, 2025, CDCR admitted that Correctional Officer Marc Hernandez, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

44.     **Defendant 31, Jelani Hunter**: On June 6, 2025, CDCR admitted that Jelani Hunter is a parole agent with DAPO, Division of Adult Parole Operation, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir.

2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

45. **<u>Defendant 32, Joseph Infante</u>**: On June 6, 2025, CDCR admitted that Correctional Sergeant Joseph Infante, an OCS officer, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). CDCR further admitted that he was a "search team leader" although it is unclear whether this refers to searching cells (in the inmates' absence) or extracting the inmates, as CDCR fails to provide any designation to clearly indicate which guards performed the extractions. He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

46. **<u>Defendant 33, Craig Koenig</u>**: On June 6, 2025, CDCR admitted that Defendant Craig Koenig was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. CDCR further admitted that former Warden Koenig approved Barron's request for OCS' involvement. He, Koenig, was the former warden of the Correctional Training Facility (CTF) in Soledad, California and acted as the singular leader, and top prison official, in

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

terms of carrying out the July 20, 2020 Operation Akili raid on the inmates.  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

47.     **Defendant 34, Jesus Lopez**: On June 6, 2025, CDCR admitted that Defendant Jesus Lopez, based out of CTF, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). CDCR further admitted that he acted as a "tactical advisor" during Operation Akili and therefore presumably designed, implemented, and/or approved the tactics in a supervisory capacity utilized during it.  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

48.     **Defendant 35, Ana Marie Luna**: Defendant Ana Marie Luna is a correctional sergeant with CTF, alleged to have participated in Operation Akili, identified by Marcelle Franklin on November 10, 2020 as one of the guards transporting inmates to the dining hall. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that she was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if she did not, she is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004);

*Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  The California Attorney General's office confirmed her identity on June 14, 2023.  She is believed to a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

49.      **Defendant 36, Derrick Thomas Marion**: Defendant Chief Derrick Thomas Marion is an agent of CDCR and is or was Chief of the Office of Correctional Safety ("OCS").  As such, he possessed authority over OCS staff and operations, including the Special Services Unit (formerly known as Investigative Services Unit), which conducts gang related investigations. Upon information and belief, OCS is responsible for gang validations within CDCR, including individual validations and validation policies generally, and was involved with the planning and execution of Operation Akili on July 20, 2020. He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

50.      **Defendant 37, David J. Marquez**: Correctional Lieutenant David J. Marquez was identified in a 602 filing by Berlan Dicey in October 2020 as one of the participants in Operation Akili.  According to Dicey, Correctional Lieutenant J. Marquez made a comment to Sgt. Ronald Glaze to "dump this mother fucker on his head if he makes any sudden move, do you understand me?" as Dicey was being transported to the Dining Hall.   As such, it appears that Marquez is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

51.      **Defendant 38, Yovani Martinez**: On June 6, 2025, CDCR admitted that Commanding Officer Yovani Martinez, based out of CTF, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each

inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

52. **Defendant 39, Latanya McDowell**: Corrections Officer Latanya McDowell is an agent of CDCR alleged to have participated in Operation Akili. She was identified by Marcelle Franklin on November 10, 2020 as one of the guards transporting inmates to the dining hall. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that she was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if she did not, she is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). She is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court. The California Attorney General's office confirmed her identity on June 14, 2023.

53. **Defendant 40, Patrick McDonald**: Sergeant Patrick McDonald is an agent of CDCR alleged to have participated in Operation Akili. He was identified by Alex Moss as a guard interrogating inmates, on August 6, 2020. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

54.     **Defendant 41, Christian Mell**: On June 6, 2025, CDCR admitted that Correctional Officer Christian Mell, based out of CTF, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

55.     **Defendant 42, Kenneth Melton**: On June 6, 2025, CDCR admitted that Correctional Officer Kenneth Melton, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*,

400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

56.    **Defendant 43, Benjamin Mendoza**: On June 6, 2025, CDCR admitted that Correctional Lieutenant Benjamin Mendoza, an OCS officer, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). CDCR further admitted that he "oversaw property control," which signals that he was not also performing as an extracting guard. However, until Plaintiffs confirm through reliable testimony who the extracting guards were – a point CDCR seems extremely reluctant to disclose -- and in an abundance of caution, he is named as a defendant to protect against the possibility that he functioned in multiple roles. He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

57.    **Defendant 44, Keith E. Mensing**: Defendant Keith E. Mensing is or was Assistant Chief Deputy Warden of the California Training Facility. Upon information and belief, he is alleged to have participated in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

58.    **Defendant 45, Donnie Gene Metcalfe, Jr.**: Captain Donnie Gene Metcalfe, Jr., is an agent of CDCR alleged to have participated in Operation Akili.  He was identified by Berlan Dicey on August 17, 2025 as a tortious actor during the raid.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

59.    **Defendant 46, Sergio Mora**: On June 6, 2025, CDCR admitted that Correctional Officer Sergio Mora, based out of CTF, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*,

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

60.    **Defendant 47, Jason C. Musselman**: On June 6, 2025, CDCR admitted that Officer Jason C. Musselman, an OCS officer, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). CDCR further admitted that he supervised the interrogations of the inmates. He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

61.    **Defendant 48, John Niduaza**: On June 6, 2025, CDCR admitted that Correctional Sergeant John Niduaza, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

62. **Defendant 49, Hector Javier Orozco**: On June 6, 2025, CDCR admitted that Officer Hector Javier Orozco, based out of CTF, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

63. **Defendant 50, Jose M. Ortega**: On June 6, 2025, CDCR admitted that "M. Ortega," title unknown, but believed to be Correctional Officer Jose M. Ortega, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he (or she) was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

64. **Defendant 51, Jesus Pacheco**: On June 6, 2025, CDCR admitted that Correctional Officer Jesus Pacheco, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify

which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

65.    **Defendant 52, Christopher Paris**: Correctional Lieutenant Christopher Paris is believed to have participated in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

66.    **Defendant 53, Joshua Kurt Peffley**: On June 6, 2025, CDCR admitted that Correctional Sergeant Joshua Kurt Peffley, based out of CTF, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)),

conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  CDCR further admitted that he acted as a "tactical advisor" during Operation Akili and therefore presumably designed, implemented, and/or approved the abusive tactics in a supervisory capacity utilized during it.  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

67.   **<u>Defendant 54, Isidro Pantoja Perez</u>**: Officer Isidro Pantoja Perez is a corrections officer at CTF.  He was identified by Marcelle Franklin on November 10, 2020 as one of the guards transporting inmates to the dining hall.  He is an agent of CDCR alleged to have participated in Operation Akili.  It is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

68.   **<u>Defendant 55, Cory D. Perryman</u>**: On June 6, 2025, CDCR admitted that Correctional Sergeant Cory D. Perryman, an OCS officer, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of

herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  CDCR further admitted that he was a "search team leader" although it is unclear whether this refers to searching cells (in the inmates' absence) or extracting the inmates, as CDCR fails to provide any designation to clearly indicate which guards performed the extractions.  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

69.    **Defendant 56, Justin D. Pierce**: On June 6, 2025, CDCR admitted that Correctional Sergeant Justin D. Pierce, an OCS officer, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  Pierce is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

70.    **Defendant 57, Daymon Prewitt**: On June 6, 2025, CDCR admitted that Correctional Officer Daymon Prewitt, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144

(2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

71.    **Defendant 58, Eric Ralls**: On June 6, 2025, CDCR admitted that Correctional Officer Eric Ralls, based out of CTF, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

72.    **Defendant 59, Jorge Ramirez**: On June 6, 2025, CDCR admitted that Correctional Officer Jorge Ramirez, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

73.    **Defendant 60, Edgar Ramos**: On June 6, 2025, CDCR admitted that Special Agent Edgar Ramos, an OCS officer, was a participant in Operation Akili.

Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.    Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). CDCR further admitted that he was a "case agent" although it is unclear what this means or indicates.  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

74.     **Defendant 61, Jenee Amira Reed**: Correctional Lieutenant Jenee Amira Reed was identified by Berlan Dicey in August 2017 as a tortious participant in Operation Akili.  CDCR's counsel confirmed her identity on June 14, 2023.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that she was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if she did not, she is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). She is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

75.     **Defendant 62, Abel Rodriguez**: On June 6, 2025, CDCR admitted that Correctional Officer Abel Rodriguez, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is

plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

76.    **Defendant 63, Matthew Rius**: On June 6, 2025, CDCR admitted that Correctional Officer Matthew Rius, based at SVSP, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); Casey v. U.S. Bank, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to either be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

77.    **Defendant 64, Ronaldo Salao**: On June 6, 2025, CDCR admitted that Correctional Officer Ronaldo Salao, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that

aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).

78.    **Defendant 65, Ricardo Salas**: On June 6, 2025, CDCR admitted that Correctional Officer Ricardo Salas, based out of CTF, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

79.    **Defendant 66, Christopher Saldana**: On June 6, 2025, CDCR admitted that Correctional Sergeant Christopher Saldana, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

80.     **Defendant 67, Christopher Salopek**: On June 6, 2025, CDCR admitted that Correctional Officer Christopher Salopek, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

81.     **Defendant 68, Lydia Scott**: On June 6, 2025, CDCR admitted that Correctional Officer Lydia Scott (spelled by CDCR as "Lyndia"), based out of CTF, was a participant in Operation Akili.  She was also identified by an inmate as a participant.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that she was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if she did not, she is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  She is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

82.     **Defendant 69, Alex B. Serrato**: Correctional Officer Alex B. Serrato was identified by Anthony Copeland as a participant of Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); Casey v. U.S. Bank, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

83. **Defendant 70, Jesse Daniel Sesma**: Correctional Sergeant Jesse Daniel Sesma was identified by Frederick Brinkley as participating in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

84. **Defendant 71, Steven T. Slimp**: On June 6, 2025, CDCR admitted that Officer Steven T. Slimp, an OCS officer, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. CDCR further admitted that he was a "search team leader" although it is unclear whether this refers to searching cells (in the inmates' absence) or extracting the inmates, as CDCR fails to provide any designation to clearly indicate which guards

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

performed the extractions.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

85.  **Defendant 72, Cody Spanke**: On June 6, 2025, CDCR admitted that Correctional Sergeant Cody Spanke, an OCS officer, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

86.  **Defendant 73, Johnny Street**: On June 6, 2025, CDCR admitted that Special Agent Johnny Street, an OCS officer, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d

765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

87.    **Defendant 74, Dustin Thompson**: On June 6, 2025, CDCR admitted that Officer Dustin Thompson, an OCS officer, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

88.    **Defendant 75, Orion Valles**: On June 6, 2025, CDCR admitted that Correctional Officer Orion Valles, based at SVSP, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (Starr v. Baca, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

89.     **Defendant 76, Marcelino Valdez**: On June 6, 2025, CDCR admitted that Correctional Sergeant Marcelino Valdez, based at SVSP, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (Starr v. Baca, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

90.     **Defendant 77, Humberto Vera**: On June 6, 2025, CDCR admitted that Sergeant Humberto Vera, based out of CTF, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.   Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). CDCR further admitted that he was a "search team leader" although it is unclear whether this refers to searching cells (in the inmates' absence) or extracting the inmates, as CDCR fails to provide any designation to clearly indicate which guards performed the extractions. He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

91.    **Defendant 78, Carlos A. Vergara**: On June 6, 2025, CDCR admitted that Correctional Officer Carlos A. Vergara, based out of CTF, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

92.    **Defendant 79, Russell Villalba**: On June 6, 2025, CDCR admitted that Russell Villalba, an OCS officer, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

93.    **Defendant 80, Arturo Villalobos**: On June 6, 2025, CDCR admitted that Commanding Sergeant Arturo Villalobos was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive

fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

94.    **Defendant 81, Jason Vinson**: On June 6, 2025, CDCR admitted that Correctional Sergeant Jason Vinson, based at SVSP, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)). CDCR further admitted that he was a "search team leader" although it is unclear whether this refers to searching cells (in the inmates' absence) or extracting the inmates, as CDCR fails to provide any designation to clearly indicate which guards performed the extractions. He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

95.    **Defendant 82, Antonio Virrueta**: On June 6, 2025, CDCR admitted that Correctional Officer Antonio Virrueta, based at SVSP, was a participant in Operation Akili. Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion. Even if he did not, he is potentially liable as a person who supervised

the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

96.      **Defendant 83, Lloyd Wallace**: On June 6, 2025, CDCR admitted that Special Agent Lloyd Wallace, an OCS officer, was a participant in Operation Akili.  Seeing as CDCR claimed on June 6, 2025, and continues to claim, that it cannot identify which specific officials present for Operation Akili extracted each inmate, it is plausible that he was one of the guards who extracted Lawrence Brown in a violent and excessive fashion.  Even if he did not, he is potentially liable as a person who supervised the event (*Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)), conspired to conduct it in the illegal fashion that it was carried out (42 U.S.C. § 1985(3)), or performed acts that aided, assisted, or enabled the wrongs complained of herein (*Meyers v. Redwood City*, 400 F.3d 765, 767 (9th Cir. 2004); *Casey v. U.S. Bank*, 127 Cal.App.4th 1138, 1144 (2005)).  He is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

## DEFENDANT DOES 1-50

97.      Defendants are identified and named according to the best information in the possession of Plaintiff.  Defendant Does 1-50 are an unknown number of additional presumed state guards or other state law enforcement agents.  This complaint will be amended to name all defendants when their exact, correct identity is ascertained.  Some defendant guards actively removed, covered, or concealed their nametags, in order to prevent their identification during the raid.

## AGENCY/EMPLOYMENT/CONSPIRACY ALLEGATIONS

98.     Plaintiff is informed and believes, and thereon alleges, that each of the 50 fictitiously-named defendants is responsible in some manner for the claims, obligations, and damages sued upon herein.

99.     Plaintiff is informed and believes, and thereon alleges, that at all relevant times, unless specifically otherwise alleged, each of the defendants was the agent, servant, and employee of each of the remaining defendants and was at all relevant times acting within the course and scope of his authority as agent, servant, and/or employee and with the permission and consent of each of the remaining defendants.

100.    As detailed by the facts herein, Defendants were in a conspiracy with each other and acted within the larger strategic plan denominated as "Operation Akili," and as such, each are liable for the entire misconduct of the whole operation, as co-conspirators, whether or not each of them understood the full extent and objectives of the plan.

101.    They shared a common plan and scheme to carry out a raid exclusively targeting African-Americans, and in doing so, committed a series of racist torts upon them including to infect them with Covid-19 disease.  They acted in concert, per a plan. Each raided individual was subjected to a similar experience of being dragged out of bed, out of his cell, attacked on some level while being forcibly transported to the central dining hall, required to strip, intentionally threatened and exposed to disease by the abandonment of safety precautions, and then interrogated while his cell was being tossed.

102.    This is what Operation Akili was – a racist, violent attack designed to inflict a mass amount of injury and suffering on the targeted population – on the pretext of being a necessary gang investigation seeking items of validation evidence, the latter presumably pursuant to certain regulations adopted in 15 CFR 3378.2.

103.    Defendants each came to a mutual understanding pursuant to Operation Akili to accomplish their unlawful plan, and one or more of them committed an overt act, and in fact committed countless of them, to further that plan.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## ADMINISTRATIVE EXHAUSTION

104.    Plaintiff satisfied parallel administrative exhaustion requirements prior to filing suit, as reflected by **Table 2** below (for Title 15 CCR § 3480, *et seq.* (aka "602") prison grievance exhaustion), and for **Table 3** Government Code section 910 *et seq.* (aka "DGS") claim exhaustion.

| TABLE 2 – 602 ADMINISTRATIVE EXHAUSTION | | | | | | |
|------|-----------|--------|-----------|------|------------------|--------|
| No | Plaintiff | CDCR # | 602 | Log | 602 Filing Date | Ex. |
| 1 | Lawrence Brown | BJ5119 | 1L Expired[1] | 23996 | 07/30/2020 | Ex. 112 |

105.    **Table 3** below alleges that Plaintiff complied the DGS administrative exhaustion requirements, as follows:

| TABLE 3 – DGS CLAIMS EXHAUSTION | | | | | | |
|-----|----------------------|---------------------|----------------------------|------------------------|-----------------|-------|
| No. | Plaintiff/ Claim No. | DGS Filing Date | Express Rejection Date | Addl/Aug Filing Date | DGS Response | Ex. |
| 1 | Brown, Lawrence Claim: 21001519 | 01/24/2021 | | 05/05/2021 | 07/07/2021 | Ex. 113 |

## STATEMENT OF FACTS

### A.  Attack on Sleeping Black Inmates at Three in the Morning.

106.    Denominated "Operation Akili," on July 20, 2020 at 3 am, while dressed in black tactical gear and led by Warden Koenig, about three dozen CTF and other CDCR officers conducted a coordinated raid exclusively targeting sleeping African-American inmates.

107.    CDCR officials and guards awakened the inmates in the middle of the night, by forcefully pulling them off of their bed, then beating, choking, and/or

---

[1]    Pursuant to 15 CCR 3486(i)(8) and 3486(i)(10), OOA acknowledged receipt of 3L appeal and did not act on the matter within 60 days.  It is therefore exhausted per 15 CCR 3486(m).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

otherwise attacking them, and then assembling them closely together nude or partially nude in a dining hall, notably without any Covid-19 disease protection or social distancing safety protocols applied, despite the fact that CDCR Covid safety policies and protocols had been in effect for over three months.

108. Approximately 100 Black prisoners within the Central Facility were subjected to the raid, one that delivered innumerable injuries, both physical and psychological.

109. Those who carried out the raid, a motley group of correctional officers and prison gang investigators recruited from both inside and outside CTF, victimized the prisoners in both word and deed, delivering horrific and near-constant racial epithets while they delivered physical blows and applied painful zip-tie restraints.

110. Authorities claimed, and continue to claim, that the raid was a necessary response to rising gang activity within CTF. They claim that the prisoners targeted during the raid were involved in such activity, but in reality, large numbers of prisoners were victimized arbitrarily.

111. If they had been gang members in the past, they had severed those ties many years before. Many were middle to late-middle age. Some had been in prison for decades. A significant number were over 55 years old and thus can be considered senior citizens.

112. After being pulled from their beds in the middle of the night and subjected to violence, humiliation, race-based insults and forcible and painful restraint, inmates from the various wings of Central Facility were herded together in Facility C's cafeteria (or Chow Hall) for processing, and then moved to interrogation rooms between D-Wing and E-Wing. There, they were questioned about their ties to gangs like Black Guerrilla Family (BGF).

113. Simultaneously, officials ransacked the prisoners' cells, seeking evidence that supported their belief that the targets of the raid were longstanding, prominent

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

members of these gangs, or at the very least supporters of the Black Lives Matter movement.

114.    At a moment when the Covid pandemic was exploding, and when prisoners were barred from receiving visitors, prison authorities displayed no hesitation in requiring approximately 100 prisoners to wait hours, face-to-face and shoulder to shoulder, often in their underwear and without shoes, for their turn to be interrogated.

115.    Virtually no Covid safety protocols were employed.  The prisoners who asked to retrieve a protective face mask or other protective items from their cell before their transfer to the Chow Hall were denied.

116.    Correctional officers were slack in their own use of face masks, either avoiding the masks altogether or wearing them around their neck or chin as they spoke with other officers and issued instructions to prisoners.  Certain officers openly expressed their hope that the inmates present would contract Covid.

117.    At the same time, the prisoners – a majority of whom were barefoot – had no choice but to make use of a single filthy bathroom with insufficient soap and paper towels.

118.    The same sinister blend of indifference, ignorance and affirmative malice continued in the interrogation rooms positioned between D-Wing and E-Wing, in the southeast corner of CTF Central Facility. *See* Figure 2.

119.    It was here that CTF authorities and gang investigators interrogated the men they had yanked from their beds without warning only several hours before. There was no insistence on face masks, on social distancing, or on the sanitization of surfaces.

120.    Authorities weaponized the Covid-19 virus.  They conducted an in-person, close-proximity event in the middle of the worst pandemic in living memory, in circumstances that maximized the chance that the targets of the raid, nearly all of whom, again, were African-American.  Some would later contract the virus.

121.    There was no necessary reason for the raid in the wake of the larger disease dangers.  Evidence of supposed gang affiliation was certainly not the kind of institutional emergency as compared to avoiding a deadly disease epidemic.

122.    The raid's timing was perfectly disastrous.  The raid offered guards the perfect opportunity to inflict significant pain and suffering on a part of the prison that they wanted to decimate.  Overwhelmingly Black, and with a history of standing up to arbitrary mistreatment through use of the peaceful 602 system, key wings of Central Facility, like D-Wing, were viewed by authorities as areas that needed to be taught a lesson by violence.

123.    Commanding officers openly suggested that they had to "take back" these areas and break the spirit of the residents.  The raid thus gave authorities a pretext to beat the inmates and vastly increase the chances that the inmates would contract a serious illness.

124.    In fact, CTF guards, while removing inmates to the Chow Hall, openly expressed their hope that the involved prisoners would contract Covid-19.  Many of the inmates who survived their contraction and infection continue to wrestle with significant medical problems.

125.    The raid introduced the Covid-19 virus into a closed environment that facilitated its rapid spread.  Prisoners by definition live in extremely close quarters.

126.    Despite the efforts of prisoners and staff, prisons are hardly models of cleanliness.  The dirty communal bathroom that those in the Chow Hall were forced to use after they were dragged from their cells is a good example of what can be found in many parts of Soledad and in other major prisons in California.

127.    Ventilation is generally poor in older prisons in California and at CTF it is known to be especially poor.  Many windows do not open at all, and prisoners report that the vents at CTF are "never cleaned."

128.    On July 20, 2020, CTF guards made sure to maximize physical contact with the inmates, by hitting them, choking them, pulling them, and screaming into their

faces.  They attacked at night, when the inmates' natural defenses were down, when they were fatigued and confused, and when they were more fearful and less resistant to authority.

129.    Authorities prevented inmates from retrieving masks, clothes, and shoes prior to their removal to the Chow Hall.  Masks were the best tool available at the time to combat Covid transmission, so it makes no sense – if officials' putative evidentiary objectives were legitimate – to prevent inmates from taking basic safety precautions.

130.    CDCR was not particularly forthcoming about the raid, even in the wake of pointed protest after it.

131.    On July 21, 2020, the day after the raid, and in response to a public protest by affected family members, Warden Koenig described the raid in these terms:

> The event itself was a result of Security Threat Group (STG) behavior that has been on-going at the Correctional Training Facility (CTF). CDCR does not identify the men racially [!] and those under investigation are suspected of STG activity. STG behavior jeopardizes everyone and especially, puts in harm's way, those who are trying to build better lives for themselves and their families.

> All the staff at CTF are fully committed to those efforts that help the men rehabilitate. There is a great deal of evidence which shows our rehabilitative efforts are successful. STG activity directly opposes the positive actions of the men applying themselves to being good citizens.

132.    In a later memorandum, on November 16, 2020, CDCR validated its actions in largely the same terms:

> We can confirm that an investigation was held as the result of STG behavior that has been ongoing at CTF. The incarcerated people in the investigation were not identified based on their race, and all safety protocols were followed through the investigation. Warden Koenig

> personally toured during the investigation to ensure it was being conducted safely and appropriately. Nobody was harmed and the institution's normal operations resumed quickly.

133.    Warden Koenig's suggestion that no one was harmed during the raid is preposterous. Numerous inmates needed medical care, not to mention the infectious consequences of the event.

134.    The putative purpose of Operation Akili was to collect evidence to "validate" certain African American inmates as gang members (within the assumed meaning of 15 CCR 3378.1, *et seq.*), such that the few rights prisoners still possess could be further deteriorated, their release dates could be delayed, and CDCR could impose other indignities.

135.    Among other punishments, being designated as a validated gang member effectively permits CDCR to segregate such inmates in the equivalent of solitary confinement.

136.    Gang validation, particularly at CTF, involves thorny constitutional issues, because the evidence of validation is not necessarily connected to any wrongdoing. For example, a common item of evidence sought by guards are writings by one George Jackson, who is the founder of the "Black Guerrilla Family" or BGF, a reported prison gang.

137.    The problem is that Jackson was not some sort of mindless thug, but a philosopher and scholar. Reading his writing would not materially deviate from reading some of the Founding Fathers' revolutionary literature.

138.    Penalizing an inmate for possessing academic quality reading material violates basic and important American constitutional rights, can be regarded as some awful Fahrenheit-451 situation with a concluding splurge of reader defamation, and thus

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

gang validation as to certain items as practiced by CDCR represents a legally controversial exercise.[2]

### B. Individual Experiences: Plaintiff and Other Akili Victims
### PLAINTIFF LAWRENCE BROWN

#### 1. Background and History

139.   Lawrence Brown (BJ5119) is an African-American inmate who is currently housed at CTF.

140.   Brown was born in Santa Ana, CA and grew up in Orange County.  He was married at 25 and currently has seven children and 10 grandchildren.

141.   Brown enjoys helping others and notes that his religious faith now informs much of his life.

142.   He denies involvement in gang activity.

#### 2. Attack on Brown During the Raid

143.   The raid was putatively carried out to identify members of major gangs (*e.g.*, BGF members, Crips, Bloods, etc.).

144.   He awoke to a white man screaming profanities in my face ('Don't fucking move! Don't fucking move!')."  He asked the officers what was going on and was simply told to "shut [his] fucking mouth" and "shut the fuck up."

145.   He was also told repeatedly that if he "tried anything" the officers would not hesitate to "fuck [him] up."

146.   He was still trying to wake up and respond when the officer who had been screaming (and was still screaming) pulled him off the top bunk.  Brown crashed into the cement floor knees first, after which the agent pushed him into the cement floor.  His left shoulder and low back were injured as a result.

---

[2]   *See* Zohrabi, Azadeh (2012) "*Resistance and Repression: The Black Guerrilla Family in Context*," 9 Hastings Race & Poverty L.J. 167; *McCabe v. Arave* (9th Cir. 1987) 827 F.2d 634, 638.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

147.    Despite repeatedly telling the officers involved that he was in pain and that he was not resisting, he was pulled out of his cell on his belly – "like I was trash."

148.    Out of a combination of stress, fear, and physical injury, Brown ended up urinating on himself in his cell.

149.    During the raid officers shouted "Fuck Black Lives Matter!" and then high-fived one another.

150.    Like all the other victims of the raid, Brown was transported to the dining room – maskless, shirtless and shoeless – and left there for hours with approximately 100 other Black inmates, sitting shoulder-to-shoulder.  He waited 8-1/2 hours in urine-drenched boxers.

151.    Unsurprisingly, he suffered multiple injuries as a result of the treatment he received by the guards.  He developed pain and mobility issues in both of his knees and wrists as well as in his back, neck and left shoulder.

152.    Brown is traumatized by the de-humanizing elements of his treatment.  This aspect, he implies, was worse than the physical pain.  He suffered nightmares as a result and writes that he "doesn't trust anyone."

153.    Regarding the raid, "...never in my entire life has anyone [so] degraded me, de-humanized me, and violated me."

### 3.  Contraction of Covid-19

154.    Brown contracted Covid-19 on or about July 29, 2020, nine days later.

### VICTIM 1: SHELTON ADAMS

### 1.  Background and History

155.    Shelton Adams (J94864), currently an inmate at CTF, grew up in Modesto, California and was raised by his grandmother.

156.    Adams is African American.

157.    As an inmate, beginning in 2001, Adams embarked upon an impressive path of rehabilitation.  In the years since he has completed well over 60 programs, to the

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

point that he is approaching consideration for release. He was rejected for release in 2017 but will be eligible again for consideration in 2022.

158. As a result of Adams' progress, CDCR guards are incentivized to provoke him into responsive action that would keep him incarcerated and a continuing source of profit and employment for them. This includes labeling him a (dangerous) gang member and otherwise attempting to marginalize, debilitate, and reduce him to a criminal who can be subjugated, continuously incarcerated, and financially exploited.

### 2. Attack on Adams During the Raid

159. The official account of Shelton's function in the July 20, 2020 raid reads as the need to conduct an "enhanced institutional search" of housing units and an investigation of Security Threat Group (STG) persons potentially associated with BGF.

160. Adams' account of the event (provided on July 26, 2020) is as follows, in relevant part:

> On 7-20-20, at approximately 0300 hrs, I was woken up by John Does yelling, "Get your black ass on the ground motherfucker!" I immediately complied and posed no threat to anyone. As I was on the floor, one John Doe stepped on my neck as the other John Doe twisted my arms upwards toward my head severely injuring my shoulders ([with one] arm was pulled out of its socket). When I screamed in pain, one of the assailants mocked, "You niggers are soft." I was lifted up off the floor by my hair and shoved face first into a wall. The blow was so severe, I almost passed out.
>
> I was then taken to the Central Dining Hall. As we were walking, I asked the assailant escorting me, "Sir, can I ask for your name?" The assailant suddenly grabbed me by my neck and slammed me up against the wall and stated, "Motherfucker, you're lucky to be able to walk!"
>
> All of the assailants had their names concealed and were unmasked. I was forced to remain naked in front of everyone. We were forced to violate social distancing protocols. In fact, the assailants were telling us that we

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(Blacks) [would] have Covid-19 by the time this ordeal was over.

161.    Witnesses observed one of the CTF guards place Adams in a headlock as another one pulled his cuffed hands upwards, as if to dislocate his shoulders.  Adams yelped in pain.

162.    They also observed Shelton being dragged down one or two flights of stairs in a headlock, in a pair of boxer shorts, arriving in front of X-Wing cells 101-105. Using his arm as a noose, the officer started choking Adams when they were in front of cell 101, with the officer yelling [to the potential witnesses] "get on your fucking bunks!"

163.    Still, the guard was observed with his back up against a wall and he lifted Adams to the point that he (Adams) was up on his toes and gagging for air.

164.    One witness states that the guards were not utilizing force to abate some threat; they utilized it for the purpose of "sadistic gratification," a well-known side effect of working as a prison guard pursuant to the literature of Philip Zimbardo and his famous Stanford study.

165.    Agents conducting the raid subsequently sought to ensure that witnesses to the attack would not attest to it by implying to the inmates – through conduct – that if they did, retaliation would result.

166.    Adams subsequently underwent medical treatment for various of his injuries.  He suffered problems relating to his shoulders, lower back and wrist, strained his thoracic and endured psychological trauma.

### 3.  Contraction of Covid-19

167.    Shelton Adams was housed in X-Wing during the raid and was forcefully extracted as detailed above.

168.    To the best of Plaintiff's information, Adams did not contract Covid-19 on the day of the raid.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

169. Rather, several months later, while Covid-19 was still circulating around Facility C from the raid, and positive inmates were reportedly being held in G-Wing, on November 18, 2020 CTF guards declared that Adams had Covid-19 and moved him to G-Wing. At the time, he had no symptoms.

170. A few days later, on or about November 21, 2020, while in G-Wing, Adams' experienced Covid-19 symptoms and thereafter tested positive. From his perception, guards intentionally infected him by declaring a false positive.

171. They did deliberately attempt to infect the inmates on July 20, 2020. Whether or not Shelton's later perception of a second attempt to infect him is true or not, it is fair for him to harbor this suspicion.

172. Multiple inmates report that, beyond the raid, guards used their ability to infect inmates as a means of punishment, especially toward ones that filed 602's or took legal action.

### VICTIM 2: ROBERT BLACKWELL

#### 1. Background and History

173. Robert Blackwell is a 34-year-old African-American man, a former inmate of CTF, and a person who was also victimized by the raid of July 20, 2020.

174. He was born in Oakland, CA, attended Parker Elementary, Frick Middle School and Oakland Technical High School. He played basketball for Frick Middle School, football for Oakland Technical High School and Castlemont High School.

175. He is the second youngest of seven children, with four sisters and two brothers.

#### 2. Attack on Blackwell During the Raid

176. On the morning of July 20, 2020, like many of the other victims of the raid, officers rushed into Blackwell's cell, pulled him off his bed and threw him to the ground. They lacked name-tags.

177. While lying on the ground, Robert's arms were wrenched behind him to be zip-tied, at which point he informed the officer involved that he suffered from chronic

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

back pain and that the officer's actions were already causing him great pain.  He received no response.

178.    Blackwell was pushed out of his cell in his underwear, was not permitted to don a mask, and was escorted to the dining hall where he waited to be interrogated for between five and eight hours along with approximately 100 other inmates, all of whom were Black.

179.    He was denied medical care and bathroom access during this period.

180.    No attempt was made to socially-distance the inmates.

181.    During his interrogation, he asked the officers present what the raid was about.  Without hesitation, they responded "Black Lives Matter," in other words, to convey the point that Black lives do not matter.

182.    As a result of the physical abuse during the raid, Blackwell developed sharp pain in his lower back and a rotator cuff injury in his right shoulder.

### 3.  Specific IIED Allegations.

183.    Blackwell reports that he heard an endless string of epithets, with virtually everything ending in "nigger," for example, "This is what we do to gang bangers, like you niggers." He also heard, "Black Lives Don't Matter" and "You're pieces of shit and you'll know that one day."

184.    Regarding masks, he was told (or heard), "You niggers ain't getting no masks," "I hope you niggers catch COVID," and, "We don't give a fuck about you, your freedom or your lives."

185.    From other inmates, Blackwell heard the following, which had been directed to them by various guards: "You niggers ain't shit," "I hate you niggers," "I hope you niggers die," and "You gang bangers are supposed to be tough...this is what you get, you gang bangers are soft as tissue."

186.    Hearing fellow inmates request masks, they – including Blackwell – heard the following: "You niggers don't need shit, you're supposed to be tough," and, "I hope we kill off your population."

187.    Blackwell was humiliated, denigrated, and dehumanized by these epithets.

188.    Blackwell had already been grieving the recent loss of family members. The raid exacerbated his emotions and he was referred to a mental health specialist.  He has experienced anxiety, loss of appetite, insomnia, and an inability to concentrate. He describes feelings of paranoia when in proximity to police officers.

## VICTIM 3: FREDERICK BRINKLEY

### 1.  Background and History

189.    Frederick Brinkley (C79499) is an African-American inmate currently housed at CTF.

190.    Prior to his incarceration Brinkley worked as a ranch hand near Elk Grove, CA.

191.    Following his incarceration Brinkley earned his GED and has completed skills training (and earned certificates) in a wide range of vocations, including landscaping and building maintenance. Ridgeline Construction has expressed interest in hiring Frederick upon his release.

192.    Brinkley was not involved in gang activity at CTF.

### 2.  Attack on Brinkley During the Raid

193.    On July 20, 2020, Brinkley was attacked in his sleep, yanked off his bunk, and slammed to ground.  He was restrained and marched in his underwear – and without shoes or a mask – to the dining hall, where he waited with approximately 100 other Black prisoners for a period of at least five hours until he was interrogated.

194.    No social distancing was practiced.  Prisoners were seated four to a table in several rows next to each other.

195.    Officers in the dining hall were not masked.  Brinkley was able to determine that they were Caucasian or Hispanic.  Every inmate brought to the dining hall, by contrast, was African-American.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

196.   Throughout the event, officers repeatedly stated – with self-satisfaction – that "Black lives don't matter."  Others let prisoners know that they would almost certainly develop Covid-19 after the raid.

197.   When Brinkley asked Commanding Officer Martinez if he could put on some clothing, Martinez responded as follows: "I'm not getting shit for you niggers.  We don't care about you getting Covid-19."

198.   Denigration of BLM, racial epithets, and a desire to see the prisoners develop the coronavirus dominated the conversation between officers, and between officers and inmates during the raid.

199.   Brinkley later developed pain in his back and arm as a result of the raid. He continues to take NSAIDs to help manage it.  He may have suffered permanent tendon damage.

### 3. Contraction of Covid-19

200.   Frederick Brinkley contracted Covid-19 while housed in G-Wing in late October, 2020.

### 4. Specific IIED Allegations

201.   Brinkley suffered severe emotional distress as a result of the raid.  He asserts that the raid was outrageous and unjustified, that authorities seemed keen on helping advance the spread of Covid among the prisoner population, and that he has had constant nightmares since about being dragged out of bed in his sleep.

202.   Regarding the masking of inmates and staff, Brinkley heard C.O. Martinez say, "I'm not getting shit for you niggers, we don't care about COVID."

203.   With respect to Covid, Brinkley heard the following remarks by guards: "We're here to infect you niggers!" and, "You don't need a fuckin' mask!"

204.   Other racial epithets included, "Shut the fuck up nigga!" and "Don't move nigga!"  Brinkley was humiliated, denigrated, and dehumanized by these epithets.

205.   Brinkley was referred to a psychologist. He suffered painful physical injuries to his back, neck, shoulder and wrist – the latter contributing to problems with

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

his right hand. Brinkley asserts that the problems with his right hand have caused him immense stress as a Black inmate because he is constantly required to ask others for help and he believes this conveys weakness. He feels extremely self-conscious and frequently attempts to hide his hand.

## VICTIM 4: TERRENCE BROWNLEE

### 1. Background and History

206.     Terrence Brownlee (C20389) is a 61-year-old African-American man from Fresno, California.

207.     Brownlee, having been incarcerated for more than 40 years, has made several overtures in the past few years to be released from prison, including two appeals in Fifth District Case Numbers F077663 and F079638.

### 2. Attack on Brownlee During the Raid

208.     According to Brownlee:

> On July 20, 2020, at approximately 3:00 am, I was awoken by unknown assailants. One of the assailants grabbed me by my legs and snatched me off the bunk. I hit the floor very hard causing injury to my wrists and back.
>
> As I was lying in a prone position, one of the assailants knocked me from behind, striking me in the testicles and causing severe pain in my testicle and abdominal areas. As I winced in pain, I was forced onto my feet barefoot in my underwear. I overheard the assailants refer to me and others as "niggers."
>
> Once I arrived at the Central Dining Hall, I was forced to remove my boxers and remain naked in front of everyone. Only black prisoners were attacked and [bound] up. The assailants used the derogatory term "nigger" as they spoke to us. They did not have their masks on but I didn't recognize them as they are not regulars here at CTF Central.

209.     Witnesses also observed the attack on Brownlee. According to one, "I recognized Prisoner Brownlee's voice. He was screaming as though he was in a lot of

pain. Brownlee's screams got louder. I heard one of the prison staff shout 'shut the fuck up!' About a second or two later, I saw the prison staff drag Brownlee by his arm and hair between two guards that were directly in front of his cell (135) and hurried him out the building. One staff member had Brownlee by his arm (Brownlee was cuffed behind his back), and the other was pulling Brownlee by his hair."

210.    Another witness heard the prison staff go into Brownlee's cell. "The officers were beating Brownlee up. There was loud bumping and screaming. Brownlee was screaming in pain and one of the officers called Brownlee a 'nigger' and told Brownlee to 'shut the f--k up!' The officers then [dragged] Brownlee out the cell by his hair. Brownlee was on his stomach with his hands cuffed behind his back. The officers [dragged] Brownlee in-between some tables that's right in front of our cells and on out [of] the building."

211.    Brownlee reported injuries to his lower right ribs, shoulders and wrists. He also began to have trouble swallowing and experienced painful consequences from being kicked and punched in the ribs. He was still reporting pain as of September 6, 2020, a month-and-a-half later.

### 3. Specific IIED Allegations.

212.    Brownlee suffered severe emotional distress following the raid. He contends that the raid was unjustified and discriminatory and was intended to help spread Covid among the prisoner population. He is clear that the officers who pulled him out of his cell employed racial epithets. He heard guards state clearly that they "did not give a fuck" about inmates contracting Covid-19. He adds that some of his fellow prisoners have made declarations on his behalf that refer to the racial epithets employed by staff on July 20, 2020.

213.    Following the raid, Brownlee was referred to Mental Health and began seeing Dr. Hall for various psychological symptoms that he attributes directly the raid. Dr. Hall informed him that he has post-traumatic stress disorder (PTSD), the symptoms of which frequently include nightmares, depression, anxiety and avoidance behaviors.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## VICTIM 5: DANNY CAMEL

### 1. Background and History

214.    Danny Camel, age 57 and African-American, is a current inmate at CTF.

215.    Camel identifies as Black/Mexican but stresses that he grew up among the African-American members of his family.  He has five children.

216.    Danny is close to completing a program at Hartnell College and is currently maintaining a GPA of 3.2.

### 2. Attack on Camel During the Raid

217.    Following the entry of officers into his cell at roughly 3:30 am on July 20, 2020 (with their names obscured), Camel was treated abusively.

218.    Following instructions to lie on a mattress on his stomach, Camel was then pulled off his bed violently, an action that caused injury to his left shoulder.

219.    He was roughed up against the wall of his cell and then zip-tied. The zip-ties were so tied that his hands turned purple.

220.    Like other inmates, Camel was not permitted to put on his shoes or retrieve a face mask prior to departure from his cell.

221.    Danny was escorted, barefoot, to the dining hall, and had to use a "nasty, unclean, dirty restroom" in his bare feet despite the severity (and ubiquity) of the Covid-19 virus.

222.    He was traumatized by the incident (and had to attend counseling), suffers chronic insomnia as a result of the raid, and has persistent pain in his left shoulder, the result of being yanked out of bed with extreme force.

223.    His shoulder joint was pulled further than it should go.  His injury is most likely a rotator cuff tear or a torn ligament or tendon.

### 3. Specific IIED Allegations.

224.    Camel suffered extreme emotional distress after the raid. He was convinced the raid had no real purpose and was discriminatory and believed that it was intended to help spread Covid-19 among the prisoners.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

225.    Camel experienced severe insomnia for an extended period of time following the events of July 20, 2020.  He was forced to consult Mental Health.  He was greatly distressed by the fact that he was forced to take pain medication for more than two years afterward.

## VICTIM 6: DWAIN CAMPBELL

### 1.  Background and History

226.    Dwain Campbell was born in San Francisco.  At around three years of age moved to Sacramento. He was raised in a neighborhood called Del Paso Heights.

227.    He received his GED in 2008 at High Desert State Prison.  He is a born-again Christian.

228.    Campbell views the July 20, 2020 raid as driven by racism, by a fear and hatred of the Black Lives Matter (BLM) movement.

### 2.  Attack on Campbell During the Raid

229.    For Campbell, at roughly 0300 on July 20, 2020, he was violently pulled from his bunk and slammed to the ground by two corrections officers. One of the pair then placed his knee in the small of Mr. Campbell's back.

230.    When Dwain complained, indicating that he had a chrono for waist chains, the immediate response was simply, "Shut up you nigger!" His hands were zip-tied behind his back and he was dragged out of his cell.

231.    Wearing nothing but his underwear, Campbell was placed with roughly 100 other Black inmates in the dining hall/kitchen (or "chow hall"). He remained restrained, and in significant pain, for the next eight hours.

232.    Campbell suffered notable injuries as a result of his experience, which, as was the case with all the other Black victims of the raid, he had done nothing to provoke.

233.    His left knee and the small of his back were injured and the officers involved managed to re-injure his right shoulder. In addition to shoulder pain, back pain, and knee pain, Campbell developed PTSD.

## VICTIM 7: MAURICE CAPLES

### 1. Background and History

234. Maurice Caples was born and raised in Los Angeles.

235. Caples contends that he was designated a member of the Crips Rolling 100s by prison authorities at the end of July 2020, but denies any and all involvement in gang activity. He suggests that his current affiliation with the Crips is based entirely on old tattoos and a probation report from 1999.

236. Caples labels the July 20, 2020 raid as sadistic and malicious and points to it as evidence of entrenched bias and racist and discriminatory practices on the part of prison officials.

### 2. Attack on Caples During the Raid

237. Maurice claims that officers entered his cell while he was asleep, jumped on his back, pulled him out of his cell, and then restrained him violently. He adds that he was wearing nothing but the clothes he went to sleep in, and that after he was assaulted and restrained he was not permitted to retrieve shoes or a face mask prior to being escorted to the dining hall.

238. After being dumped in the dining hall with other Black prisoners, Caples spent roughly five-and-a-half hours in pain, waiting to be interviewed.

239. Caples notes that he suffered significant injuries as a result of the raid, including a swollen wrist (from the zip-ties) and severe back pain from corrections officers "...jumping on [his] back with force."

240. Caples notes that he was denied immediate treatment after the raid, though he did receive care at a late date. He adds that he was denied access to the restroom for the duration of his time in the dining

241. Caples expects to be paroled at some point in 2021.

### 3. Specific IIED Allegations.

242. Caples suffered severe emotional distress after the raid. He heard a seemingly endless string of insults and epithets during the raid, including, "Shut up

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

motherfuckers" and "Black Lives Don't Matter today."   Caples was humiliated, denigrated, and dehumanized by these epithets.

243.    Caples reports feeling extreme fear every time his door pops open unexpectedly.  He feels greatly distressed by the fact that the raid resulted in his file being altered to reflect his supposed membership in BGF, which is something he denies vigorously. Caples was traumatized by the raid, which he feels had no purpose other than to support a false narrative about his (and others') supposed gang loyalties.

## VICTIM 8: ANTHONY CHAMBERS

### 1.  Background and History

244.    Anthony Chambers (V54958), age 37 and African-American, is an inmate at the Correctional Training Facility in Soledad, CA.

245.    Chambers is a native of Los Angeles. He attended Lancaster High School, where he played basketball, and he also spent a year at Lancaster College.

246.    His affiliation with a gang, and his supposed security threat status, is entirely invented.

### 2.  Attack on Chambers During the Raid

247.    Chambers believes the raid the result of a number of factors affecting CTF staff coming together: cruelty, sadism and racism.

248.    He was awakened by "wannabe" commandos, OCS Teams, and other state officials who assaulted him and utilized racial slurs against him.

249.    He was pulled from his bunk, slammed against the wall of his cell, and handcuffed tightly.

250.    He suffered bodily injury and was informed by them that they were being exposed to the COVID-19 virus.

251.    He, his cellmate, and other Black inmates were referred to as "niggers," repeatedly.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

252. Medical treatment was not summoned for prisoners injured in the raid and that he and other Black inmates in the dining area were denied timely access to the restroom.

### 3. Specific IIED Allegations.

253. Chambers states that while the raid was in progress, he and his cellmate were repeatedly referred to as "niggers." He is thus adamant that the raid was driven by racial animus and fear of the BLM movement. Like most of the other inmates, Chambers observes that it had no real purpose beyond basic anti-Black racial bias. Chambers was humiliated, denigrated, and dehumanized by these epithets.

254. Chambers was diagnosed with PTSD following the raid and suffered severe insomnia. He was distressed by the fact that he was forced to received ongoing medical treatment for both physical and psychological injuries.

### VICTIM 9: DANIEL COLVIN

### 1. Background and History

255. Plaintiff Daniel Colvin (G45255) is a 35-year-old African-American inmate of the Correctional Training Facility (CTF) at Soledad, CA.

256. Colvin was born and raised in Los Angeles. His father, mother, and little brother continue to play a central role in his life, despite his incarceration.

257. The two dominant interests in his life are sports and computers. Colvin played football in high school and was, for a period of time, enrolled at West LA College, where he studied Computer Science.

258. Despite having no history of gang involvement or affiliation, Colvin was, post-raid, validated as an STG II based on a false allegation made during his sentencing phase of his trial.

### 2. Attack on Colvin During the Raid

259. Like most of the other Black victims of the July 20 raid, Colvin was ripped from his bunk while still asleep. Guards entered his cell without warning.

260. Colvin crashed to the cement floor. In shock, and sitting on the cement, he asked, "What the fuck is up?" The response was immediate – "Black Lives Matter. That's what the fuck is up."

261. Colvin reports that he was "dragged by his feet to the tier," after which he was thrown up against a wall and restrained. and from there he was escorted to the dining hall.

262. Like other Black inmates attacked and then dumped in the dining hall, Colvin was not wearing shoes or socks and was clad in his boxer underwear. Unlike other inmates, Colvin, at some point, managed to put a shirt on.

263. Daniel says he was strip-searched in front of inmates and guards in the dining hall.

264. When one of the inmates called out, "This isn't right. We have rights," the response was immediate: "That Black Lives Matter bullshit don't matter here."

265. Daniel waited with approximately 100 other Black inmates in the dining hall for hours, restrained and in pain, until he was finally questioned and allowed to return to his cell.

266. Upon his return, all of his paperwork was missing. It was eventually returned, along with a validation packet. Colvin's validation (which relied on his tattoos, two old photos, and the false accusation made during sentencing) was entirely retaliatory.

267. Colvin suffered from lingering pain after the July 20, 2020 raid. When he finally visited medical a week later, he was told to stretch.

### 3. Specific IIED Allegations.

268. For Colvin, the raid was discriminatory and racially-motivated. It had no defensible purpose beyond a desire to brutalize CTF's Black population both physically and psychologically.

269. Colvin was (and remains) dismayed by the racial invective he and his fellow Black inmates were subjected to. The derogatory comments were ceaseless

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

according to Colvin, and, over the course of the raid, he heard innumerable variations of "That Black Lives Matter bullshit don't matter here."   Colvin was humiliated, denigrated, and dehumanized by these epithets.

270.    Colvin suffered emotional distress during the raid, particularly when he was ordered to strip naked in the Dining Hall in front of all the other inmates and a number of officers.  He found this embarrassing and offensive.

271.    Colvin suffered psychological distress, in addition to obvious physical risk, by at least three elements: denial of medical treatment, lack of social distancing (a source of much understandable anxiety), and a failure to follow any standard Covid protocols (proper use of masks, etc.). This caused Colvin enormous emotional upset and concern, as is clear from the 602 he filed after the raid.

## VICTIM 10: ANTHONY COPELAND

### 1. Background and History

272.    Anthony Copeland is 55 years old, African American, and a former inmate at CTF.  He was born in Cincinnati, Ohio, but raised in Oakland.

273.    Copeland grew up in a single-parent household.  His father has never been present in his life.

274.    Anthony never finished high school but managed to earn a living doing landscaping and warehouse work.

275.    He is interested in giving back to the community, helping average people connect more fully with God, and – someday – owning his own landscaping business.

276.    He denies involvement in gang activity and claims he has no idea what was behind the July 20, 2020 raid on Black inmates of CTF.

### 2. Attack on Copeland During the Raid

277.    Anthony offers the following description of what happened to him on the morning of July 20, 2020: "At approximately 3:30 in the morning, while sleeping, I was bum-rushed ... by two squad officers pinning me down in my bed, twisting my arms, and pressing their knees in my back."

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

278.    In a separate statement outlining his experience, Anthony indicates that one of these officers jumped heavily on his back, using his full weight. All of the bending, pinning, twisting and cuffing eventually re-aggravated existing injuries and caused new problems.

279.    "I continued to tell the officers they were hurting me … I have a bad shoulder and back – but they continued to show me no concern, dragging me and pulling me out of my bed without allowing me to put on any clothes or my shoes or my mask to protect me from Covid-19."

280.    "I tried to explain to the officers that I have diabetes and have foot pain and I need my shoes. Once again the officers showed ... no concern for my medical condition and continued to pull or walk me down the hallway towards the dining hall, [where they put me] with about a hundred other inmates with no mask on."

281.    Anthony suffered significant injuries as a result of the raid, particularly what he refers to as improper, overly-tight cuffing.  He developed severe pain and swelling in his shoulder and back.

282.    Eventually, another officer (a "Mr. Brown") eventually showed him a bit of mercy, and "loosened the cuffs and put me in two cuffs to help stop the pain in my shoulder and wrist." The double-cuffing relieved some of the pressure on his shoulder and arm.

283.    Copeland describes the officers (roughly 40 in total) as "very disrespectful" and says that, for the most part, they "showed no concern [for] the pain I was in."

284.    When he requested medical attention and spoke of his pain, they responded, "'Stop complaining and sit down.'" Copeland is clear that with 40 or so officers on hand, implementing proper social distancing and use of masks, while maintaining security, would have been relatively simple.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

285.    Anthony was initially given an ice pack and NSAIDs to help with his pain and swelling, but this proved insufficient and he was eventually prescribed Cymbalta (duloxetine), which is a combination antidepressant and painkiller.

286.    His shoulder issue appears to be chronic.

287.    Anthony was traumatized by the incident and has had trouble sleeping ever since. He also received counseling.

288.    He reports that he now sleeps fully-clothed (in case of a repeat event), is attuned to the sound of jangling keys, and is constantly awake at night, so often, in fact, that authorities have come to rely on him as a witness when security incidents occur at night.

## VICTIM 11: CHRISTOPHER COX

### 1. Background and History

289.    Christopher Cox, age 53, is an African-American inmate currently housed at Salinas Valley State Prison.  His CDCR number is V73527.

290.    Cox was raised in a single-parent household and is the youngest of six children. He was born in Alabama and raised in Los Angeles. He is close with a number of his siblings.

291.    At the time of his arrest, he ran a successful cell phone business and worked as a personal trainer. He is also credited on some music projects released commercially.

292.    Cox denies all gang involvement and suggests that the driving force behind the July 20, 2020 raid was a "hatred toward Blacks."

### 2. Attack on Cox During the Raid

293.    Cox's experience on the morning of July 20, 2020 mirrors that of other victims of the raid.

294.    He was yanked off his bunk onto the cement floor, held down, kneed in the back, and cuffed (with zip-ties) "very violently."

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

295.    He was dragged to the dining hall and left in the company of a large number of other Black inmates who had been similarly treated.  He was stripped naked and not permitted to retrieve or obtain a protective face mask.

296.    He was questioned arbitrarily, and without realizing that the questioning was designed to help support validation of prisoners on a large scale.

297.    Once Christopher's questioning was completed ("...after hours of being naked and tightly cuffed"), he returned to his cell, only to find personal property such as his television and CD player broken (or "trashed") and his paperwork missing.  Officers apparently seized a photograph of Cox's deceased mother that, even as late as early 2021, had not been returned.

298.     Cox's back and right ring finger were injured as a result of being "roughed up and assaulted."

299.    Cox was repeatedly called a "nigger."  He also heard guards use the phrase, "Fuck you, Black gang bangers" on at least one occasion.

300.    Officers involved took steps to conceal anything, particularly their name tags, that might identify them.

301.    Officers repeatedly informed the Black prisoners inside and outside the dining hall that they, the prisoners, had been exposed to Covid-19.

### 3.  Specific IIED Allegations.

302.    Cox suffered severe emotional distress in the wake of the raid. He asserts the raid had no purpose beyond a desire to spread Covid among the prisoners and that it was driven by racist sentiments.

303.    He offers the fact that none of the victims of the raid were allowed to don a protective mask or even put on a pair of shoes. He heard racial epithets "all night," and distinctly remembers a C.O. saying, "I hope all you black gangbangers catch Covid and die."  Cox was humiliated, denigrated, and dehumanized by these epithets.

304.    Cox sought medical treatment afterward and was diagnosed with PTSD by a psychiatrist. He adds that he has "…been dealing with…depression due to what

occurred here still to this day," and indicates that the raid took its toll "pain-wise, emotionally."

### VICTIM 12: BERLAN DICEY

#### 1. Background and History

305.    Berlan Dicey, 45 and African American, is currently housed at CTF.

306.    Dicey, born in Rancho Dominguez, CA, comes from a large family.  He is the youngest of seven children. His father was a veteran of World War II and a former police officer. After his mother and father divorced, the family lived in many different towns and cities in California.

307.    Dicey had hopes of a career in engineering or music, but with his ongoing incarceration, he now hopes to make a difference by speaking to and/or working with youth.

308.    He denies any and all gang involvement.

#### 2. Attack on Dicey During the Raid

309.    The raid of July 20, 2020 was driven both by racial animus and fear of (and hostility toward) BLM.  He says that when he was questioned on the morning of the raid, the questions revolved around BLM recruitment (if any) at CTF.

310.    Dicey offers the following picture of the raid: he heard noises in the early morning hours of July 20, 2020, then looked out his window and saw a multitude of officers in "commando" type gear, and with lights on their helmets, running and preparing for activity.

311.    Some of these officers entered Dicey's cell, grabbed him by the head, arms and shoulder, and "violently slammed [him] into a concrete wall" before zip-tying his hands extremely tightly.  He was elbowed in the nose and mouth in the process.

312.    The officers' name tags, and their faces, were covered.

313.    He was escorted to "two or three Salinas Valley State Prison (SVSP) officials" and then, "out of nowhere," he says he was kicked, punched and thrown to the ground ("stomped on" as he puts it).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

314. He was picked up by the zip-ties, and, without his feet touching the ground, his penis and groin were touched as the officers carried him down the stairs.

315. Dicey hurried along the hallway and into the dining hall, where "80 to 100 Black men, no mask, [were] crammed together."

316. Dicey began to express his anger and rushed out of the dining hall but was immediately grabbed and beaten by two security officers who delivered multiple blows and had Dicey's genitals pressed up against a steel heater.

317. Dicey was then placed in a holding cage for upwards of 3-1/2 hours. The zip-ties cut off all circulation and caused intense shoulder pain. They remained in the place for the duration of the raid.

318. Dicey was then interrogated thoroughly and threatened throughout the process.

319. He eventually sought medical attention on the orders of a nurse (who saw the condition of his right hand after the zip-ties were finally cut off); however, once he finally arrived, medical care was denied.

320. Five days after the raid, Dicey finally received medical care; he was prescribed standard painkillers and topical creams for injuries to his stomach, groin and other areas. He received physical therapy. An ultrasound was performed.

### 3. Specific IIED Allegations.

321. Dicey views Operation Akili an exercise without legitimate purpose, driven by racial animus and a desire to retaliate against inmates, partly for filing 602 and other complaints against certain officers. Officials attacked inmates en masse, for discriminatory reasons. They called them "niggers." The warden was a willing participant; Dicey heard him yelling "good strike" as he, Dicey, was being hurried down the main corridor to the dining area.

322. Dicey suffered great psychological pain from the raid. He was violated sexually when guards painfully grabbed his penis and groin. He was subjected to

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

immense verbal abuse (particularly from Defendant Villalobos), much of it racial in character.

323.    He suffered immense "mental anguish, deep grief, distress, anxiety and fright."   He was placed in painful hand restraints and confined to a cage for at least three-and-a-half hours, which generated feelings of anger, despair and hopelessness.

324.    According to Dicey, one officer repeatedly called him a "motherfucker" and instructed fellow officers to "dump him head first" if he moved in any way. Dicey experienced immediate and lasting fear as a result.  Dicey was humiliated, denigrated, and dehumanized by these epithets.

325.    Dicey alleges that he was treated disrespectfully and denied medical treatment, a source of significant anxiety.

326.    The injuries Dicey sustained in the raid interfered with his ability to sleep soundly in his bunk.  Eventually he found it slightly easier to sleep on the floor. Unfortunately, he found that his cellmate's use of the toilet resulted in urine contaminating his sleeping area (on the floor).  The raid, in short, caused physical injuries to Dicey that resulted in sleep disruptions, anger, frustration and profound personal humiliation.

327.    Dicey consulted Mental Health after the raid and, as of July 24, 2020, was taking medication prescribed for anxiety.

### VICTIM 13: RICKY DUNCAN

#### 1.  Background

328.    Plaintiff Ricky Duncan was born in Dallas, Texas.  He notes that his family is spiritual and that he has benefited enormously from their unconditional love. His family moved to California when Ricky was 13.  Upon his release from prison, he plans to dedicate himself to helping children.

329.    Duncan is clear that he has never been involved in gang activity and notes that he was validated as a member of BGF almost solely on the basis of the fact that the

bookmark in his copy of the Quran had a picture of a monkey on it. Authorities, he says, took this to be a gorilla and thus a symbol of BGF.

### 2. Attack on Duncan During the Raid

330.    According to Duncan, he was in a deep sleep when he heard noises and was suddenly yanked off his bunk by unknown assailants and slammed to the ground, resulting in an injury to his back and severe physical pain.

331.    He was then pulled out of his cell by his arms, an incredibly painful experience. Just prior to being pulled off his bunk, he believes he recalls the officers shouting, "Get the fuck up!"

332.    In or near the day-room, one of his assailants, who was masked, had his knee in Duncan's back. Duncan informed his assailant that he had Paget's disease, a degenerative bone disease, and that he was especially vulnerable to pain and permanent injury. The assailant, he says, ignored him and applied greater pressure. He then asked Duncan the question, "Do Black lives really matter?" but then answered the question himself, responding, "No."

333.    Duncan notes that he had serious pain when walking after the raid and was given a cane to assist him. Even so, he did not receive medical attention until three days after the raid. He was eventually hospitalized for a knee replacement.

### 3. Specific IIED Allegations.

334.    Duncan states that the raid had no purpose. It was aimed at inmates strictly on the basis of race, and that it was also intended to spread Covid-19. A guard asked him rhetorically, "Do Black lives really matter?" and then answered his own question – "No" – before starting to laugh hysterically. "Black people," the same guard added, "do nothing but complain." Duncan was humiliated, denigrated, and dehumanized by these epithets.

335.    When an inmate in the Dining Hall asked a coughing C.O. to put on a mask, the guard responded by saying, "Shut up before I cough on your ass."

336.    Duncan indicates that he has received therapy.  Like many other victims of the raid who experienced trauma and subsequent emotional distress, Duncan has had significant sleep issues that stem from his experience on July 20, 2020.

### VICTIM 14: RAHSAAN FITZGERALD

#### 1. Background and History

337.    Rahsaan Fitzgerald (H08881) was born May 15, 1973.  He is African American and currently incarcerated at CTF.

338.    Rahsaan was born and raised in Long Beach, CA. He comes from a large extended family and also has a daughter and a grandchild.

339.    Since his incarceration he has dedicated himself to auto mechanics and welding but, more recently, he has sought to become a drug and alcohol specialist through the Stratford Career Institute. He is interested in helping young people find their way in life – or, as he puts it, "helping people find ways to help themselves."

#### 2. Attack on Fitzgerald During the Raid

340.    Fitzgerald is adamant that the July 20, 2020 raid was "racially-motivated"; again, following the raid itself, Fitzgerald was questioned extensively about the prevalence of BLM inside CTF.  He remembers one question in particular ("How do you feel about BLM?") that led him to conclude that the raid was "racial by design."

341.    Fitzgerald woke up at approximately 3:30 am on July 20, 2020 with officers on his back, pulling his arms violently behind him. They plexi-cuffed him, causing him tremendous neck and shoulder pain in the process. The cuffs were extremely tight.

342.    Fitzgerald was walked to the dining hall without a mask and forced to take a seat and wait prior to his interrogation many hours later.

#### 3. Specific IIED Allegations.

343.    Fitzgerald remains extremely distressed by the fact that he was treated "like an animal" during the raid.  He worries constantly that he is going to experience retaliation for his participation in the present lawsuit.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

344.    The raid was driven by racism, Fitzgerald believes, and had no purpose other than to help support false claims that various inmates remained active members of various gangs. Following validation, far fewer of this group of inmates would qualify for release.

345.    Fitzgerald heard officers using phrases like "Fuck Black Lives Matter." In the Dining Hall he heard others saying, "Fuck you niggers." Fitzgerald claims that one officer said to several others something to the effect that, when it comes to guys complaining about the lack of masks, "…they don't have to worry, because we're giving it [Covid-19] to them all!"

346.    Fitzgerald states that at least one fellow inmate told him that, prior to entering his cell and extracting him violently, one C.O. said to the others, "Get that nigger Fitzgerald, he wrote me up" – a reference to the fact that Fitzgerald had submitted a 602 previously complaining about the C.O.'s conduct.  Fitzgerald was humiliated, denigrated, and dehumanized by these epithets.

347.    Fitzgerald has had to attend draining physical therapy to help him recover from his physical injuries. He has had to speak with a psychiatrist to help him deal with the lingering trauma of the raid. Fitzgerald was embarrassed and humiliated by having to be naked in front of his fellow prisoners – and staff – for hours on end.

348.    Efforts to have Fitzgerald validated as a gang member caused him immense stress, especially when it was time for him to appear in front of the Parole Board.  Whenever he hears the jangling of keys, he immediately thinks that they are "coming to mess with [him] again." In short, he remains emotionally scarred by the incident.

### VICTIM 15: RICKY FONTENOT

### 1.  Background and History

349.    Ricky Fontenot is from Los Angeles, is married and has three children. Prior to his arrest he had his own security company, South Central Security, and also worked in construction.

350. Fontenot was a member of a street gang as a teenager but claims that CDCR chose to affiliate him with the Crips, after the raid, in order to cause problems for him with the parole board. Fontenot believes that this is a standard CDCR strategy and that the agency regularly "messes with" inmates and their status to "keep [them] from getting a [release] date."

351. Fontenot opines that racism and prejudice toward Blacks drives almost everything CDCR does.

352. Fontenot was convicted of gun possession. During a police stop, officers claimed they found a gun where Fontenot had been sitting in the vehicle. He expects to be paroled sometime in 2021.

## 2. Attack on Fontenot During the Raid

353. Ricky first heard shouting. The next thing he knew his cellmate was being pulled from his bed by three or four guards, after which he himself was pulled from his bed with even greater force. He eventually fell out of the top bunk.

354. All he recalls is being yelled at: "Sit up and show your hands!"

355. His right knee became swollen after the raid and he was filmed by Sgt. McDonnell. He received no medical care of any kind at the time of the raid and implies that he received none later.

356. Fontenot asserts that all of the post-raid gang-oriented affiliating and validating was nothing more than an attempt on the part of CDCR to justify the violence associated with the raid.

357. CDCR essentially created the gang investigation as a pretext for the physical and psychological abuse they inflicted upon the inmates. The attitude of authorities was replete with prejudice and that their chief goal at all times was to "mess with the Blacks."

## 3. Specific IIED Allegations.

358. Fontenot suffered extreme emotional distress as a result of the raid. He is adamant that the raid was a pointless exercise designed to abuse CTF's Black population

and spread Covid among the prisoners.  He still suffers nightmares in which he is dragged out of bed in his sleep.

359.   Fontenot heard the word "nigger" constantly during the operation, for example. "Shut the fuck up nigger," and "Don't move nigger!"

360.   When he mentioned the need to wear a mask as protection against Covid transmission, he was told, "Don't worry about a damn mask!" He heard a number of variations on the same insult or threat: "You don't need a mask or shoes, we don't give a shit about you getting infected."  Fontenot was humiliated, denigrated, and dehumanized by these epithets.

361.   Fontenot believes that being validated as a gang member cost him a date with the Parole Board.

## VICTIM 16: MARVIN FOSTER

### 1.  Background and History

362.   Marvin Foster (J14305), 52, is African American and a current inmate at CTF.

363.   Foster was born in the Virgin Islands. He was raised in a two-parent household along with nine siblings: five brother and four sisters.

### 2.  Attack on Foster During the Raid

364.   Foster was told by prison officials that they were interested in identifying and rooting out members of BGF.

365.   According to him, "commando" style officers rushed into his cell around 3 am on July 20, 2020.  They pulled him out of his bunk with extreme violence, threw him down onto the cement floor of his cell, placed their knees on his neck, back, shoulders and legs to subdue him, and then wrenched his arms behind his back to cuff him.

366.   Marvin suffered a sprained shoulder as a direct result of these actions. His left pinky was dislocated and both his armpit area (on both sides) and wrists were bruised and purple.

367.   Foster heard the following statements, repeatedly: "Fuck you niggers!" "Fuck Black Lives Matter!" "Fuck your family members who are protesting!" and "I hope you get Covid!"

368.   Marvin says he received no medical treatment initially and was in excruciating pain for an extended period of time. Two days later he received X-rays, a sling for his shoulder, and codeine- and ibuprofen-based painkillers. His right shoulder was sprained and he had a flexion deformity of his finger. He received mental health care for both trauma and anxiety.

## VICTIM 17: MARCELLE FRANKLIN

### 1. Background and History

369.   Marcelle Franklin in a 50-years-old Black man who has three children and two grandchildren.  He loves movies and football and adds that his passion is raising birds.

370.   Franklin claims that ISU/IGI organized a "fake hit list" to justify the attack on July 20, 2020.

371.   The purpose of the raid, he stresses, was intimidation, harassment and assault.  Officials manufactured an opportunity to rough up the inmates and believed that they would not ask questions later.

### 2.  Attack on Franklin During the Raid

372.   He was attacked at roughly 3:30 am, pulled from his bunk and placed in zip-ties, after which he was transported in the dining hall. He spent over 6 hrs. there "in nothing but my underwear."

373.   The commanding officers who attacked him were not wearing name tags. He adds that the inmates in the dining hall did not have masks on and were refused immediate medical treatment.

374.   Franklin suffered a number of injuries as a result of the raid, including to his lower back and left knee. He was seen in medical on a later date.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

375. Officers who were present during the raid, and who escorted the Black inmates to the chow hall, included COs Perez, Luna, Brown and McDowell, used racial epithets, including the word "nigger," during the process.

### 3. Specific IIED Allegations.

376. Franklin is clear that the raid caused him severe emotional distress. He regards it as a racist act and one that had no point beyond brutalizing CTF's Black population and spreading Covid-19. Franklin indicates that immediately after raid concluded he heard guards deliver insults aimed at the victims of the raid, including statements like, "Black Lives Don't Matter."

377. Franklin notes that guards made a point of going maskless in order to ensure that, if any of them had Covid-19, the virus would be transferred to the inmate population (which, at that time, was entirely Covid-free). He claims that guards were laughing at the notion that more should be done to protect inmates' health. Franklin says that guards told the inmates, "You get free medical, so you're good!" Franklin was humiliated, denigrated, and dehumanized by these epithets.

378. Franklin asked to be seen by Mental Health but says that the counselor he sees is "no help" because that individual is also a CDCR officer, like all the other members of staff.

379. Franklin's trauma interferes greatly with his ability to sleep. Hearing footsteps in the early morning and seeing flashlights in darkened areas cause him to experience significant anxiety, as both remind him of what he experienced on July 20, 2020.

### VICTIM 18: ERIC FRAZIER

### 1. Background and History

380. Eric Frazier was born in 1965 and raised in Long Beach, California, and is the father of three boys and one girl. He attended Long Beach Poly, where he earned his G.E.D. Later he coached kids' football and baseball and reports that he has a great relationship with kids.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

381.     Prior to his incarceration, Frazier worked in maintenance services, a family business.  He has used this experience to help his children and grandchildren establish businesses of their own.

382.     In the wake of the raid, Frazier was evidently validated a member of both BGF and the Crips.  This, he claims, is impossible and highlights the absurdity of the raid and the entire anti-BGF effort.

383.     The atmosphere at CTF prior to the raid was good.  Gang activity was minimal and there was "no tension with the COs."  Echoing other inmates, "everyone was programming," by which he means that the Black inmates were participating in programs to earn the right to be released as quickly as possible.

384.     Frazier qualifies for parole under the CDCR's Elderly Parole Program and expects to be considered for release within the next two years.

### 2.  Attack on Frazier During the Raid.

385.     Frazier awoke around 3 am to the voices of several commando-like officers telling him to "get down."  None of the group was wearing name-tags.  When he asked for a moment to retrieve his face mask, the group rushed in and grabbed him around the neck and the legs and pulled him to the ground.

386.     With one of the officers grabbing him around the neck, Frazier continued to ask for an opportunity to put on his mask.  Eventually he was told, "Fuck you – you're gonna have Corona after this."

387.     As he lay on the ground, Frazier told the officers that his back was in pain. The officers hurled epithets and insults, zip-tied his hands and feet, and threw him into the corridor.

388.     Frazier's suffering so great that he was not transported to the dining hall but went straight to medical.  Medical personnel ordered a commanding officer to remove his wrist ties, after which he was then placed in a wheelchair and transported for medical treatment.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

389.    Frazier suffered back injuries.  He is currently taking at least 600mg ibuprofen per day and was, until recently, receiving physical therapy.

### 3.  Specific IIED Allegations.

390.    Like many other inmates, Frazier experienced extreme distress as a direct result of the operation.  He has no doubt that the raid was fundamentally racist and that officials used the raid as a means to spread Covid-19 among the inmate population.

391.    Frazier heard "nigger" repeatedly along with various references to "you people." Other inmates told him that they had been referred to as "niggers."  Frazier was humiliated, denigrated, and dehumanized by these epithets.

392.    He was told by at least one guard that he would have Covid after the raid concluded.

393.    Frazier says his sleep is broken and that he wakes up repeatedly thinking that officers are coming again.

### VICTIM 19: JONATHAN HAMILTON

### 1.  Background and History

394.    Jonathan Hamilton (F37508), 37, is mixed-race (Black and White) and is currently an inmate at CTF.  He provides tattoo and fitness training services to his fellow inmates.

395.    He obtained his GED while incarcerated, has completed many different self-help programs and courses, and aims to help youth find the right path in life.  He notes that he entered the prison system as a juvenile offender and understands how it feels to be "lost" in life.

396.    Hamilton's mother's connection to (or sympathy with) criminal activity led directly to his own incarceration later, "...as I was young and influenced by my mom and peers at a young age."

397.    He denies that he is associated in any way with gang activity, as he gave all that up in 2009.

### 2.  Attack on Hamilton During the Raid

398.    At around 3 am, he "woke up and [then] got raided and beat by the police for no reason." He was yanked off his bunk, thrown to the ground, "struck numerous times," and dragged out his cell before his hands were bound "so tight they turned purple." The lack of blood flow eventually became so serious that the zip-ties had to be cut off.

399.    He received a validation packet later and was classified as STG II.

400.    He was "escorted around with no mask [or] shoes" and was in his underwear through the raid and his time in the dining hall. When he attempted to ask questions, he was told simply, "Shut up nigger" and "You niggers want to play games." Even more frequently, he was referred to as a "motherfucker," "a piece of shit," *etc*. Hamilton was humiliated, denigrated, and dehumanized by these epithets.

401.    He was not permitted to put on clothes or retrieve a mask before he was escorted, barefoot, to the dining hall, which was filled with approximately 100 other Black inmates.

402.    Hamilton says he was stripped naked prior to being asked questions about his supposed gang affiliation. Photos were also taken.

403.    He hit his head when he was pulled from his bunk and his wrist was fractured as a result of being punched and kicked repeatedly. Both of these injuries were eventually treated and healed but his thumb is still partially numb from the pressure of the zip-tie restraints.

### 3. Specific IIED Allegations.

404.    Hamilton experienced severe emotional distress following the raid. "They beat me up, violated my rights, and gave me Covid-19," with the result that "I see Mental Health Weekly."

405.    He is convinced the raid was a discriminatory action designed to infect prisoners with Covid. He also asserts that the raid was intended to help validate African-American prisoners as gang members.

406.    Officers told Hamilton the following: "Shut the fuck up nigger," "You niggers want to play games," and "Black Lives Don't Matter in Soledad."

407.    As he was being removed from his cell, Hamilton asked if he could retrieve his mask. He was told, "Shut the fuck up nigger and keep walking."

408.    According to Hamilton, "We all heard the guards making racial slurs, saying 'Fuck niggers,' and 'Black Lives Don't Matter.'"

409.    In addition to his post-raid physical injuries, Hamilton suffered emotionally. He has had trouble sleeping and he sees Mental Health for depression and PTSD. He fears retaliation.

## VICTIM 20: CLAUDE HARPER

### 1. Background and History

410.    The raid constituted revenge for an attack by inmates on a commanding officer at Folsom State Prison.  Harper observes that it is "common that the CDCR retaliates on the race of inmate who committed the injury/assault on one of its own."

411.    Claude confirms that there were no cases of Covid-19 at Soledad prior to the raid, and that the very first case of Covid at the institution was a Black inmate who had been targeted during the raid.

412.    CDCR's official reason for the raid is pretextual, because it is not necessary to raid and beat up sleeping inmates at three am in order to seize and examine items in their possession.  Protocols exist for such exercises.

### 2. Attack on Harper During the Raid

413.    Harper's cell opened at roughly three am and someone jumped on his back as he slept face down. The commanding officer placed him in a choke-hold, twisted his arm behind his back, and told him, "Don't move motherfucker or I'll break your neck."

414.    That officer and another officer then dragged Claude off his bunk and onto the concrete floor, injuring his shoulder, after which they placed their knees on his back and applied zip-ties as restraints.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

415. Harper was dragged outside his cell, then taken down three flights of stairs in his boxers (while barefoot) and left in the dining hall. He remained there for many hours, restrained and in significant pain. His shoulder injury made the wait particularly unpleasant.

416. Harper, observing all the other Black inmates in the dining hall, most of whom were in a condition similar to his own, asked for medical attention for himself and others. Officers responded that "that Black Lives Matter shit don't apply in here."

417. Harper noted that none of the guards were wearing name tags.

418. Claude was eventually returned to his cell but his request for medical attention continued to be denied. Only after the raid was reported in local media did authorities allow the injured inmates to receive medical care.

419. Harper suffered injuries to his shoulder and lower back as a result of being dragged off his bunk and restrained forcibly by officers using their knees.

### 3. Specific IIED Allegations.

420. During the raid, Harper was left cuffed and in severe pain for upwards of four hours – a source of immense anxiety and distress.

421. Following the raid, Harper was diagnosed and treated for PTSD.

422. He asserts that the raid had no legitimate purpose and involved a wildly excessive use of force. According to Harper, its real purpose was to "round inmates up to infect them with Covid-19." He also contends that the raid was fundamentally racist in character.

423. He was referred to a number of times as a "motherfucker" and was told "That Black Lives Matter shit don't apply in here – that's how we get down." Statements like this were frequently followed by laughter. Harper was humiliated, denigrated, and dehumanized by these epithets.

424. The lack of proper Covid protocols during the raid – masking, social distancing, etc. – caused him immense distress.

425. Even more distress resulted from Harper being subjected to validation efforts that began with Operation Akili.

<u>**VICTIM 21: BERNARD HARRIS**</u>

### 1. Background and History

426. Bernard Harris (T41074), 45 years of age, is an African-American inmate at the Correctional Training Facility, Long Beach, CA.

427. The July 20, 2020 raid was prompted by profound racial and cultural bias, which he suggests is endemic to CTF. He accuses prison officials of manufacturing his gang affiliation.

### 2. Attack on Harris During the Raid

428. A group of officers rushed into his cell and dragged him from his bunk, which caused him to crash onto the cement floor beneath him.

429. Harris was then dragged out of his cell and violently handcuffed. He was placed in the dining hall without shoes, a shirt, or a mask to protect him from Covid-19 transmission.

430. He waited in the dining hall at least 5-1/2 hours for his interrogation in the presence of approximately 100 other Black inmates. He was denied medical treatment and access to the restroom.

431. Harris aggravated a pre-existing back issue (arthritis) as a result of the raid.

432. The officers who escorted him to the dining hall were not wearing face masks. When he asked an officer near him why face masks were not being worn and why the inmates were not seated at least six feet apart to minimize the possibility of Covid-19 transmission, he was told, "Black lives don't matter to them!" ("them" referring to his fellow COs).

### 3. Specific IIED Allegations.

433. Bernard Harris states that the raid was a racist act and one designed to spread Covid among the inmates. He also claims it was driven by fear of the BLM movement.

434. When Harris asked a guard why he was not wearing a mask, he was told, "Black Lives Don't Matter to us."

435. Black prisoners, according to Harris, were subjected to "multiple racial slurs." Harris was humiliated, denigrated, and dehumanized by these epithets.

436. The raid caused Harris emotional distress by exacerbating pre-existing physical injuries. He also suffers with PTSD and has traumatic memories.

### VICTIM 22: ERWIN HARRIS

#### 1. Background and History

437. Erwin Harris (T25610), 62, is an African-American inmate at CTF.

438. Prior to his incarceration, Harris lived in San Jose. He is the father of seven children, three boys and four girls.

439. Harris is hard-working and says his goal, on a daily basis, is always to be the "best person he can be." He is the co-founder of a non-profit organization.

440. Like other prisoners, Harris suggests that an attack on a male guard at another institution helped bring about the raid at CTF as a form of retaliation.

#### 2. Attack on Harris During the Raid

441. Harris' account of the raid is consistent with the others in that officers rushed into his cell, yanked him from his bunk onto the floor, beat him into submission, then restrained him violently, dragged him out of the cell, and "rolled" and "dragged" him down the sets of stairs outside the cells.

442. Harris was then abandoned until the MTA arrived.

443. His back and foot were injured and he subsequently experienced pain throughout his entire body as a result of the abuse he suffered.

444. Erwin suggests that prison officials spent much of their time during the raid denigrating the Black Lives Matter movement.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

### 3. Specific IIED Allegations.

445.    Erwin Harris reports experiencing severe emotional distress as a result of the raid.  It was a violent, discriminatory act designed to spread Covid.  He was yelled at, spat upon and called a "nigger…over and over again as they abused [me]."  The experience, he says, was "crazy."

446.    He heard officers shouting variations of "All you Black motherfuckers have Covid!"   Erwin was humiliated, denigrated, and dehumanized by these epithets.

447.    He suffers from depression as a result of the treatment he received during the raid and sees a therapist ("Ms. Craig") who tries to help him.

448.    Erwin suggests that the raid exacerbated emotional issues he has been dealing with for decades. "It got really bad for me when this happened," he says. "They keep hurting me."

### VICTIM 23: MARK HARRIS

### 1. Background and History

449.    Mark Harris (D09716) is an African American inmate currently housed at CTF.  He is 60 years of age.

450.    Harris says he was on the streets, alone, at 10 years old, at that he took to robbing people in order to survive.

451.    Of his current life: "Today I have a beautiful wife I've met since being locked down.  My dream is to go home and live my life in a productive manner and enjoy everything that life has to offer."

452.    Harris serves as a secretary of the MAC executive body at CTF.

453.    Harris notes that Black inmates at CTF have not had any significant problems since 2015.

### 2. Attack on Harris During the Raid

454.    Officers burst into his cell, dragged him out of bed onto the cement floor, roughed him up, cuffed him, and took him to the dining hall, where he waited in the

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

company of approximately 100 fellow Black inmates for at least 3 hours before being interrogated.

455.    Harris was clad only in his boxer shorts.

456.    When he was pulled from bed, officers re-aggravated an existing neck injury.

### 3. Specific IIED Allegations.

457.    Mark Harris indicates that he experienced severe emotional distress after the raid.  He stresses that, "there was no reason for it," and claims that the raid was a discriminatory act designed to spread Covid-19 among the prisoners, especially the Black prisoners.

458.    Mark heard the guards saying, "Black Lives Don't Matter."

459.    He has a great deal of trouble sleeping. He often wakes in the middle of night "wondering if they are coming." His inability to sleep is often accompanied by a cold sweat.

## VICTIM 24: RASHAUN HORN

### 1. Background and History

460.    Rashaun Horn is a 49-year-old African-American male that was incarcerated at CTF on July 20, 2020.  He grew up poor, from Watts, in the Los Angeles area.  Although he got good grades, he got into trouble early in life, at 22.

461.    He is presently a private citizen, having served his time, paid his debt on a drug scrape, and was released shortly after the raid.

462.    He suffered a rotator cuff tear in his shoulder from the incident.

### 2. Attack on Horn During the Raid

463.    On July 20, 2020, Horn's cell door was opened suddenly, he was grabbed from his bed and slammed to the floor, hitting his left shoulder and face.  It knocked the wind out of him and caused a lower dental plate in his mouth to fly from his mouth.  He was then dragged by his ankles on to the tier where he was accosted by a second masked guard who handled his penis and testicles.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

464.    At the time, he was instructed to "not be saying BLM.  You knew the game was dirty when you started playing."

### 3.  Specific IIED Allegations.

465.    Horn asserts that Operation Akili had a profound effect on him both physically and psychologically.  His emotional injuries were especially serious and stemmed from extended and unnecessary pain and suffering.

466.    Horn was assaulted without cause and called a "nigger" by his attackers. He reports abundant "derogatory profanity," including, "fucking nigger" and statements like, "Don't cry out that nigger shit." He was also told, "Don't be saying BLM," and "Black Lives Do Not Matter."  He was told by officers that he – and all the other Black victims of the raid – had been exposed, and would likely contract, Covid-19.  Horn was humiliated, denigrated, and dehumanized by these epithets.

467.    Horn reports that his penis, groin and anus were handled roughly during the raid, an experience that cause him distress and dismay.

468.    He claims significant "emotional and psychological injuries" stemming from the physical abuse that was inflicted upon him.

### VICTIM 25: KEVIN JACKSON

### 1.  Background and History

469.    Kevin Jackson is 41 years old and has been incarcerated for eight years. He has four children whom he describes collectively as "my world and motivation in life."

470.    Prior to the raid, Kevin's outlook was positive and he was focused on self-improvement.  He was validated as a Crips gang member, which he resents since it is based solely on a 15-year-old tattoo.

471.    He was never told the purpose of the raid by anyone in a position of authority, either at the time or later.

### 2.  Attack on Jackson During the Raid

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

472.    He and his cellmate were violently pulled from their beds, physically restrained (especially by the neck), and placed in the chow hall.  He was told to face forward and not to look around at the commanding officers.  Neither he nor his cellmate were afforded or allowed to obtain face masks, shoes, or any other forms of clothing for their own protection.

473.    He was denied access to medical care during and immediately after the raid.  He finally received some medical attention 2-3 days later.

474.    Kevin suffered a serious back injury and a finger injury from the raid.

### 3.  Specific IIED Allegations.

475.    Jackson suggests that the raid was an unjustified, discriminatory, and violent action that was intended, in part, to spread Covid-19.

476.    Jackson was disturbed the number of officers calling the inmates "niggers" and then laughing at them.

477.    Jackson heard from the guards' comments to the effect that the inmates had all been given Covid-19 and that the guards did not care about any of them.

478.    Jackson was humiliated, denigrated, and dehumanized by these epithets.

479.    Jackson has experienced severe emotional distress because he has been targeted for retaliation due to his participation in this lawsuit.  He experiences immense psychological distress as a result of his various physical injuries, the pain of which interfere with his sleep and require him to take pain medication on a regular basis.

### VICTIM 26: NATHANIAL JOHNSON

### 1.  Background and History

480.    Nathanial Johnson is a 46-year-old Black male who has been incarcerated for the past 12 years.

481.    He enjoys serving as a MAC representative inside Soledad, a position that allows him to advocate on the prisoners' behalf and work to address institutional issues.

482.    Johnson also serves as a kitchen cook (which he likes) and is interested in motivational speaking.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

483.    Johnson denies being affiliated with any gang or group.

484.    Though Johnson was never informed of the raid's purpose, he suggests the principal motivation behind it was to instill fear in Soledad's Black population to make the point that CTF officials can inflict pain and suffering on a defenseless group of inmates.

485.    Johnson was sentenced to 25 years for burglary in 2010 after a history of property crimes.

## 2.  Attack on Johnson During the Raid

486.    At roughly three am, he and his cellmate were viciously and violently attacked by guards dressed in all black with face coverings.  He was forcibly restrained and then escorted to the dining hall while being denied the ability to wear clothes, shoes or a protective face mask.

487.    He was repeatedly told to "shut up" and face forward at all times.  He was physically forced to face forward in a violent way, with an arm around his neck.

488.    Nathaniel was restrained with zip-tie handcuffs that were overly-tight and immensely painful.

489.    In the course of the raid, Nathaniel re-injured a knee.  Nathaniel did not receive medical care until a week or so later, despite his repeated requests to see a doctor, nurse or other health practitioner.  He was later prescribed pain medication.

## 3.  Specific IIED Allegations.

490.    Johnson suffers severe emotional distress because of the raid and asserts that it was clearly racial in nature and intended to spread Covid-19 among the inmates.

491.    In addition to the guards' physical abuse, they "openly displayed…their racial thoughts and views."

492.    Johnson said that officers made it clear that "You Blacks don't run nothing," and "We [i.e. the officers] run shit." This was clearly intended to demean the prisoners and remind them that the guards were in charge and that they had almost no power to govern themselves inside CTF.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

493.     According to Johnson, guards were constantly saying, "Fuck them" and "Who cares?" He recalls hearing – or being told – that the Black population of CTF were, "dumb monkeys without a clue." Johnson was humiliated, denigrated, and dehumanized by these epithets.

494.     Johnson continues to be treated for raid-related depression, which stems in part from a raid-related back injury.

495.     He notes that he now, "Doesn't trust law enforcement," and is "constantly worried about [his] safety."

## VICTIM 27: ANTOINE KEIL

### 1.  Background and History

496.     Plaintiff Antoine Keil is a 46-year-old African American man from the Bay Area. He is a barber by trade and has four children. He was released from custody in 2021.

### 2.  Attack on Keil During the Raid

497.     In his 602, Keil details the events of July 20, 2020:

> [A]t approximately 0300 hours, the door to my assigned cell abruptly swung open. As I looked up (I was asleep), I was snatched from the bunk and slammed violently on to the floor and assaulted by wannabe commandos. I was not resisting and [gave] no cause for force to be used against me. One of the assailants had his knee on the back of my neck applying pressure. I said to the assailant, "I can't breathe."
>
> "That Black Lives bullshit don't mean anything here motherfucker!" the assailant snapped in response. I was lifted off the floor by my neck and violently slammed against the wall, striking my forehead and mouth. I was then hurried down the stairs without shoes or socks. I injured my foot on the stairs' rough surface. Once I arrived at the Central Dining Hall, I was forced to remove my boxers and remain naked in front of everyone. …

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

I was called "Nigger" multiple times by the unknown assailants. I even overheard one of the assailants tell another Black prisoner, "You niggas are now infected."

498. Keil was injured in his fingers, shoulders and back.

### 3. Specific IIED Allegations.

499. Keil asserts that Operation Akili was driven by racism and discrimination.

500. In addition to significant physical injuries, he suffered severe emotional injuries, prompted, in part, by the infliction of "wanton and unnecessary pain and suffering."

501. He was subjected to many "derogatory statements and racial slurs." He reports being called a "nigger" on multiple occasions by his assailants. At one point, while being assaulted, he was told, "That Black Lives Matter bullshit don't mean anything here, motherfucker." He overheard an officer telling another Black inmate, "You niggers are infected now." Keil was humiliated, denigrated, and dehumanized by these epithets.

502. Forced to remain naked in front of other inmates and staff in the Dining Hall, Keil experienced profound upset and humiliation. His cell was ransacked and many personal possessions were seized as another source of distress.

### VICTIM 28: ANTHONY KING

### 1. Background and History

503. Anthony King was born in Los Angeles, where he and his brother were raised by their mother. Mr. King is also a single parent. He notes that he works as a truck driver. Noting that he has worn "many hats," he has worked at various times as a youth counselor, forklift driver (at Home Depot), and youth sports director. He has also served on the local PTA.

504. King has no connections to gang activity and claims that those targeted during the raid were simply Black inmates with whom guards had personal issues, especially Defendant Isidro Perez.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

### 2. Attack on King During the Raid.

505.    At about three am, masked men entered his cell, grabbed him by the left arm, and yanked him out of bed. All the while, he claims, they were hurling epithets and race-based insults such as "Fuck you niggers!" "Fuck Black Lives Matter and fuck your family if they're out there protesting!"   King was humiliated, denigrated, and dehumanized by these epithets.

506.    King was kicked in the back and dragged out of his cell.  The officers continued to rough him up as they applied the same zip-ties with which they had restrained everyone else that morning.

507.    Anthony's shoulder, back and knee were injured as a result of the raid. He had injured his knee previously and it had been surgically repaired only a short time before.

508.    Anthony visited the medical facility three times and failed to obtain care each time, but it does appear that he was seen by a health professional seven or eight days after the raid.  He was supposed to receive X-rays and be issued a cane, but the Covid situation delayed this.  He was given a supply of aspirin.

### 3. Specific IIED Allegations.

509.    Post-raid, King has experienced severe emotional distress.  The raid was racist in character, was in no way justified, and was intended to help Covid-19 spread among the inmate population.

510.    Like other victims of the raid, King heard comments ranging from, "Fuck you niggers!" to "Fuck Black Lives Matter" and "Fuck your family if they're out there protesting."  King was humiliated, denigrated, and dehumanized by these epithets.

511.    King reports ongoing raid-related nightmares, lack of sleep (i.e. broken sleep) and PTSD.

### VICTIM 29: GARY LAWLESS

### 1. Background and History

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

512.    Gary Lawless is a 47-year-old African-American inmate, currently housed at CTF.   He is a published author, having written a 2017 novel ("The Body Count") about the struggles of inner-city life in Oakland, California.

### 2.  Attack on Lawless During the Raid

513.    Lawless relates that on July 20, 2020, at around 3 AM:

> My cell door swung open. I was woken up by someone in camouflage grabbing me around [my] legs and pulling me from the top bunk. I was in shock because I was asleep. I felt a hard kick between my legs so I tried to ball up. I was yanked from the floor & put into zipties with my hands behind my back, cutting off hand blood circulation. I had no shoes or mask on as I was dragged down the stairs in my boxer briefs. I asked for my mask and was told I don't need it, 'everyone gonna catch coronavirus anyway.'

514.    Lawless' thumbs and neck were injured.  He was treated, as well as referred for counseling for psychological trauma.

### VICTIM 30: DARREYL LEWIS

### 1.  Background and History

515.    Darreyl Lewis is a 60-year-old African-American inmate currently housed at CTF.

516.    Lewis has committed himself fully to his rehabilitation during his time in prison.  He has earned three degrees during his time at CTF and other facilities.

### 2.  Attack on Lewis During the Raid

517.    At approximately 0300 on July 20, 2020, he was pulled violently from his bunk without warning of any kind.  His arm was yanked with such force that it "popped out of its socket."

518.    Inside and outside the cell, his attackers hurled racial epithets constantly. Two, in particular, stick in his mind: "Black lives don't fucking matter!" and "We don't care if you niggers catch coronavirus."

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

519. Lewis suffered injuries to his shoulder and leg. About a week after the incident, he visited medical and was eventually diagnosed with PTSD.

520. Lewis believes that the raid was driven first and foremost by race-based animus. As Darreyl puts it, the cause of the raid was fourfold: "Racism, racism, and racism" along with a desire to inflict gratuitous pain and suffering.

## VICTIM 31: MICHAEL McCURTY

### 1. Background and History

521. Michael McCurty is from Oakland, CA. He served in the United States Air Force. He also attended Laney College for two years.

522. McCurty suggests that the purpose of identifying gang affiliation is a pretext utilized by prison officials. As for its real purpose: "Sadistic, malicious, racial, discriminatory and pervasive racial, cultural bias at CTF."

### 2. Attack on McCurty During the Raid

523. McCurty's cell door opened, ISU officials entered his cell and pulled him off his bunk. Commanding Officer Mell placed his knee in McCurty's back and pulled at his neck, at which point McCurty shouted, "I can't breathe!" He was pulled out of the cell, handcuffed forcefully, and escorted to the dining hall.

524. McCurty was not wearing shirt, shoes, or a mask. He was escorted to the dining hall to join the other Black inmates, also without clothes, shoes and basic Covid-19 protections such as a mask.

525. Michael was required to wait about five hours, during which time he was precluded from using the restroom and denied medical treatment.

526. The raid aggravated Michael's back issues, a pre-existing condition of osteoarthritis of the thoracic spine. He was attacked despite the fact that he has a permanent back brace accommodation. He was denied prompt medical attention.

### 3. Specific IIED Allegations.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

527.    McCurty suffered extreme emotional distress following the raid, which he says was unjustified and fueled by racist sentiment as well as a desire to spread the Covid-19 virus.  Fear of BLM was also an important motivator according to McCurty.

528.    The officers he observed were not wearing face masks.  He heard officers saying things, like, "Black Lives Don't Matter here at CTF and all you niggers will learn that sooner or later."  McCurty was humiliated, denigrated, and dehumanized by these epithets.

529.    McCurty experiences lingering traumatic memories connected to the raid, in part because the violence meted out exacerbated a number of pre-existing physical injuries.  McCurty was denied immediate medical treatment and remains haunted by the many hours of fear and worry he experienced on July 20, 2020.

## VICTIM 32: TROY MENDENHALL

### 1.  Background and History

530.    Troy Mendenhall is a 58-year-old African-American inmate at CTF.  He has a 25-year-old daughter and an interest in developing programs for youth.  He aspires to own and operate his own business upon release.

### 2.  Attack on Mendenhall During the Raid

531.    Mendenhall was sound asleep in bed, on his stomach, in the early morning hours of July 20, 2020.  He heard someone enter his cell and turned his head to see what was happening.

532.    Immediately, four individuals, all masked, grabbed him and pulled him out of bed so roughly that he crashed onto the cement floor, injuring his left hand and wrist in the process. A pre-existing injury was immediately aggravated.

533.    While on the floor, he felt pressure being applied to both his back and his knee. Troy was removed from his cell and his hands were zip-tied.  He describes the experience as follows: "I was forced to my feet, taken outside the cell [and] zip-tied behind my back. I told the person/officer that I was under doctor's care and orders to be

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

handcuffed in the front only, and was told to shut up. I was then told to walk toward the stairs, at which time I witnessed another inmate falling down the stairs..."

534. Mendenhall was taken to the dining hall and placed shoulder-to-shoulder with other inmates, all of whom were Black. He noted that all, with a single exception, were unmasked.

535. Some inmates began to shout, "Black lives matter!" and were immediately removed and placed in cages.

536. The guards were cavalier in their own attitude toward their masks and removed them frequently as they laughed and joked with other officers.

537. He was later interrogated and returned to his cell, at which time he noted that all his paperwork was missing.

538. Mendenhall was finally able to attend medical several days after the attack and was diagnosed with neurologic impairment of the left hand and wrist.

### 3. Specific IIED Allegations.

539. Like other victims of the July 20, 2020 raid, Troy Mendenhall suffered severe emotional distress both during and after the event because the raid had no legitimate purpose beyond punishing CTF's Black population.

540. Indeed, Mendenhall regards the raid as a fundamentally racist event intended to act as a Covid-19 "super-spreader," which is of course dehumanizing in that it serves as a kind of declaration of war.

### VICTIM 33: ALEXANDER MOSS

### 1. Background and History

541. Alexander Moss is a 56-year-old African-American inmate currently housed at CTF.

542. Moss was born in Georgia but his family relocated to California soon afterwards to escape the prejudices of the South. Moss' father was an MP in the Marine Corps.

543.    Moss likes to learn new things and meet new people, particularly people from different cultural backgrounds.  He is eager to be of service to the larger community and is anxious to explore ways of reducing recidivism among former inmates and the stigma that tends to attach itself to those who have served time.

### 2. Attack on Moss During Raid

544.    Prison officials entered his cell in the early hours of July 20, 2020 in "full tactical gear."

545.    He was pulled from his upper bunk onto the cement floor by his left wrist, which in turn caused him to land on, and injure, his right hip.  Restraints were applied and he was handed over to another officer, prior to being escorted to the dining hall.  He never resisted in any way.

546.    Alex's injuries were burdensome and interfered with his quality of life.  A sciatic nerve is his back was re-aggravated. The flex-cuffs placed on him were so tight that he lost all feeling in his right thumb for a significant period of time afterward.  He eventually visited Medical and was prescribed painkillers and physical therapy.

### 3. Specific IIED Allegations.

547.    Moss suffered severe emotional distress following the raid due to internalization of the raid's objectives: "They specifically targeted Blacks in an attempt to intimidate us due to the popularity of 'BLM' in society."

548.    As inmates were being assaulted, Moss heard guards saying things like, "You niggers are soft" and "You niggers are weak."

549.    When, in the Dining Hall, Moss asked for a mask to protect himself from Covid, he was told, "All you Blacks will have Covid when this is over…"

550.    Moss reports that he was interviewed in a very condescending fashion.

551.    After the raid, other inmates – including Adams, Brownlee and McCurty told him that they had been called "niggers" by guards working on July 20, 2020.

552.    Moss had some relatively minor physical injuries, including nerve damage in his thumb, but emotional, things proved to be more persistent.  He experienced

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

sleeplessness, flashbacks, hyper-vigilance, nightmares, depression, a sense of isolation and vulnerability, and both fear and distress.

## VICTIM 34: REGINALD NETTLES

### 1. Background and History

553.    Reginald Nettles was born and raised in Chicago, Ill. into a close-knit family.

554.    Prior to his arrest, Nettles was employed as a California State Certified Chemical Hazmat Handler.  He has an education and served in the Marine Corps.

555.    Reginald understands the raid as founded in profiling, harassment, and stereotypes, with racism as its central impetus.

556.    Reginald references "manufactured systems of belief" and argues that one is not allowed to outgrow stereotypes in places like Soledad.

### 2. Attack on Nettles During the Raid

557.    In the dead of night, masked men in riot gear entered Nettles' cell.  These unannounced, nameless assailants used unwarranted and unprovoked excessive force to remove him from his bed onto the concrete floor below.  He felt immediate and extreme pain in his lower back and right knee, the latter of which collapsed. He was zip-tied with unnecessary force.

558.    He is unsure whether he broke any bones.  His requests for medical attention were initially denied, until he was finally seen on July 23, 2020.

559.    Nettles was denied access to a protective face mask prior to being escorted to the dining hall.  He was shoeless and clad only in his boxers.  He was stripped naked, searched and forced to wait for hours at a small table with other inmates. No social distancing was practiced.

### 3. Specific IIED Allegations.

560.    Nettles sees the raid as a fundamentally racist and discriminatory event that was entirely unjustified.  He was appalled by the violence involved.

561.    He was treated inhumanely and unprofessionally and this treatment caused him tremendous distress.

562.    The fact that no Covid protocols were followed also constituted infliction of significant psychological distress.  At the time, the Delta variant posed a profound danger to human health, and yet prison officials seemed strangely unworried by the risk posed to inmates by gathering them together.

563.    Nettles feels victimized unnecessarily.  He felt humiliation and a sense of impotence when he was cuffed for hours in the CTF dining hall and then strip searched and questioned.  His "dignity as a Black man" was, he says, fundamentally undermined by the treatment he received.

## VICTIM 35: JOSEPH O'NEAL

### 1.  Background and History

564.    Joseph O'Neal, 55 years old and African-American, is also an inmate at CTF.   He was born in Arkansas and is one of eight siblings. He is a huge fan of outdoor activities, hunting and fishing in particular, and football.

### 2.  Attack on O'Neal During the Raid

565.    As a result of the raid, O'Neal suffered damage to tendons in both his wrists and both his shoulders, after being ripped out of bed and then zip-tied for a lengthy period of time.

566.    Joseph:

> [My] cell door, G-wing 345, was yanked open. There was yelling, cursing, foul language that was being said -- and toward Black inmates: "Get out of the fucking bed nigger!" I was pulled out of my bunk, dragged on the cold, hard floor [and] placed in zip-ties really tight. [I was] pulled out onto the tier, marched down three tiers out in the hallway, [and] placed in the Dining Hall (Chow Hall) from 2:30-3:00 am until 9:00 am with the zip-ties pulled too tight and without any clothing but my underwear and no mask.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

567.    A seemingly endless number of epithets were directed toward Black inmates, including, "Your Black ass is in trouble now," "Shut the fuck up!" "Fuck Black lives!" and, last but not least, "Stop asking fucking questions!"

### 3.  Specific IIED Allegations.

568.    O'Neal suffered severe emotional distress following the raid.  The raid was an outrageous, discriminatory act for which there was zero justification.  He also believes it was intended to help spread Covid-19 through the inmate population.

569.    While lying on the floor of his cell after being dragged out of bed, O'Neal heard one guard say to another, "We finally got these coons," and "Don't move nigger." O'Neal was humiliated, denigrated, and dehumanized by these epithets.

## VICTIM 36: DERRICE PORTER

### 1.  Background and History

570.    Derrice Porter is 50, African-American, and another inmate currently housed at CTF.   Porter was born and grew up in South-Central Los Angeles.  He is married and has two brothers.

571.    There was no provocation for the raid on the part of Black inmates at CTF.  Its main purpose was to terrorize them.

### 2.  Attack on Porter During the Raid

572.    At around 3 am, he and his cellmate were viciously attacked by a multitude of officers.  He was torn off the top bunk and struck the locker and the bottom bunk as he fell onto the cement floor. "I was punched and kicked," he writes, "and then three officers jumped on my head, back and legs."

573.    As he lay face down, officers crossed his legs and then folded them toward his back; a knee was placed on his head and neck. "Then, an unknown officer kneed me in the head, and then I was zip-tied with only my drawers on, no mask, no clothes, no shoes."

574.    He was then taken to the dining hall, where he waited with other Black inmates for about six hours, zip-tied for the duration.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

575.    No attempt was made to socially distance the prisoners or otherwise protect them from Covid-19 transmission.  The inmates were in their underwear.

576.    Derrice contends that his interrogation focused largely on BLM and whether it existed inside CTF.

577.    Porter suffered bruises to his shoulder and neck and a contusion on his head that produced a large bump.

### 3. Specific IIED Allegations.

578.    Like other victims of the raid, Porter suffered significant emotional distress after Operation Akili.  He has no doubt, and is distressed by, the fact that the raid was driven by racist sentiment and that it was used to help spread Covid-19 inside CTF.

579.    While inmates were confined to the dining hall, "peace officers were heard calling Black inmates the N-Word."  Staff wearing SVSP black patches, and a CDCR Sergeant, proceeded to remove their masks and state that they "want[ed] to infect [us] all with the deadly Delta variant."  Porter was humiliated, denigrated, and dehumanized by these epithets.

580.    Porter is also distressed by the fact that he suffered physical injuries in the raid for no apparent reason.  "I am afraid to sleep at night and have anxiety and panic attacks when an officer is close to me, for fear of being attacked again."

### VICTIM 37: MICHAEL RHINES

### 1. Background and History

581.    Michael Rhines, born in 1968, is part of a family that migrated from New Orleans to San Jose, California.  Prior to his incarceration, Rhines worked as a fitness trainer and notes that he has a longstanding interest in special education.  He continues to teach boxing at CTF.

582.    He is interested in starting his own small business at some point and notes that he occasionally stops and buys homeless men and women on the street a decent meal.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

583. Rhines attributes the raid to racism and a deep-seated need on the part of prison authorities to victimize Black inmates, and Black people more broadly.

584. He adds that authorities may have also been motivated by a desire to exact revenge for an unrelated attack on a guard at Folsom.

### 2. Attack on Rhines During the Raid

585. At 3:00 am, officers violently removed him from his bed while he was undressed, slammed him against the wall, and twisted his wrist behind his back. He was then transported to the dining hall, without a mask. No social distancing was practiced. They stripped him down in front of countless other Black men.

586. Rhines was taken to another location [presumably the interrogation rooms] to be questioned. His interrogator was Commanding Officer Hernandez from Salinas Valley, who accused him of being a BGF member. Rhines dismisses this.

587. Rhines' left hand was injured during the raid. He experienced significant pain. Officers laughed at (and thus humiliated) him during the raid.

### 3. Specific IIED Allegations.

588. Rhines experienced severe emotional distress as result of Operation Akili. He is convinced the raid was intended to counter the emergency of the Black Lives Matter movement. He also feels that administrators were eager to have Covid-19 spread as quickly and widely as possible among the inmates. Other inmates informed him that guards and staff used the following phrases or issued the following directives: "Slaves, butt naked!" "All Blacks – Shut your mouth!" and "You ninjas always screaming!"

589. Rhines was humiliated, denigrated, and dehumanized by these epithets.

590. Rhines asserts that he heard guards say that Black people in the United States "always complain" and are "unworthy of respect." He also heard "nigger" used frequently. Guards said that Black inmates "deserve[d] Covid," that the virus was "made for [them]," and that they didn't need masks.

591. Rhines experienced enormous distress when staff removed the braces he uses to help him stand and walk. He has terrible trouble sleeping currently and suffers

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

with panic attacks and anxiety. He states that these conditions have had an adverse impact on his relationships with certain CTF guards and with family members, friends and fellow inmates. He adds that these conditions have impaired his sleep and physical health.

## VICTIM 38: CHRISTOPHER ROBINSON

### 1. Background and History

592. Christopher Robinson was raised in Bakersfield, California. He played college and semi-professional football for many years. He later had a chimney, dryer, and vent family business and coached kids' football, baseball and basketball in his spare time.

593. He was productive in his community prior to incarceration. Prior to entering prison, he had never been away from his family.

594. Following the July 20 raid, Robinson, who is African-American, was validated as a member of the Crips on the basis of old tattoos. He denies any and all gang affiliation.

595. He describes the raid as a product of "racist profiling," stressing that while the raid targeted several genuine gang members, the vast majority of those targeted were unaffiliated with gangs.

596. Robinson expects to be paroled fairly soon.

### 2. Attack on Robinson During the Raid

597. According to Robinson, officers entered his cell and yanked him out of bed so quickly that he woke up while falling to a cement floor.

598. Robinson was told to "get the fuck up" and come toward the officers, who were backing up from him. He was then pushed back against the bunk ladder, whose rails struck him between the shoulder blades.

599.    Christopher was slammed repeatedly between the wall and the lockers, after which his left arm was pulled and twisted.  He was then handcuffed.

600.    He was then taken to morgue, kitchen, and an old counselor's office where he was roughed up, harassed, intimidated and violated by naked photos taken of him.

601.    Robinson was injured in his left arm, left wrist, left shoulder, neck, back, left elbow, head (back), right wrist, left hand, left thumb and trigger finger.

602.    Christopher was subjected to epithets and was asked repeatedly about his feelings toward the Black Lives Matter movement.

### 3.  Specific IIED Allegations.

603.    Robinson also experienced severe emotional distress in the wake of the raid.  He is convinced that the raid had no purpose except to abuse CTF's Black inmates and advance the spread of Covid-19 among the prison's population (especially its Black prisoners).

604.    Speaking about both himself and his fellow Black inmates, Robinson is clear about the damage the raid caused: "They [i.e. those who carried out the raid] caused severe emotional and physical pain that led to mental problems that require professional help."

605.    He heard different variations of the following comments: "Your lives don't matter," "You can die," "Black Lives Don't Matter," "No one gives a damn about Black lives," "The sooner you guys get infected the better," and "You will die and not have to worry about prison."

606.    Robinson heard inordinate use of "nigger." He also recalls a guard saying that they – the Black inmates – looked like a bunch of monkeys in a cage.  He and fellow inmates were bombarded by racial epithets.  Robinson was humiliated, denigrated, and dehumanized by them.

607.    He is still seeing a therapist and dealing with psychological difficulties caused by the raid.  He had no such issues prior to the event. The various physical

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

injuries he suffered – including a deformity to his left elbow – have contributed to his psychological issues.

608.    He lists the following psychological ailments associated with the raid: emotional trauma, fear, and anxiety.  For Robinson, the raid brought about "a significant life change."

## VICTIM 39: CEDRIC SANCHEZ

### 1.  Background and History

609.    Cedric Sanchez is a 39-year-old African-American inmate at CTF.  He was born in South Los Angeles to a single mother.  He has two full siblings and 11 half-siblings.

610.    Since his incarceration, Sanchez has worked diligently to improve both himself and his prospects for early release.  He has attended, and successfully completed, a large number of self-help courses, and has also volunteered on many occasions to serve as a mentor to at-risk youth by warning them of the dangers of gang life.

611.    Cedric has not been involved in gang activity for almost two decades.

### 2.  Attack on Sanchez During the Raid

612.    On July 20, 2020, guards entered his cell unannounced, grabbed him off the top bunk, slammed him to the ground, restrained him with zip-ties, and trundled him off to the dining hall where he was forced to sit with approximately 100 other inmates for about five hours.  The inmates were without masks, lacked shoes, and were in the their underwear.

613.    Sanchez suffered injuries to his right shoulder and right hip and was prescribed painkillers as a result.

### 3.  Specific IIED Allegations.

614.    Operation Akili was carried out for no good reason. The guards attacked CTF's Black prisoners, leaving no doubt that the raid was founded in racism.  It was, in both intent and effect, "a Covid superspreader event."

615.    Administrators were not averse to Covid spreading among the Black prison population if this spread weakened its will.  Part of the goal of rounding up the Black population up was to facilitate a more rapid and "efficient" diffusion of the Covid virus.

616.    These realities telegraph how little human value a person like Sanchez has to CTF officials – inmates are not incarcerated persons to be safeguarded until release, but racial enemies to be debilitated and defeated – and this is emotionally distressing on that metric.

## VICTIM 40: GARY SASSER

### 1.  Background and History

617.    Gary Sasser was born in 1964 and raised by a family of women in West Los Angeles.   He describes himself as something of a student of human potential and positive thinking and is eager to educate youth.

618.    Sasser denies any and all gang affiliation and asserts that the raid was a product of deep-seated racial discrimination.

619.    No explanation for the raid was offered at or near the event.  Later, inmates learned that prison officials were putatively targeting BGF members.

### 2.  Attack on Sasser During the Raid.

620.    Between 3:15 and 3:30 am, a group of masked ISU officers, referred to "Team #2," pulled him off his bunk and restrained him violently after doing the same thing to his cellmate.  Sasser's arms were twisted so badly when he was restrained with zip-ties that he requires surgery.

621.    When he tried to put his shower shoes on, he was slammed against the cell wall.  He was marched to the dining hall shoeless, shirtless and without a protective face mask.

622.    Sasser's left arm was injured during the raid.  In the short-to-medium term, he was given ibuprofen and a sling for his arm.

### VICTIM 41: RONALD SMALLWOOD

#### 1.  Background and History

623.    Ronald Smallwood, who turned 63 in January 2024, is an African-American man and another victim of the attack on CTF's Black prisoners carried out on July 20, 2020.

624.    Smallwood was born in St. Louis and raised in Pasadena, California.  He has six siblings: two sisters and four brothers.  His mother lives in Seattle; his father lives in St. Louis.

625.    Smallwood likes to "draw, read and exercise."  He seeks an opportunity to serve as a motivational speaker for troubled youth and "help rebuild our communities."

#### 2.  Attack on Smallwood During the Raid

626.    At roughly 3:30 am, his cell door was flung open and several individuals wearing helmets with lights on them and masks detained him as well as his cellmate.  He describes being handled roughly and restrained with zip-ties.

627.    He was then escorted to the dining hall while in his boxer shorts.  He was not given even a few additional seconds to put on his pants or shoes, or grab a protective mask, before being removed from his cell.

628.    Smallwood: "We were told to shut the fuck up and sit down - without our mask to protect us from Covid-19 and from unknown masked men. We sat in that same position for several hours, with a gunman standing over us. [They said], 'Fuck BLM!'"

629.    When Ronald and others asked the guards why they were treating the prisoners so badly, the guards responded simply, "Because we can."

#### 3.  Specific IIED Allegations.

630.    Smallwood suffered extreme emotional distress after the raid.  Though the raid was unnecessary and designed to spread the Covid-19 virus, it was mostly carried

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

out mainly to brutalize CTF's Black population.  He notes that a number of inmates were seriously injured during the event.

631.    Smallwood personally heard several CTF officers yell, "Fuck BLM!" and "Fuck all of them, I hope they [i.e. the Black inmates] get Covid!"  Other inmates told Smallwood later that they had heard guards saying, "Fuck all of them niggers!" and different versions of the same sentiment.  Smallwood was humiliated, denigrated, and dehumanized by these epithets.

632.    The distress he experienced was such that he had to speak to both family members and his attorney, just to get some perspective and advice about how to deal with the emotions involved.

633.    He describes the unfortunate, lasting impact of the raid on his psychological state: "Ever since the accident I barely sleep and I wake almost every morning waiting to be attacked."

## VICTIM 42: DAMON TERRELL

### 1. Background and History

634.    Damon Terrell is an African-American male and was raised by his maternal grandmother in Compton, California.  He worked with his father for a time in construction.  He continues to work towards his G.E.D. and currently needs only two more courses to finish.

### 2. Attack on Terrell During the Raid

635.    Terrell was on the toilet in cell 205 of B-Wing when the raid happened, and he was thus in position to see exactly what happened to his cellmate, who was yanked off his bed by masked intruders and then slammed against the wall and cuffed.

636.    Terrell was ordered off the toilet.  He complied, placed his hands behind his back, at which point he was restrained with zip-ties. He notes that his arms were pushed upward toward his head, causing him pain in his left shoulder.

637.    Terrell suffered a shoulder injury as a result

638.    Terrell noted the name tags of both officers were obscured.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

639.    He was asked whether he thought the Black Lives Matter movement was creating a hostile environment in the United States.

640.    His request to retrieve a protective face mask was denied.

641.    Escorted to the dining hall while restrained and in pain, Damon waited five hours in the presence of approximately 100 other Black inmates.  During this wait, he was accompanied to the restroom at one point and again questioned about BLM.

642.    When he was formally questioned, virtually all questions related to the Black Lives Matter movement.

643.    His interrogation was filmed.

### 3.  Specific IIED Allegations.

644.    Terrell suffered severe emotional distress following the raid and is adamant that it was entirely unprovoked.  He agrees that it was racist in intent and designed to spread Covid-19 among the inmates.

645.    As he walked by several officers, he heard one say, "I hope you Black motherfuckers get Covid-19!"  Terrell was humiliated, denigrated, and dehumanized by these epithets.

646.    Terrell has received extensive counseling since the incident and continues to attend therapy.  He adds that he has been diagnosed with PTSD by Mental Health.  He now takes medication and likely will for the foreseeable future. Like other victims of the raid, he experiences severe anxiety.  This was not an issue for him prior to the raid.

647.    Terrell notes that though he asked repeatedly for a mask to help minimize his chances of contracting Covid-19, he was repeatedly denied.

648.    Terrell is no longer able to sleep through the night because he fears a repeat of the events of July 20, 2020.

### VICTIM 43: CLIFFORD WILLIAMS

### 1.  Background and History

649.    Clifford Williams is from the Inglewood area of Los Angeles and played football in the class of 1982.  He was a chef by training and worked for the Marriott Hotel near LAX before his criminal troubles resulted in a prison sentence.

### 2.  Attack on Williams During the Raid

650.    Since 2019, he suffered from a medical condition relating to his toe that requires him to walk with a cain.   Consequently, he was absolutely no threat to guards while he was sleeping in the early morning of July 20, 2021.

651.    On that morning, he was torn from his bed which caused a head injury and resulted in five stitches to his head.  He underwent a surgical procedure eight days later, on July 28, 2020.

652.    During the raid, he was rounded up with many other African-American inmates and placed in close proximity in the dining hall for approximately five hours, before being interrogated about the Black Lives Matter movement.

### 3.  Specific IIED Allegations.

653.    Williams asserts that the raid on July 20, 2020 was outrageous and indefensible and caused him severe and lingering emotional distress, including PTSD.

654.    At the same time, he has been anxious and concerned about lingering injuries from the raid.  He has had surgery a number of times on his head and on his foot to remedy injuries suffered in the raid.

655.    Williams has also suffered serious sleep issues since July 20, 2020.  He regularly wakes up in the early morning hours for no apparent reason.  He has been seeing Mental Health and reports that he is suffering "anxiety, stress, nervousness, and fear" and is seeing a psychologist or psychiatrist. He concludes, sadly, "I may have a mental disorder."

656.    More recently, Williams has submitted additional information. Regarding his anxiety and PTSD, he notes the following: "I can still hear the C.O.s snickering. It's giving me nightmares. I also cannot get their snickering out of my thoughts or memories, no matter what I do."

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## VICTIM 44: QUINN WILRIDGE

### 1. Background and History

657. Quinn Malcolm Wilridge turned 64 recently. He is African-American and is currently housed at CTF.

658. Wilridge was born and raised in Oakland and is a military veteran with strong ties to the VA in Menlo Park, California. Wilridge played a variety of sports throughout his youth but remains especially fond of football.

659. Quinn wants to contribute to rebuilding the family structure in the United States through volunteer work. His interests include motivational speaking, physical fitness and writing. He also aims to complete three books he has been working on since he was sentenced.

660. He claims his validation as a gang member is a result of retaliation because he pushed the issue of embezzlement by CDCR employees.

### 2. Attack on Wilridge During the Raid

661. Quinn was attacked the moment officers entered his cell. While still on his bunk, he was continuously punched all over his body and then snatched off his bunk.

662. The officers then stood Wilridge up briefly before they slammed him against the wall of the cell. He was handcuffed so tightly that circulation to his hands was cut off.

663. He was then slammed into a steel table outside his cell, after which he was slammed again into a nearby wall, in the hallway this time. Wilridge was then paraded to the dining hall, where he was placed with approximately 100 other Black inmates, who were in a state of undress and lacking masks. No social distancing was being practiced.

664. Quinn reported his injuries minutes after the attack, but he received no medical attention until almost eight hours later, at roughly 11:00 am.

665.    He was transported in a wheelchair to medical, with severe back pain.  He reported having a concussion and injuries to his neck, shoulder, stomach, knees and lower legs.

666.    The officers involved in the attack seemed upset that he was attempting to protect himself while being beaten.  He was told repeatedly to stop resisting.  He recalls one warning in particular, issued by a single officer: "Shut the fuck up or you're going to get fucked up!"

### 3.  Specific IIED Allegations.

667.    The raid was a discriminatory event conducted for the secondary purpose of spreading Covid-19.  He remains angry that, "…they [the C.O.s] assaulted us and deprived us Constitutionally."

668.    Things he heard from a dozen officers or more left him feeling terrorized. "I felt as though I had been targeted, and that an infectious Covid-19 virus was used as a weapon to further injure me…"  He heard the word "nigger" used repeatedly.

669.    Hate, he claims, was projected racially during the raid, and the extreme nature of the violence and the language used "affect[s] [him] psychologically" to this day.

670.    Wilridge attends a comprehensive Mental Health program and is attempting to heal.  Nevertheless, he feels "on edge all the time" and suffers "severe depression…and anxiety," both of which have been diagnosed formally.

671.    Wilridge remains upset by the fact that he was already classified as psychologically vulnerable prior to the raid. No consideration was given to this status.

672.    The abuse he was subjected to damaged his vision temporarily.

673.    Officers seemed interested in the notion that, given the state the prisoners were in (i.e. shoeless, maskless, and packed together in the Dining Hall), they were vastly more likely to contract Covid-19.  According to Wilridge, the officers discussed this increased vulnerability.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

674. Wilridge experienced psychological distress related to the physical abuse he suffered. Going forward, he attended "extensive mental health counseling." He also implies that he began taking higher doses of psychiatric (likely antidepressant) medication.

**C.    The Nighttime Attack Catalyzes a Covid-19 Epidemic Throughout the Prison Killing 19 Inmates and Infecting 2,700 Others**

675. Prior to July 20, 2020, as confirmed by Warden Koenig himself, there were no cases of Covid-19 contraction at CTF.

676. The first reported cases of contraction, "ground zero" of the outbreak (shown with green dots in Figure 1), occurred just days after the raid in late July in a specific wing of the prison, D-Wing, directly adjacent to where prisoners were interrogated during the raid.

677. The timing and location between the interrogations and the first Covid cases creates an indisputable causal connection that identifies the raid as the source of the original infections, as shown below in **Figure 1**:

**FIGURE 1**

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**CTF Central July 2020 Dot Map**



678.    The interrogation rooms for the raid – sitting between D-Wing and E-Wing – were adjacent to the outbreak in D-Wing and the first cases of infections, as shown in **Figure 2**:

**FIGURE 2**

**CTF Central July 2020 Dot Map**



679.    Illuminating the strong raid-to-infection causality, one of the earliest victims, if not the actual "ground zero" inmate, Lawrence Brown (BJ5119) housed in D-Wing, tested positive for Covid-19 approximately nine days after the raid on or about July 29, 2020.

680.    According to Brown, officers entered his cell in the dark without warning of any kind.  He was thrown from his bed onto a cement floor and restrained violently. He protested that he was doing nothing to resist the officers, and yet he was dragged out of his cell by his feet, after which an officer knelt on his back, pressed his face into the cement, and warned him that he would be "...hurt worse if [he] didn't shut up."

681.    Brown was so traumatized in the moment that he urinated on himself.  He was eventually dumped in the Chow Hall with all the other Black prisoners who had been rounded up that morning.  He spent the next seven-to-eight hours tightly restrained and in significant pain.

682.    The treatment he received that morning closely parallels the treatment that most victims of the raid later described – a mixture of sadistic violence, threats, and racial slurs – while officers were "standing inches from my face, yelling at me to not fucking move, several times."

683.    Like so many other victims of the raid, Brown reports that members of the raiding party were wearing full riot gear.  It is not clear, however, whether a riot mask does or does not offer good protection against Covid-19 transmission. The plastic is obviously impenetrable, but the mask is typically open at the bottom.

684.    Brown spent three weeks in quarantine.  For him, it was the raid itself, and not the Covid infection, that caused him the greatest suffering.  The raid "really messed me up" and that, as a result of such trauma, he lost all faith in the personnel at CTF.

685.    For others, however, and especially for inmates who were not specifically targeted on July 20, Covid-19 did the most damage.  As noted in Figure 1, at least two other CTF inmates in D-Block, who happened to be cellmates, contracted Covid-19 in the waning days of July, 2020.  One of this pair, Raemon Pardue, died from the disease on August 20, 2020.

686.    Neither Pardue nor his cellmate, Ronald Patterson, was a direct victim of the raid, but they witnessed it as occupants of D-Wing.  Both began to experience symptoms of Covid-19 toward the end of July 2020, at roughly the same time as Lawrence Brown.

687.    As seen in Diagram 1 below, Covid-19 infections in D-Wing started in July, intensified in August, and then flattened out in the subsequent months.  But again, Plaintiff only possesses 25% of the infectious data at this point.

# **DIAGRAM 1**

## **D-WING CONTRACTIONS**

July 2020   August 2020   September 2020   October 2020   November 2020

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

688.    Regardless, shortly before the raid but more than six months into the pandemic, at a time when San Quentin already had hundreds of cases on its hands, CTF officials nevertheless volitionally elected to engage in a violent, personal raid on Black prisoners, a decision that if not reflecting a deliberate ambition to weaponize Covid-19 against the inmates, constituted an absurdly dangerous penological decision, exceeding all boundaries of discretion, justification, and frankly, sanity.

689.    The safety considerations and protocols related to Covid that appear to have successfully guided decision-making prior to July 20, 2020 were abandoned in favor of the exact opposite approach to disease management, a sort of Rodney King meets Josef Mengele intersection of Schadenfreudian infectious malevolence.

690.    The group of commanding officers and investigators who carried out the attack on July 20, 2020 originated from different institutions and agencies.  Some may have been members of CDCR's Office of Correctional Safety (OCS), which includes its Special Services Unit (SSU).  Other agents may have been from CDCR's Institutional Gang Investigators (IGI, from both Soledad CTF and neighboring Salinas Valley State Prison (SVSP)), as well as CDCR Sacramento, and as CDCR's Special Services Unit Gang Intel Ops (also known as SSU).

691.    Accordingly, the correlation between the July 20, 2020 event and CTF's first cases of Covid-19 just days later is bolstered by the fact that those who carried out the raid were interlopers at a time when CTF was otherwise not receiving outside visitors.

692.    On August 1, 2020, following identification of the virus in D-Wing, it went into quarantine.  Throughout the remainder of August, 2020 (represented with azure-blue dots below) and again showing the cases of contraction in Plaintiff's best estimate of their chronological order, one can see the virus spread throughout D-Wing and move into E-Wing, shown in **Figure 3**.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## FIGURE 3

## CTF July-August 2020 Dot Map



693.    A blow-up of the affected area shows the movement of the virus through D-Wing, in chronological order, then moving from D-Wing to both E-Wing and F-Wing, as depicted in **Figure 4**.

## FIGURE 4

### CTF Central July-August 2020 Dot Map



694.   After the initial outbreak, officials embarked on a program of testing and quarantining inmates in a putative effort to contain the virus, and perhaps as a result, the spread receded in September, 2020.

695.   During September 2020, Plaintiff's current data run (currently at 25% reporting) shows six infections in D-Wing, in royal blue, depicted in Figure 5.

## FIGURE 5

### CTF Central July-Sep 2020 Dot Map



696.    In October 2020, the virus started to spread again, in the same location of the prison, by going from the D-E-F Wing area into Central's B-Wing, C-Wing, and G-Wing, as shown below with additional yellow dots in **Figure 6.**

## FIGURE 6
## CTF Central July-Oct 2020 Dot Map



697.    Notably, there are two October cases in Lassen Hall; given the lack of proximity to D-Wing, these could possibly originate from a second source.

698.    While it is possible that a third case in Soledad North, the one in Whitney B, was from an independent source, its location fairly close to F-Wing and G-Wing mark its appearance as more than likely correlated to the continuing outbreak in Central, which by that time was radiating outward from the D- and E-Wing corner in Central.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

699.    Through July, August, and September of 2020, it seemed as though CTF North might be spared the infectious misery that was afflicting Central.  There were no confirmed cases of Covid-19 in this half of the prison (based on the current data in Plaintiff's possession).  In October, 2020, Plaintiff's current data contains three cases in North.

700.    Some prisoners in North have reported that as early as the Spring of 2020 they were being moved and/or isolated, temporarily, as part of a Covid-oriented response by authorities.  Inmate William Lynn, for example, in the North Facility, claims that he was quarantined as early as May 7, 2020, close to three months before CTF identified its first case of Covid-19 in July 2020.

701.    Despite such precautionary moves, however, the evidence at this point suggests that no one (except as mentioned above) in North Facility actually tested positive for Covid-19 until October, 2020.

702.    In October and November, as the colder weather settled into the Bay Area and made the conditions for infection more contagious, the virus exploded throughout the prison (shown by red dots for November), generally radiating from the right, bottom corner (Southwest, geographically speaking) section to the entire facility as shown below in **Figure 7**.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**FIGURE 7**

**CTF Central and North July-Nov 2020 Dot Map**



703. Thus, in early November, CTF North's A-Yard, bounded in part by Lassen Hall (A and B) and Rainier Hall (A and B), began to see significant numbers of Covid cases.

704. In B-Yard, which is bounded by Whitney Hall (A and B) and Shasta Hall (A and B) and thus effectively mirrors the layout of A-Yard, there were also many cases.

705. In A-Yard, in terms of causation, it is most probable that the two October cases caused the November cases. It is plausible that these two October cases originated from the spread in D-Wing but it is also plausible that there was a second source in North.

706.   Similarly, in B-Yard, it is probable that the October case caused Whitney's spread in November and beyond, and it is plausible that the October case originated from the spread in D-Wing, while also being plausible that the October case originated from a second source.

707.   The explosion of cases in CTF North continued through December 2020, shown below in **Figure 8**, with orange dots:

## FIGURE 8

### CTF Central and North July-Dec 2020 Dot Map



708.   Plaintiff has documented approximately 700 cases, about 25% of CTF's official Covid-19 statistics claiming over 2,700 cases,  Accordingly, there is significantly more data to account for.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

709.    Nevertheless, by January 2021 and in the months following, the pandemic slowed significantly.  Plaintiff has documented about 40 cases, while CDCR reports 360.  There were clusters of Covid in Shasta Hall in January and February, 2021, additional cases in Rainier and a scattering of individual cases elsewhere.

710.    All told, from a single cluster of infections beginning just after the July 20, 2020 raid, Covid-19 spread throughout CTF Central, and plausibly spread to CTF North, ultimately claiming the lives of 19 inmates and infecting over 2,700 inmates.

711.    However, as detailed below, it is not unreasonable to calculate based on statistics that approximately 1,200 of these 2,700 cases would have occurred either way: 397 in Central and 1,080 in North (1,477 total).

712.    In short, and by analogy, CTF prison officials intentionally started a forest fire.  They directly murdered between 1-18 inmates as a result and caused a lot of damage to others.  However, it is also true that a fire probably would have started at some point at CTF, either way, and injured about half of the total victims.

713.    In terms of liability for intentional torts, it matters not that other causes would have contributed.  Arsonists are liable for the entire fire they start, even ones with concurrent or multiple causes creating injuries suffered by victims during the process.

714.    That said, in terms of reasonable damage metrics, and reasonable litigation positions, Plaintiff makes room for the reality that legal responsibility should probably be proportionate to the direct harm caused.  Natural causes possibly account for a substantial portion of the fire damage, a bit less than half (about 46%), given the total number of cases at CTF Soledad.

## D.  Causation Analysis

715.    For purposes of establishing causation, and assuming CDCR's Covid statistics are accurate, the spread of Covid-19 at CTF is best described as two related events: *(i)* an initial ignition with radiating spread that originated from D-Wing beginning on July 20, 2020 and that continued through November 4, 2020, which caused about 250 cases in Central; and *(ii)* then, an explosion of 107 diagnosed cases beginning

on November 5, 2020 that promoted spread through March 15, 2021 and caused another 2,500 cases, at which point the Covid-19 epidemic at CTF fizzled out.

716.   In the initial July-November window, Operation Akili is almost certainly the exclusive cause of the 250 Covid-19 infections in Central, as established by the (H)(1) analysis below.

717.   In the November 2020 – March 2021 explosion window, Akili is most likely a concurrent (49%) – and therefore not exclusive – cause, of the 2,500 infections beginning, per the (H)(2) observations.

### 1.    Operation Akili is the Sole Source of All Covid-19 Infections at Central CTF through November 4, 2020.

718.   According to CDCR's count expressed in Table 4, the following summarizes the number of diagnosed infections by month from March 2020 through March 2021:

| TABLE 4 | |
|---|---|
| **Month/yr** | **Cases** |
| March 2020 | 0 |
| April 2020 | 0 |
| May 2020 | 0 |
| June 2020 | 0 |
| July 2020 | 4 |
| August 2020 | 96 |
| September 2020 | 42 |
| October 2020 | 104 |
| November 2020 | 653 |
| December 2020 | 1452 |
| January 2021 | 360 |
| February 2021 | 13 |
| March 2021 | 3 |
| **Total** | **2,724** |

719.   From January 1, 2020 through July 19, 2020, there were no reported infections of Covid-19 at CTF.

720.    The number of reported infections by CDCR from July 20, 2020 to November 4, 2020 is 261.  Plaintiff identifies 3 of those in CTF North but with only 1/4 of the data.  For estimation purposes, Plaintiff assigns 250 cases to Central and 11 to CTF North.

721.    The number of infections reported by CDCR from November 5, 2020 to March 31 is 2,463.

722.    As to the cause of the (250) initial infections in Central, there are four dynamics/factors that lead one to conclude that the raid is probably their exclusive source.

**a.  The Timing of the First Infections Correspond to the Raid**.

723.    ***First***, as of April 8, 2020, CTF stopped permitting visitors on or about April 8, 2020 and maintained that prohibition through the end of the year.  This helped them achieve 0 cases as of July 20, 2020.

724.    On July 29, 2020 – nine days after the raid – the first cases at CTF were diagnosed, one of whom as a product of an inmate being spit on by a D-Wing extraction guard on July 20, 2020.

725.    By its nature, the raid introduced prison officials from various other parts of the state.  These individuals introduced a foreign element to CTF.  There is no other viable alternate explanation for the first cases of Covid, given the known lack of cases immediately before the raid, the timing of the initial infections, and the close contact between guards and inmates during Operation Akili.

**b.  No Credible Second/Independent Source Reporting.**

726.    ***Second***, there is no credible reporting about a second source, independent of the raid, for the infections in Central through November 4, 2020.  There is no other "super-spreader" event, no specific infected guard was ever identified as a second source, and within CDCR's daily reports, there is no indication of a reportable event to compete with Operation Akili.

727.   The spread of Covid-19 radiated out from its origin in D-Wing, much like a rock dropped in a pond, and would be expected to ripple throughout Central and even eventually reach the shores of North CTF.

### c. The Lack of Any Gap Between Infections.

728.   ***Third***, based on the data Plaintiff has accumulated, there is no material gap between infections.  If Operation Akili started a Covid cluster but that strain fizzled out (for example, by August 31, 2020), there is a good chance there would be a gap between the last Operation Akili infection and the infections traceable to the new second source.

729.   However, a pictorial review showing the number of days between infections in this window tells us that there is no significant gap, certainly none that is longer than the outside incubation period of about 10 days, as depicted in Graph 1. Moreover, this lack of a gap is based on only 25% of the data; with a complete picture of all the contraction dates, there would most likely be even shorter gaps.

# **GRAPH 1**



## **NUMBER OF DAYS OF GAP BETWEEN INFECTIONS**

### (JULY 20, 2020 – NOVEMBER 4, 2020) (with 20% of Data)

### d.    A Single Source Can Easily Account for All Central Infections.

730.    **_Fourth_**, the New York Times reported Covid data for California as of April 2021.  That data included its report that 9/100 people caught the disease within the state, while 42/100 caught it while in custody in California, a 4.5 times greater risk from confinement.

731.    Similarly, a 2020 study analyzed the estimated reproductive rate, or R-naught, of Covid-19 in the custodial setting.[3]  It reported 8.44 as that rate.  The World Health Organization (WHO) estimated Covid R-naught outside of custody to be between 1-4 and 2.4.  The figures from the New York Times, the Puglisi study, and WHO exist in harmony.

732.    These numbers tell us that the disease is extremely contagious to those in these confined in close quarters.

733.    Given the uber-contagiousness of Covid-19 in custody, it is not surprising that a single infection on July 20, 2020 multiplied and spread to cause several hundred infections within three months.  A second, independent source of infection was certainly not necessary to produce an outbreak of this size.

734.    Frankly, the number of Covid-19 infections from the single source of the raid would have been much higher given an estimated R-naught of 8.44, but on August 1, 2020, CTF officials placed B-Wing, C-Wing and D-Wing on quarantine, thereby suppressing the accelerated spread in the custodial setting.

735.    Notably, officials did not put E-Wing on quarantine and this explains why the virus spread from D-Wing to E-Wing more aggressively, as shown in Figure 6.

736.    Consequently, given:

(i)     the zero-free Covid environment before the raid and the Covid ignition promptly after it;

---

[3]    Puglisi, _et al._, "_Estimation of COVID-19 basic reproduction ratio in a large urban jail in the United States_," Annals of Epidemiology 53 (2021) 103-105.

*(ii)*    the lack of any credible alternate second source reporting event;

*(iii)*    the lack of any gap between infections; and

*(iv)*    the powerful ability of Covid-19 to spread quickly in a custodial setting,

Plaintiff believes and thereon alleges that Operation Akili exclusively caused all (250) infections at CTF Central from July 20, 2020 to November 4, 2020.

### 2.    The Raid is Either the Exclusive or a Concurrent Cause as to the 2,500 Additional Covid-19 Cases as of November 5, 2020.

737.    Figures 6-7 depict how cases in October started to appear in CTF North and then increased dramatically in November, 2020.  The question for causation purposes is whether the spread into CTF North was a product of Akili, a product of other causes, or the confluence of both.

### a.    The Porous Barrier Between CTF Central and CTF North Suggests that the Virus Spread from D-Wing, Through Central, and then Moved from Central to North.

738.    Although CTF Central and CTF North are in many ways independent from each other, witness testimony establishes that the barrier between the two was quite porous in terms of people who might be carrying the virus to bring it from CTF Central to CTF North in the October-November time frame when infections began to appear in North.

739.    As related by an inmate witness, Derek Martinez:

> The only reason I believe we got any outbreak was because of the lack of mask wearing by staff that was shuffled between yards (from a day shift in C-yard to night shift here [in North] by same c/o's) to the lack of separation of medical staff to the separate yards.  The same medical staff that'd be exposed to corona in C-yard would then be asked to work here in the same day. That by itself would expose this population to covid. The same happened for sure in the kitchen where I was working. Staff that worked in central (C-yard) would come up and

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

do a shift here.  Then they would take down their masks in the office for half their shift (way over the ~8 ~ 15 min. exposure limit) talk/eat in confined quarters.  They would talk to us with masks down, and way closer than the 6 foot distance requirement.

When kitchen staff did test positive a few times, they did not test the workers and kept it under wraps that anyone did test positive or later called it a false positive, even though they would quarantine that staff for the 2 week quarantine period. ...

Or what happened to a few friends, they would get a false positive with no follow up test to see if it was a false positive and that resulted in them getting moved to the dorm (which was a designated quarantine zone). The dorm mind you was an open aired no separation area where if you didn't have covid before going there you were sure to get infected once there as happened to those with false positives that were sent there.  Once the dorm was filled up the staff made a tent city on both c-yard and here at north yard.  Overflow of positives were then sent to those areas as well as parts of some of the buildings (Whitney b at B-yard and Ranier b on A-yard).  …

740.   Given this testimony, which incidentally Martinez signed under oath, it is reasonable to infer that Covid spread from CTF Central to North via prison officials' decision to actively move people back and forth between Central and North during the epidemic.

### b. The Disproportionate Magnitude of CTF North's Covid Experience Relative to CDCR's Average Reporting Suggests that Operation Akili Is Equally Responsible for North's Cases.

741.   On November 5, 2020, CDCR reports 107 diagnosed infections in one day at CTF.  Given a reported 261 cases total from July 20, 2020 to November 4, 2020 – on average just 2.4 new cases per day – the virus blasted off to 44x its former daily rate on November 5, 2020 forward, with lower multiples through the 2020 winter.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

742. By the end of November, CTF reported 653 cases for that month and then reported 1,452 infections for December, 2020.  From November 5, 2020 to the end of the epidemic in March 2021, CTF reported a total of 2,463 cases, as reported in Table 4.

743. In general, the colder weather in November dramatically improved the conditions for the spread of Covid.  A study of CDCR's Covid-19 statistics at 32 other prisons (for which Plaintiff possesses both 2020 population and Covid-19 data) reflects that there were 21,285 infections for a prison population of 83,686 in a window from November 5, 2020 to December 31, 2020, excluding CTF, as shown below in Table 5.

**TABLE 5**

**CDCR COVID CASES - 2020**

| NO. | PRISON | POP. | 11/4/20 | 12/31/20 | DIFF. |
|---|---|---|---|---|---|
| 1. | ASP | 3286 | 2948 | 3110 | 162 |
| 2. | CAL | 2916 | 26 | 746 | 720 |
| 3. | CCC | 2099 | 667 | 1240 | 573 |
| 4. | CCI | 2929 | 857 | 1243 | 386 |
| 5. | CEN | 3080 | 75 | 512 | 437 |
| 6. | CHCF | 2379 | 10 | 441 | 431 |
| 7. | CIM | 1956 | 1435 | 1530 | 95 |
| 8. | CMC | 3023 | 302 | 1150 | 848 |
| 9. | CMF | 1963 | 8 | 448 | 440 |
| 10. | COR | 2917 | 363 | 715 | 352 |
| 11. | CRC | 1976 | 1665 | 1911 | 246 |
| 12. | CTF | 4200 | 261 | 2351 | 2090 |
| 13. | CVSP | 1855 | 1614 | 1798 | 184 |
| 14. | DVI | 1258 | 0 | 145 | 145 |
| 15. | FOL | 2011 | 1347 | 1360 | 13 |
| 16. | HDSP | 3295 | 5 | 1929 | 1924 |
| 17. | ISP | 2741 | 114 | 869 | 755 |
| 18. | KVSP | 3629 | 16 | 823 | 807 |
| 19. | LAC | 2680 | 198 | 1412 | 1214 |
| 20. | MCSP | 3850 | 45 | 1494 | 1449 |
| 21. | NKSP | 2306 | 86 | 656 | 570 |
| 22. | PBSP | 2191 | 3 | 194 | 191 |
| 23. | PVSP | 2743 | 30 | 1976 | 1946 |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | | | | | |
|---|---|---|---|---|---|
| **TABLE 5** | | | | | |
| **CDCR COVID CASES - 2020** | | | | | |
| **NO.** | **PRISON** | **POP.** | **11/4/20** | **12/31/20** | **DIFF.** |
| 24. | RJD | 3514 | 3 | 940 | 937 |
| 25. | SAC | 2233 | 12 | 234 | 222 |
| 26. | SATF | 4321 | 862 | 2992 | 2130 |
| 27. | SCC | 2865 | 18 | 1124 | 1106 |
| 28. | SOL | 3165 | 4 | 660 | 656 |
| 29. | SQ | 2614 | 2239 | 2245 | 6 |
| 30. | SVSP | 2885 | 129 | 414 | 285 |
| 31. | VSP | 2661 | 313 | 1481 | 1168 |
| 32. | WSP | 2345 | 295 | 1182 | 887 |
| 33. | Total | 87,886 | | | 23375 |
| 34. | **Exc. CTF** | **83,686** | | | **21,285** |

744.   Consequently, all other things being equal, the chance of a given inmate contracting Covid-19 while in prison at CDCR in the 11/5/20-12/31/20 window, apart from CTF, was 25.4% (21,285/83,686).

745.   Applying that percentage to CTF, without the impact of Operation Akili, and again emphasizing the assumption of all other things being equal, the remaining 4,200 inmates at CTF (separating out the roughly 600 inmates in D-Wing and E-Wing that had already experienced a full Covid-19 run by November 4, 2020) would have (based on the law of averages) resulted in about 1,067 additional, naturally-occurring infections (4,200 x 25.4%).

746.   However, CTF reported 2,090 infections from November 5, 2020 to December 31, 2020, about double (1.95x) than there otherwise would have been on average without the raid in this window (1,067).

747.   Given this data, and again speaking as a matter of averages (and discounting the witness testimony that suggests an open path of transmission from Central to North), it appears on a statistical basis that Operation Akili was responsible for about 49% of the CTF infections in this November-December window

(1,023/2,090); the other 51% (1,067/2,090) of infections might be attributable to the naturally higher risk of contracting Covid-19 from being in CDCR's custodial environment in November-December 2020.

748.   Like a forest fire, Operation Akili as the arsonist effectively created a situation in which there were a dozen or so still burning areas (active Covid cases) in Central as the incendiary conditions of early November approached.  We know that there was no firewall between Central and North; indeed, based on witness testimony, a case can be made that the opposite is true.

749.   For purposes of pleading a case of causation that plausibly suggests responsibility for CDCR officials under *Iqbal/Twombly* standards for all 2,463 cases beginning on November 5, 2020, the witness testimony and the math suggests that Operation Akili was an equal (49%) cause of those cases, relative to other forces.

750.   As an intentional tort, Akili is therefore clearly the legal cause of all 2,724 cases, both Central and North, from July 20, 2020 to March 15, 2021.

## ENTITLEMENT TO PUNITIVE DAMAGES

751.   As detailed by the evidence and allegations set forth both above and below, Defendants initiated a violent, racist mass tort against Plaintiff without cause, based on the pretextual claim of an urgency to gather gang evidence.

752.   However, acquisition of gang evidence putatively in Plaintiff's possession by beating inmates up and assembling them in close proximity was not a mission critical exercise, and could not in any realm of the imagination be justified during a global disease pandemic.

753.   Defendants' extraordinary racial animus expressed during the event was as gratuitous as it was telling about their intentions: to punish CTF Black inmates for race-based grievances they harbored against Blacks, but had nothing to do with *CTF* Black inmates' own conduct.

754.   Regardless, Operation Akili went well beyond the animus directed at the targeted population, spreading to all manner, ilk and identity of prisoner at CTF, and

exists as one of the most openly deplorable, reckless acts of wanton malevolence that agents of the California Department of Corrections and Rehabilitation have ever committed.

755.   As such, these elements of the case as demonstrated by the presentation of the above facts, including a simply shocking amount of racial invective, individually and in their totality, also entitles Plaintiff to relief in the form of punitive damages under the definitions set forth in federal law relating to evil motive,[4] in Civil Code section 3294(c)(1) pertaining to legal malice[5] and 3294(c)(2) relating to legal oppression.[6]

756.   In addition, certain causes of action automatically entitle Plaintiff to punitive damages if the elements of that claim are proven.

757.   If this case were brought to a jury, it could result in a shockingly high quantum of punitive damages – as shocking as Defendants' own conduct in waging deliberate biological warfare against a population they are legally obligated to protect.

---

[4]   This is phrased along the lines of 'evil motive or intent, or reckless or callous indifference to the federally protected rights of others.' *See Ngo v. Reno Hilton*, 140 F.3d 1299, 1302-1304 (9th Cir. 1998).

[5]   The term "malice" under California state law means "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Civ. Code, § 3294, subd. (c)(1).

[6]   The term "oppression" means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Civ. Code, § 3294, subd. (c)(2).

# CAUSES OF ACTION

## I.

## FIRST CAUSE OF ACTION

## VIOLATION OF FEDERAL CIVIL RIGHTS

## MASS TORT ACTION

## EIGHTH AMENDMENT VIOLATION INVOLVING
## CRUEL AND UNUSUAL PUNISHMENT

## (42 U.S.C. § 1983)

### (Against All Defendants Except Defendant 1)

758. Plaintiff incorporates paragraphs 1-757, as if fully set forth into this cause of action.

759. Plaintiff possessed a federally-protected right to be free from excessive force, a right secured by the Fourth Amendment to the United States Constitution, enabled for enforcement in the federal district courts pursuant to 42 U.S.C. § 1983.

760. The Eighth Amendment guarantees Plaintiff, a former prisoner, the right to be free from cruel and unusual punishment.

761. In carrying out Operation Akili, Defendants, and each of them, acting under color of law, used excessive, wanton, and gratuitous force, as set forth by the detail above, which caused Plaintiff various physical and psychological injuries.

762. Each Defendant, in executing Operation Akili, functioned as a participant in a sequence of events that caused Plaintiff to suffer excessive, wanton, and gratuitous force, as set forth by the detail above, which caused Plaintiff various physical and psychological injuries.

763. There is no indication in the evidence that, as sleeping persons, Plaintiff and the other inmate victims provoked, resisted, or presented any danger whatsoever to Defendants; indeed, there is no reason this raid needed to be, or should have been, conducted during a pandemic at all, as Black inmates were programming in a peaceful

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

manner and any danger analysis would immediately return a conclusion that no close-proximity exercises should be conducted at all given the extraordinary risk of contraction of disease and death.

764. But even if the raid could be justified during a pandemic, all the guards needed to do was wake the inmates up, ask or direct them to move out of their respective cells and escort them to a socially-distanced location, by respecting Covid-19 safety protocols. Defendants did the opposite.

765. There was absolutely no cause for Defendants to approach the situation with a violent, commando/military mindset.

766. Defendants were not easy to identify during the raid, as they were dressed in tactical gear, and based on multiple reports, were not wearing badges or other identifying tags, or were covering them.

767. As such, Plaintiff names all Defendants believed to have personally participated in Operation Akili, subject to later confirmation as to which defendants exactly handled which inmates, which at this time is functionally unknowable.

### A. CDCR Officials Inflicted Engaged in the Unnecessary and Wanton Infliction of Pain Toward Plaintiff During Operation Akili.

768. For all of the reasons detailed above, including the individual narratives provided, in which Defendants generally woke the targeted inmates up in the middle of the night by attacking them, threw them around their respective (concrete) cells, and otherwise gratuitously attacked them – instead of just waking them up and politely directing them to accompany guards to the Dining Hall – Defendants engaged in the unnecessary and wanton infliction of pain on the targeted inmates.

769. Defendants acting in a supervisory capacity were either personally involved in the assaultive conduct or directed the individual cell extractions.

770. Defendants acting in a supervisory capacity set in motion a series of acts by the violent extraction officials, knowingly refused to terminate such violence, which

they knew or reasonably should have known would cause the extraction guards to inflict unwarranted injury.

771.    Defendant supervisors are also responsible for culpable action or inaction in training, supervision, or control of the extraction officers, as they should have immediately halted any use of force.  As they did not, they acquiesced in the constitutional deprivation by the extraction subordinates.  Their conduct, in participating in gratuitous violence or allowing it displayed a reckless and/or callous indifference to the inmates, including Plaintiff.

772.    To the extent that Defendants inflicted cruel and unusual punishment by utilizing excessive violence, which was pursuant to the literal terms of Operation Akili, Defendants are liable for executing a policy that was itself a violation of the Eighth Amendment.

773.    Operation Akili was completely unnecessary: as per the daily reports, there was no STG threat emanating from CTF African-American population whatsoever. The last threats, in 2018 and 2019 respectively, involved the STG-11 Fresno Bulldogs, Surenos, and STG-1 Mexican Mafia in 2018, and then in 2019, an August 14, 2019 riot involving the Fresno Bulldogs, Surenos, Paisa, and Mexican Mafia.

774.    Consequently, CDCR's decision to attack CTF's Black inmate population during Operation Akili was utterly gratuitous, totally unnecessary, and as detailed above, reflects the ventilation of officials' race grievances that had nothing to do with the Plaintiff's own conduct.

775.    Well-aware that their actions were taken in blatant disregard of well-established constitutional norms, Defendants often wore no badges, nametags, or credentials by which they could be identified or obscured them. Therefore, Plaintiff alleges that each defendant named herein was responsible for and/or personally participated in these violations.

**B.    Plaintiff is not Required to Prove that Defendants' Conduct Was Malicious and Sadistic, but Even if He is so Obligated, Defendants' Actions Meets that Standard.**

776.    Eighth Amendment case law makes clear that in situations of prison disturbances, officials must balance the threat that unrest poses to inmates, prison workers, administrators, and visitors, on the one hand, against the harm inmates may suffer if guards use force to quell it.

777.    In these situations, it has been observed that corrections officials must make their decisions in haste, under pressure, and frequently without the luxury of a second chance.

778.    Thus, a standard has evolved that requires plaintiff inmates to establish that the officials' conduct was malicious and sadistic for injuries inflicted during a prison disturbance.

779.    However, this standard does not apply to this case, because this case did not involve a prison disturbance.  Operation Akili did not require guards to react, or respond, to a disturbance situation created by prisoners, thereby triggering an understandable amount of deference to officials making use-of-force judgments under pressure, through no action of the guards' own making.

780.    Rather, Akili involved CDCR officials' own premeditated decision to embark on a campaign of racial violence against sleeping inmates on their own volition, based on the pretext that there was a gang threat emanating from these inmates, in a situation where CDCR officials themselves voluntarily engaged in needless violence.

781.    Accordingly, the entire construct of a balancing test is inapplicable to this fact scenario.  This case is nothing more than CDCR guards' voluntary exercise to gratuitously attack CTF Black inmates without any legitimate reason whatsoever.  No deference to their judgments should be given, no balancing test should be employed, and no malicious or sadistic standard should be imposed.

782.    However, for all of the same reasons – that Operation Akili was effectively a misguided race-driven attack – CDCR guards' violent conduct toward sleeping persons satisfies a malicious and sadistic standard.  Indeed, some of the evidence, such as guards' open announcement that the inmates would contract Covid-19 and the very structure of Akili, designed to maximize that risk by rounding them up in close proximity during a pandemic known for the importance of social distancing, reflects CDCR officials' palpable desire to commit a mass murder of African-Americans by infecting them with a deadly disease.  Obviously, this is both malicious and sadistic.

**C.    For the Same Reasons, Plaintiff is not Subject to a *De Minimis* Injury Limitation.  Government Officials Are Liable for Gratuitously Tormenting Inmates, Regardless of the Injury Inflicted.**

783.    In cases of prison disturbances, such as the 2019 Mexican-mafia riots noted in the daily reports, or other scenarios where CDCR officials' actions can be justified by evolving circumstances that required them to make use-of-force judgments, *de minimis* injuries generally do not state an Eighth Amendment claim.

784.    However, like the malicious-and-sadistic requirement, this limitation presupposes that there was some plausible justification for CDCR officials' actions. Here, the guards' misguided race grievances do not qualify as any legal justification whatsoever.

785.    While it is true that not every malevolent touch by a prison guard gives rise to a federal cause of action, plaintiff, who were violently attacked while sleeping in his cell – and regardless of whether they suffered a discernable injury – CDCR officials' treatment of them was not just a "malevolent touch" but rather a premeditated, violent mass race attack involving multiple guards in the middle of the night assaulting sleeping inmates in disguise, igniting a Covid-19 epidemic, and inflicting the full spectrum on injuries, from minor ones up to and including death.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

786.    In this sense, Operation Akili constituted an event that was "repugnant to the conscience of mankind."  A physical injury is not required when an event meets that standard.

787.    As such, while certain inmates did suffer various injuries that were clearly beyond "*de minimis*," the "*de minimis*" injury limitation should not be applied in this case.  It certainly would not apply to Plaintiff Brown.

**D.  Supervisory Defendants Are Liable.**

788.    Defendants acting in a supervisory capacity were either personally involved in the assaultive conduct or directed the individual cell extractions.

789.    Defendants acting in a supervisory capacity set in motion a series of acts by the violent extraction officials and knowingly refused to terminate such violence. Defendants knew or reasonably should have known that their inaction would cause the extraction guards to inflict unwarranted injury.

790.    Defendant supervisors are also responsible for culpable action or inaction in training, supervision, or control of the extraction officers, as they should have immediately halted any use of force.  As they did not, they acquiesced in the constitutional deprivation by the extraction subordinates.  Their conduct, in participating in gratuitous violence or allowing it displayed a reckless and/or callous indifference to the plaintiff.

791.    To the extent that Defendants inflicted cruel and unusual punishment by utilizing excessive violence, which was pursuant to the literal terms of Operation Akili, Defendants are liable for executing a policy that was itself a violation of the Eighth Amendment.

## II.

## SECOND CAUSE OF ACTION

## CONSPIRACY TO VIOLATE FEDERAL CIVIL RIGHTS

## EIGHTH AMENDMENT VIOLATION
## CONSPIRACY TO MASS ATTACK
## SLEEPING INMATES WITH EXCESSIVE FORCE
## (42 U.S.C. § 1985)

### (Against All Defendants Except Defendant 1)

792.    Plaintiff incorporates paragraphs 1-791, as if fully set forth into this cause of action.

793.    The Eighth Amendment guarantees that prisoners cannot be subject to cruel and unusual punishment.

794.    Plaintiff possessed a federally-protected right to be protected from conspiracies to violate his constitutional rights, including his right to be free from cruel and unusual punishment, a right secured by the Eighth Amendment to the United States Constitution, enforceable for federal enforcement via 42 U.S.C. § 1985.

795.    Some number of days, weeks, or maybe even months before July 20, 2020, Defendants formed, planned, and agreed-on Operation Akili: a mass, gratuitously-violent attack on Black inmates without Covid-19 safety protocols that resulted in numerous needless direct physical injuries and resulted in a Covid-19 epidemic that spread throughout the entire prison.

796.    On information and belief, the operational plan of Operation Akili is supported by written detail that outlines Defendants' meeting of the minds to its objectives, plan, execution, and gratuitously-violent treatment of the targeted inmates. Defendants' coordinated action also reflects their meeting of the minds in terms of how the raid was to be, and was, carried out, in terms of rounding up inmates to place them in close proximity of each other, and in close proximity to guards, during a global pandemic.

797.    Defendants acted under color of state law in that they are state employees, operate the state prisons, and carry out the acts, omissions, policies, and practices described herein as California state agents.

798.    In carrying out Operation Akili, while acting as part of a conspiracy, Defendants inflicted cruel and unusual punishment, through the employment of excessive force, as set forth in detail above, which caused Plaintiff various physical and psychological injuries.

799.    Defendants were not easy to identify during the raid, as they were dressed in tactical gear, and based on multiple reports, collectively agreed to take steps to avoid being identified, by not wearing badges or covering them up.  As such, Plaintiff names all Defendants as co-conspirators that participated in Operation Akili.

800.    Defendants' conspiratorial campaign in Operation Akili was founded in racial discrimination, by targeting Black inmates for violence and danger by using the pretext of a gang investigation to commit these wrongs.

801.    Thus, Defendants did conspire to execute Operation Akili for the purpose of targeting Black inmates for racial discrimination in the form of gratuitous violence employed against them in a coordinated manner.  Defendants thereby deprived Plaintiff of the equal protection of laws, in terms of punishing them with violence without process or through lawful means, and Plaintiff was thereby injured.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

# III.

## THIRD CAUSE OF ACTION

## CLASS ACTION

## VIOLATION OF FEDERAL CIVIL RIGHTS

## EIGHTH AMENDMENT VIOLATION

## DELIBERATE MASS INFLICTION OF COVID-19

## (42 U.S.C. § 1983)

**(By Class Representative Lawrence Brown on Behalf
of all CTF Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021,
Against All Defendants Except Defendant 1)**

802. Plaintiff incorporates paragraphs 1-801 as if fully set forth into this cause of action.

### A. Background about CTF

803. Correctional Training Facility is one of 35 adult correctional facilities operated by California Department of Corrections and Rehabilitation. CTF is located in Soledad, California adjacent to Salinas Valley State Prison. It is comprised of three facilities: Central Facility, North Facility and South Facility.

804. According to internal CDCR documents in 2021, each facility operates independently of one another and has its own medical/dental/mental health services, kitchen, dining hall, canteen, library, chapel, clothing distribution, visiting, educational and vocational programming, and outside recreation.

805. As of April 2020, just before the raid, CTF's reported population was 4,801. The South facility is the original facility and opened in 1946 followed by Central Facility in 1951 and North facility in 1958.

806. According to internal CDCR documents, Central Facility is a Level II General Population unit consisting of nine three tier housing units of two person cells with a total bed capacity of 2,496. Each housing unit is ordinarily supervised by two custody officers. The housing units are similar with wet cells, an officer station outside

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

the gate, a shower room on each tier with a metal screen blocking the door, toilet area, two inmate phones, laundry area, and a barbershop.

807.   Central Facility contains two dining halls and a kitchen. Within Central Facility is the Prison Industry Authority Health Care Facilities Maintenance training area.  Central Facility also offers medical, medical triage, infirmary and dental.

## B.   Defendants Violated Plaintiff's Eighth Amendment Right to Avoid a Substantial Risk of Serious Harm from Disease.

808.   By July 19, 2020, and on information and belief, each Defendant was aware that inmates housed at CTF, and indeed all persons around the globe, faced an elevated risk of serious harm from potential infection with Covid-19, a deadly disease.

809.   By July 19, 2020, each Defendant was aware that there was a global pandemic related to Covid-19 and that one pathway of transmission of disease resulted from close contact with other people, in that respiratory droplets could transport the virus from one person to another.

810.   By July 19, 2020, each Defendant was aware that incarceration poses extraordinary risk of disease transmission due to the close quarters of so many people, including inmates, prison staff and other personnel.

811.   As such, by July 19, 2020, each Defendant, through various orders, directives, policy initiatives, and other mandatory obligations, was aware that it was his legal duty to minimize the spread of Covid-19 by not exacerbating the conditions that risk an infectious event, to respect standard safety precautions: social distancing, as much as possible in the prison environment; general minimization of needless movement and contact between people; utilization of masks and other protective gear; and isolation of inmates from other people upon confirmation of infection.

812.   Yet despite these standard precautions and well-known rights and safety rules, each Defendant embarked on, participated in, and executed Operation Akili, which was execution of a plan with the exact opposite philosophy.  It maximized contact between inmates by guards committing crimes on them through a cell extraction process

and intentionally attempted to infect them with Covid-19 by assembling them in one location, which they did.

813. Defendants weakened the inmates' natural immune defenses by assembling them in a common area without protective clothing or masks, at night and in the cold, and with the intent to expose and infect them with Covid-19.

814. Akili exposed inmates to a large number of other inmates and CTF staff during the extraction, assembly, and interrogation process, with the intent to infect them with Covid-19.

815. Defendants' Operation Akili was designed as an exercise in forcibly removing approximately 100 inmates from their cells, in the middle of the night while they were sleeping, in order to herd them into CTF's central dining hall #1 and placing them in close proximity with each other.

816. The guards required them to strip naked, did not respect social distancing rules, did not allow inmates to use their own masks, and did not provide them with masks. Warm clothing was denied and many inmates were in a near-naked state.

817. Defendants actively placed inmates in close contact with inmates, often by yelling or shouting at them at close range, thereby expelling respiratory droplets that were potentially infectious.

818. CDCR agents then individually interrogated the inmates about their gang affiliations while the larger group remained in this congested state of close physical proximity.

819. Meanwhile, Defendants variously informed the inmates, employing an unusual amount of racial invective, that they were recklessly and/or deliberately exposing them to Covid-19, that the inmates were going to get infected, or that they would now be infected. **Table 6** sets forth a representative sample of witness accounts.

| No. | WITNESS | EVIDENCE |
|-----|---------|----------|
| | **TABLE 6 – COVID VITRIOL** | |
| 1 | Shelton Adams | They told us (Black prisoners): "By the time this ordeal is over, you niggers will have Covid-19!" |
| 2 | Fred Brinkley | I asked [a guard], can I get some clothing and why were his colleagues not wearing masks and he responded by saying, "I'm not getting shit for you niggers, we don't care about Covid." |
| 3 | Terrence Brownlee | The officers ... didn't have any masks on. They told us we were going to get Coronavirus. |
| 4 | Marvin Foster | Guard: "'I hope you get COVID.'" |
| 5 | Antoine Keil | When I was in the chow hall they told us we were going to get Covid-19. |
| 6 | Anonymous | One officer said, "You Niggers will all have COVID when we're done with this." I was very confused."[7] |
| 7 | Gary Lawless | They told us to shut the fuck up and we were not allowed to put our masks on. When we were in the kitchen after being kicked in the nuts and dragged down the stairs, we have Covid now. |
| 8 | Gary Lawless | I had no shoes or mask on as I was dragged down the stairs in my boxer briefs. I asked for my mask and was told I don't need it, "everyone gonna catch coronavirus anyway." |
| 9 | Antwyone Lynch | I asked if I could wear a face mask or covering and they responded to me by saying, "no, we don't care if you catch COVID, you're a tuff crip!'" |
| 10 | Joseph O'Neal | The Supervising Sergeant was coughing and everybody started yelling for the Sergeant to put on a mask and he refused! I believe this incident was also to infect us (race) with COVID-19. |
| 11 | Clifford Williams | I was not provided adequate protection for COVID-19, when they placed me and two hundred other black inmates in a confined area without a mask or our face, for over 5 hrs. Unable to social distance." |

---

[7] *Armstrong v. Newsom*, N.D. Cal. Case No. 4:94-cv-02307-CW, Dkt. 3227 (N.D. Cal. 1994).

820.   Before Operation Akili, as of July 20, 2020, CTF Soledad did not have any cases of Covid-19.  After it, infections appeared and eventually spiked in the November-December 2020 window:



821.   As can be seen by CDCR's graph of CTF Covid-19 detail, after July 20, 2020, CTF reported its first batch of cases and then steadily over the next few months it turned into a spiraling epidemic, peaking in mid-December at over 500 active cases at any one time.

822.   In California, there were about 3,090,000 cases between July 2020 and February 2021.[8]  With a population of about 40M people, the risk of infection was therefore about 0.07725, or 7,725 per 100,000 (7.7/100).

823.   As of July 2020, CTF had an inmate population of 4,800.  Approximately 2,743 inmates contracted Covid-19 from July 2020 to February 2021.  This is 57%

_____

[8]   Based on reporting from the New York Times, it appears that there was an average of 7,000 new cases each day in California from July 20, 2020 to November 20, 2020.  From November 20, 2020 through February 20, 2021, there were approximately 25,000 cases per day in California.  Thus, the total number of infections in California in the July 20, 2020 to February 20, 2021 window is about $3,090,000.

percent of the CTF population.  Per 100,000 people, this translates to 57,000 people per 100K or 7.3 times as great a risk as the larger California population faced.

824.    In summary, the July 20, 2020 raid became a "super-spreader" event in that the mass aggregation of inmates in close proximity to one another (and to the guards), and especially their extraction from D-Wing, without safety precautions, such that the virus initially erupted and catalyzed the viral spread of the disease to the entire prison, to what ultimately became 2,743 infections and 19 deaths, by magnifying the risk of contraction to many times as great as the larger California population faced.

## C.  Class Action Allegations

825.    This cause of action is brought as a class action and may properly be so maintained pursuant to the provisions of Federal Rule of Civil Procedure 23.  Class representative Lawrence Brown brings this cause of action on behalf of himself and all CTF inmates who ultimately contracted Covid-19 from July 20, 2020 through March 15, 2021.  This class is reported to consist of approximately 2,743 inmates.

### 1.  Class Definition

826.    A class should be defined precisely and unambiguously, should be sufficiently definite so that it is administratively feasible to determine whether a particular individual is a member of the proposed class, and must not be defined so broadly as to include a great number of members who could not have been harmed by the defendant's allegedly unlawful conduct.

827.    The class is defined as all inmates housed at CTF Soledad that contracted Covid-19 from July 20, 2020 to March 15, 2021.

### 2.  Ascertainable Class

828.    The class is ascertainable because CTF is required by state law to carefully track and report all instances of contraction of serious diseases to state health authorities.  Consequently, CDCR possesses exact information as to who caught Covid-19, and when, as to all persons in its custody.  Without any assistance from official channels, Plaintiff has identified over 700 class members.

### 3. Numerosity

829.   Rule 23(a)(1) requires the plaintiff to show that "the class is so numerous that joinder of all members is impracticable."

830.   The class as identified, composed of approximately 2,700 inmates that caught Covid-19 in the designated window, is too numerous to make individual litigation practical or feasible.

### 4. Commonality

831.   Rule 23(a)(2) requires the plaintiff to show that there are questions of law or fact common to the class.

832.   Members of the class share numerous common questions of fact and law pertaining to the manner, method, and pathway of their contraction of Covid-19. Numerous issues relating to a true and accurate understanding of CTF's Covid-19 epidemic are common to the class.  These include:

(a)   Whether there were any documented Covid-19 infections before July 20, 2020 that could otherwise possibly interrupt causation between the raid and the epidemic;

(b)   the safety precautions in place to prevent the introduction of Covid-19 into the CTF prison population before July 20, 2020;

(c)   the impetus, details, plan, agreements, and coordinated action anticipated by Operation Akili;

(d)   pursuant to Operation Akili, whether CDCR actually rounded up approximately 100 Black inmates in Central Dining Hall #1 in close proximity during a global pandemic, required them to remove their clothes and packed them together without appropriate Covid-19 safety protocols, all of which would create the requisite viral conditions to trigger a super-spreader event.

(e)   the identity of the defendant actors involved in Operation Akili;

(f)   the chain of authority that permitted and/or encouraged the quantum of racial invective observed during the raid, in other words, did CTF guards announce that infecting the prisoners with Covid-19 was a

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

purpose of Operation Akili and did they plan the operation to achieve that outcome?

(g)  the safety precautions, if any (or the opposite) contemplated, expected and executed during Operation Akili with respect to containing the spread of Covid-19;

(h)  the exact etiology of the CTF Covid-19 viral epidemic and any secondary causes;

(i)  the details surrounding the abandonment of the pre-raid safety precautions that permitted the July 20, 2020 raid to initiate a spread of the virus;

(j)  various policy decisions after the raid to contain, quarantine or minimize the spread of Covid-19 – or their abandonment;

(l)  whether the July 20, 2020 raid in fact a "super-spreader" event such that it actually and proximately caused all 2,743 reported Covid-19 infections (and 19 reported deaths) at CTF from July 20, 2020 to March 15, 2021 (or some more limited number if causation was interrupted), even if each individual case of contraction might have had its own specific viral journey among the inmate population;

(m)  the typical experience of a person that is infected and nevertheless survives Covid-19, which was the vast majority of the class;

(n)  the types, forms, and extent of damages of surviving members of the class; and

(o)  whether Plaintiff and class members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and/or costs of suit.

### 5. Typicality

833.  Rule 23(a)(3) requires the plaintiff to show that the claims or defenses of the representative parties are typical of the claims or defenses of the class.

834.  The class plaintiff is representative of the larger class. Brown was housed in CTF D-Wing, where Covid-19 erupted, and he contracted Covid-19 in the designated window. There is no reason to think the class representative's claims are markedly different from the remaining class members: as per Figures 1-8. CTF officials infected

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

inmates in D-Wing, where Brown was – and indeed, he appears to be the first case – and the virus radiated outward from there.

835.   The class representative, and each class member, contracted Covid-19 in the designated window at CTF as a result of Defendants' original decision to introduce Covid-19 to CTF through Operation Akili, originating in D-Wing and spreading through Central CTF, and then jumping from Central to North, as reflected in Figures 1-8.

836.   The class representative alleges that he caught Covid-19 as the product of Defendants' original tort of conducting a conspiratorial super-spreader disease event on July 20, 2020.  Given the close timing between the raid on July 20, 2020 and the first cases of Covid at CTF on July 29, 2020, Figures 1-8 presented above indicate that the raid was indeed the source that spread the virus throughout the prison and thus is the presumptive causal mechanism for all members of the class.

837.   The class representative alleges that Defendants originally targeted African-Americans in Operation Akili, that the raid was motivated by racial animus, and that Defendants maximized, rather than minimized, the chance of infecting such African-Americans, and did so successfully during the extraction and interrogation process in D-Wing, as depicted in Figures 1-8, and radiating out from there.  Plaintiff has no reason to believe that members of the class would view the situation in any materially different way.

838.   The class representative alleges that as a result of the July 20, 2020 raid, he ultimately contracted Covid-19, although the exact path of transmission of the virus necessarily varies as to each class member, as it would for the spread of any disease.  Plaintiff has no reason to believe that members of the class would view the situation any differently.

839.   Plaintiff is unaware of any conflicting elements between himself, as the class representative, and the larger class: each has every incentive to establish that his contraction originated from the same original, assaultive, illegal, and intentional raid on

July 20, 2020, known as Operation Akili, while all make room for individual variation in the exact path that the virus took from the raid to reach him.

840.    Apart from the specific connection of the July 20, 2020 raid to a given member's particular contraction experience, and apart from the racism expressed by guards deliberately intending that result as the targets of Operation Akili, perceptions of the event specific to Covid-19 are similar and consistent, among the class representative, class members, and witnesses.

## TABLE 7 – COVID-19 DETAIL

| No. | WITNESS | EVIDENCE |
|-----|---------|----------|
| | **TABLE 7 – Covid Accounts** | |
| 1 | Shelton Adams | All of the assailants had their names concealed and they were unmasked. I was forced to remain naked in front of everyone. We were forced to violate social distancing protocols. In fact, the assailants were telling us we (Blacks) will have Covid-19 by the time this order was over.<br><br>Adams contracted Covid-19 on or about November 18, 2020. |
| 2 | Fred Brinkley | While being escorted to the Dining Hall, I observed many other prison officials did not have any face masks on. … I asked C/O Y. Martinez, can I get some clothing and why were his colleagues not wearing masks and he responded by saying, 'I'm not get shit for you niggers, we don't care about COVID' … I was putting in plastic zip tie hand restraints, denied to be allowed to put my mask on. The officers escorted me to the Facility Dinning [sic] Room area … The officers also denied prisoners to practice social distancing and deliberately mixed prisoners with prisoners in other housing units all of which violated COVID-19 health orders … In the Dining Room there were also approximately 150 prisoners in restraints and did not have masks on to cover our faces. There were also officers who did not have name tags on their uniforms that were not wearing any face covering and their mask was around their neck … Officers were coughing … and not wearing a mask and the prisoners in the dining room area in an up roar begin yelling telling the officers to put on a mask. The officers ignored us … the raid infected inmates with Covid-19, which is now |

| | | **TABLE 7 – Covid Accounts** |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| | | rapidly spreading in Soledad … I and the others were detained in the dining hall for several hours while our cells were ransacked by staff. Days later, some of the same inmates contracted Covid-19 … They dragged us all...to the dining hall in the dark with no shoes, clothes, mandated face mask (just the underwear we were sleep in), and placed at the dining hall tables four to a table in several rows next to each other. Though [it was] dark, I could easily discern from reflecting lights that none of the staff had facial mask on their faces.<br><br>Brinkley was diagnosed with Covid-19 on or about November 5, 2020. |
| 3 | Anthony Copeland | They continued to show me no concern, dragging me and pulling me out of my bed without allowing me to put on any clothes or my shoes or my mask to protect me from COVID-19.  I tried explaining to the officers that I have diabetes and have foot pain and I need my shoes. Once again, the officer showed no concern about my medical condition, and continued to pull on me walking down the hallway towards the dining hall, putting me in the dining with about a hundred other inmates with no mask on. |
| 4 | Christopher Cox | I was stripped naked and crowded with other Black inmates without masks. |
| 5 | Dameon Oliver | On July 20, 2020, at 3:00 AM I was awakened by some CTF guard ...pulling me out aggressively brutally from my ankles … without my Covid 19 face mask … the CTF guards violated my Covid 19 constitutional rights: They wore no mask. All the blacks were crowded up in the dining hall bunched up 3 feet or less apart. |
| 6 | Berlan Dicey | I hurried up the corridor into the dining hall where I saw 80 to 100 black men, no mask, crammed at the tables. |
| 7 | Vickter Estrada (Representative) | Estrada caught Covid-19 on approximately December 24, 2020.  He was housed at Rainier B in Soledad North, Cell 218.  His infection lasted approximately three weeks, from December 24, 2020 to January 13, 2021, and he suffers from loss of smell, taste, from headaches and fatigue. |
| 8 | Rahsaan Fitzgerald | I was walked to the dining hall maskless and seated around other Blacks who also were maskless … there's a mandatory mask wearing policy here at Soledad. I was not allowed to put my protective face |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | | **TABLE 7 – Covid Accounts** |
| --- | --- | --- |
| **No.** | **WITNESS** | **EVIDENCE** |
| | | mask on. I was escorted to the dining hall & seated around 100 or more Black Inmates wearing no mask. There were numerous officers coughing. My well-being was compromised by these officers' negligence. |
| 9 | Daitwon Futrell | Since the raid of July 20, 2020, about a week later this prison had its first outbreak … I was transferred here CTF from LAC (Los Angeles County) state prison. Now at LAC there was a very minimal amount of cases there. The prisons know what other prisons have, a high or low [number] of cases. There are also certain criterions that you must have to be transferred to this prison. A few of which are EOP, ASU, SHU or a lifer.  I have none of this and was still transferred to this prison. |
| | | This prison was still opened for transfers knowing of its outbreak. According to Sgt. Gonzalez this prison CTF (Central Training Facility) is not supposed to be accepting any inmates. I've been here since Oct 7, 2020 and have seen multiple wings get quarantined because of the virus. |
| | | On Nov 7, 2020, the wing I was in (G-wing) had 70+ cases. They tested us on Nov 5th and got the results Nov 8th. Now on Nov 9th the CO's in the wing that day told my cellie at the time that he was positive. Then they told me that I was going to move to a different wing. For whatever reason I did not move that night. So the next morning I packed up my property and pushed it outside the cell. They told me to go back inside the cell but I refused to go back in the cell. The cause of my refusal is because I was not going to stay in the cell with someone that tested positive for the Covid-19 virus. |
| | | Therefore I would be receiving an RVR (rule violation) for not going back in the cell with him. I don't believe I should be punished for being in charge of my life and health. This just shows their negligence for our health and safety. Also on Nov 10th this prison has exploded in cases of the corona virus. The last I heard this prison CTF has over 200 positive cases. Which proves that this prison since July does not have control of this deadly virus. |
| 10 | Bernard Harris | I was dragged out the cell … and escorted to the Dining Hall, without any shirt face mask or tennis shoe … while being escorted to the |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | **TABLE 7 – Covid Accounts** | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| | | Dining Hall, I observed that the escorting officers and other agents did not have any face masks on. When I asked why were we not seated six feet apart, I was told by the escorting officer, "Black Lives Don't Matter to Them!" |
| 11 | Mark Harris | [O]n 7/20/20, in the morning me and about one hundred to two hundred African inmate here at Central facility, Soledad state prison were [extracted] and placed in handcuffs and marched to central facility dining hall in nothing but under-wear, no shoes, socks, and no face mask to protect me from getting sick from covd-19. This act was dangerous … |
| 12 | Louis Johnson | [W]hat's funny is, two weeks prior to this raid, no inmates tested positive for the coronavirus, and two week after the raid, the prison became overwhelmed with corona virus.  As of yesterday, the administration locked down the whole prison, claiming 161 inmates tested positive, but … it's much more than that here now, and they not giving us anything outside our cells, such as showers, canteen, packages, phone calls, or any other program.<br><br>But yet, they allow inmates to cell feed us, and all the inmates that they say are positive, they are putting them in one big gym all together for 14 days, then allowing the inmates to go back to general population and continue to cell feed the whole population.  So yes, CTF is intentionally spreading the Covid-19 virus throughout this prison, and they are still conducting transfers from one prison to another, and forcing inmates to accept cellmates from other prisons. If an inmate refuses a cellie, he's then written up a rule violation and punished, sometimes even placed in the hole. |
| 13 | Antoine Keil | When I was in the chow hall they told us we were going to get Covid-19. They had their names covered and was not wearing facemasks. They kept calling us niggers, motherfuckers, and assholes … the officers didn't have facemasks on and they had their name tags covered. They told us that us niggas were infected now. |
| 14 | Gary Lawless | They told us to shut the fuck up and we were not allowed to put our masks on. When we were in the kitchen after being kicked in the nuts and drug down the stairs, we have Covid now … I had no shoes or mask on as I was dragged down the stairs in my boxer briefs. I asked |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| TABLE 7 – Covid Accounts | | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
|  |  | for my mask and was told I don't need it, everyone [is going to] catch coronavirus anyway. |
| 15 | Michael McCurty | While being escorted to the Dining Hall, I observed that none of the escorting officers and other agents [had] any face coverings or mask on (Going against COVID-19 directive orders) … I was pulled out of the cell ... without any shirt, face mask or shoes. I was held in the Dining Hall for almost 5 hours with over 100 other black inmates. |
| 16 | Troy Mendenhall | I was singled out because of my race, assaulted and potentially exposed to Covid-19, precluded from wearing a mask among 100 other prisoners. |
| 17 | William Milton | On July 20, 2020, at approximately 0300 hours, I was awoken by loud rumbling, shouting, and keys jingling as prison staff ran into and through X-Wing (running up the stairs). My assigned cell in X-Wing during the time in question was 137 (lower bunk). Cell 137 is the very first cell to the right upon entering the building. <br><br> I stood at the cell door trying to determine what was going on. I heard the prison staff go in to a cell to the right of my position. I recognized Prisoner Brownlee's voice (Terrance Brownlee, COCRI C20389). He was screaming as though he was in a lot of pain. <br><br> Brownlee·s screams got louder. I heard one of the prison staff shout "Shut the fuck up!" About a second or two later, I saw the prison staff drag Brownlee by his arm and hair between two tables that is directly in front of his cell (135) and hurried him out the building. One staff member had Brownlee by his arm (Brownlee was cuffed behind his back), and the other was pulling Brownlee by his hair. <br><br> Approximately ten seconds later, I heard loud bumping coming down the stairs as though someone was dragging something heavy. I saw a prison guard dragging Prisoner Adams (Shelton Adams, CDCR# J94864) by his head near cells 105 and 106, i.e., the prison guard had Adams in a headlock. <br><br> The prison guard attempted to drag Adams in said headlock position between the two rows of tables that are positioned directly in front of my cell, but decided to drag Adams toward the right side of the tables |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | TABLE 7 – Covid Accounts | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| | | positioned directly in front of cells 101 to 105 (east side of the building). The two rows of tables consist of six tables - two rows of three tables positioned parallel directly in front of cells 137 to 134 (west side of building) and 101 to 105 (east side of the building).'Ihe space in between the two rows is very narrow.<br><br>The prison guard had Adams in a headlock using his (prison guard's) left arm and his (prison guard's) right hand to tighten his (prison guard's) grip on Adams' head.<br><br>As they made their way to a position in between cells 101 and 102 – which is directly in front of me – the prison guard abruptly stopped and began choking Adams up against the chase door belonging to cell 101 using the headlock as a noose.<br><br>The prison guard had his back up against the wall (chase door) and pulling upward lifting Adams to the point he (Adams) was up on his toes and gagging for air.<br><br>My cell light was on and the prison guard looked in my direction. Upon seeing me, the prison guard yelled at the top of his voice, "Get on your fuckin' bunks!" I immediately got on my bunk.<br><br>Seconds later, a separate prison guard shined a bright light in my face from outside my cell door window. The prison guard shined the light in my face and then shined the light on my cellie as he slept on the upper bunk. The prison guard shined the light in my face again for approximately three to five seconds as I tried to shield my eyes from the laser powered beam of light.<br><br>I remained on my bunk and continued to listen to the goings on outside. I heard other prisoners crying out in pain as they were being beaten and drug down the stairs.<br><br>All the prison guards and staff I observed had their faces covered. I didn't recognize anyone other than than the aforementioned prisoners nor was I able to see any name tags.<br><br>Neither Brownlee or Adams appeared to be resisting, fighting back, or was posing any kind of a threat to anyone. Quite the opposite. |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | TABLE 7 – Covid Accounts | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| | | The only aggressors I observed were the prison guards. They were not utilizing excessive force to abate some threat, they were utilizing excessive force for the very purpose of sadistic gratification and to cause those prisoners serious harm.<br><br>William Milton subsequently contracted Covid-19 in November, 2020 as an occupant of X-wing in Central. He, and class member Corey Smith, were quarantined in the chapel (dorm setting). |
| 18 | Reginald Nettles | Prior to the 20, July 2020 raid, there wasn't a single case of covid-19; as of yesterday 11, November 2020 we now know from a local news report that the total number is 217 confirmed positive cases among inmates (active cases) and 20 confirmed active cases among staff here at CTF. |
| 19 | Anthony Oliver | All of a sudden, CTF during Aug.-Nov. 2020 have been having severe outbreaks of prisoners testing positive and there is no 'space' secured housing units to put them all in. So, prisoners' movement have been restricted only in our housing unit, 8 of 9 wings are on quarantine as I write, D-Wing was on quarantine Sept.-Oct. 2020, and G-Wing, X-Wing, Z-Wing was not.<br><br>However, as soon as D-Wing got cleared with having no more positive tests for COVID-19, outbreaks start in other wings, thereby placing us on quarantine and we never get a chance to see prisoners on quarantine. |
| 20 | Joseph O'Neal | The prisoners were not allowed to wear a mask and the peace officers disregarded...six feet away from people, denying us to practice social distancing … there were approximately 125 to 150 prisoners, all Black, none of us were allowed to retrieve our mask and we were mixing from all units. Several officers were not wearing a MASK, no covering and the Supervising Sergeant was coughing and everybody start[ed] yelling for the Sergeant to put on a mask and he refused! I believe this incident was also to infect us (race) with COVID-19." |
| 21 | Saul Pelayo | Pelayo believes that he became infected with Covid-19 on November 7, 2020. He tested positive for the virus on November 15. After testing positive for Covid, Pelayo was moved into quarantine, where his health declined rapidly. He was a resident of F-Wing in CTF's Central Facility. He lived on the third tier of F-Wing in cell 348U. |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| TABLE 7 – Covid Accounts | | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| | | Pelayo attributes the rapid spread of Covid, following the precipitating raid on July 20, 2020, to CTF's practice of knowingly mixing Covid-positive and Covid-negative prisoners. |
| | | CTF officials, Saul stresses, displayed callous disregard for prisoners' health and safety and cross-contaminated prisoners by intentionally moving positive prisoners with Covid-negative prisoners.  He is confident that this practice caused his own infection. |
| | | He reports that he is still dealing with lingering Covid symptoms.  He describes "mental fog" and headaches, chest pain and breathing difficulties, along with general fatigue. |
| 22 | Adam Sanford | A resident of G-Wing, Sanford tested positive for Covid-19 on November 5, 2020.  By November 11, 2020, G-Wing had become a quarantine location.  Covid-positive inmates were left where they were, while Covid-negative inmates were moved to different locations. |
| 23 | Jason Smith | I have been directly affected by the repercussion of the racial raid including but not limited to: (1) COVID-19 outbreak at CTF-C eleven (11) days later on 07/31/20 … as a result of the raid, dozens of prisoners contracted COVID-19 … [My complaint is that] conducting a racial raid targeting only black prisoners, in peak of the COVID-19 pandemic on 07/20/20, and failing to take proper safety protocols that subsequently led to an outbreak of the virus." |
| 25 | Clifford Williams | I was not provided adequate protection for COVID-19, when they placed me and two-hundred other black inmates in a confined area without a mask or our face, for over 5 hrs. Unable to social distance. |
| 26 | Marcelle Williams | Officers flagrantly violated COVID-19 protocols … social distancing and other COVID-19 protocols were not followed during the 2020-07-20 raid. |
| 27 | Anonymous | The only business they like is lockdowns and gang war, because they get hazard pay (2x their regular pay), if there is a lockdown. |

## 6.  Adequacy of Class Representative

841.   As alleged above, the class representative's claims are typical of the class members.  As detailed in his individual narrative, Lawrence Brown was attacked in his

cell in D-Wing on July 20, 2020, was the subject of close personal contact that probably caused him to become infected at that time. In addition, the class representative has been apprised of his duties and has been selected because of his knowledge, interest, and participation in these events. As such, he will serve as an adequate representative of the class.

### 7. Adequacy of Class Counsel.

842.    Class counsel is experienced in civil rights litigation, has previously and competently litigated a large mass tort/disease civil rights action, and possess no known conflicts of interest with the class representatives or the class members.

### 8. Risk of Inconsistent or Dispositive Adjudications

843.    Pursuant to Rule 23(b)(1)(A), a class action may also be maintained if prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

844.    Here, with as many as 2,700 individual actions theoretically possible, prosecuting separate actions would clearly create a risk of inconsistent or varying adjudications that would establish incompatible standards for CDCR.

845.    Pursuant to Rule 23(b)(1)(B), a class action may be maintained if adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

846.    Here, with as many as 2,700 individual actions theoretically possible, adjudications with respect to individual members would, as a practical matter, be dispositive of the interests of other members since Defendants may or will assert common defenses, some of which may dispositive as to others.

847.    Alternatively, with as many as 2,700 individual actions theoretically possible, adjudications with respect to individual members would, as a practical matter,

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

substantially impair or impede the ability of remaining class members to protect their interests.

### 9. Common Questions of Fact and Law Predominate

848. Pursuant to Rule 23(b)(1)(A), a class action may also be maintained if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

849. As reflected by the list above, the class representatives clearly share a number of common issues with members of the class. These same questions of fact and law are common to class members relative to plaintiffs proposing to litigate individual actions.

850. The general tenor of the case also weighs in favor of permitting the matter to proceed on a class action basis, as the vast majority of inmates do not have the technical or legal ability to prosecute a case of this complexity.

851. To Plaintiff's knowledge, there are no other known damage actions seeking class relief for wrongful contraction of Covid-19 at CTF; and there is little or no competition for this kind of complex, protracted, and difficult civil rights case.

852. The Northern District is the most logical and appropriate forum for this case given that all cases of contraction occurred in this District, at a single prison located within its federal jurisdiction.

853. The difficulty of managing this case as a class action is not exceedingly so. Plaintiff has already identified 25% of the class and has already developed a potentially certifiable class as of this writing with about 700 members. Defendants are statutorily obligated to maintain records that would enable Plaintiff to identify the remaining 2,000 class members.

854. Proposed class members are unlikely to be able to file individual suits on their own in light of the complex coordination required to successfully exhaust both prison administrative processes and DGS government claim processes, as all are

incarcerated and the vast majority are indigent and unrepresented. Plaintiff's counsel and the class representatives have made a concerted effort to protect the interests of the class on an administrative exhaustion basis.

855.    Class members have limited access to retained or court-appointed counsel. They have restricted access to research materials to protect their rights, including necessary forms and instructions to complete exhaustion processes fully and accurately. They face further obstacles relating to restrictions on their access to all of the above in light of the Covid-19 pandemic.

856.    In addition, they face the risk of retaliation for any legal (602) actions they take, as opposed to the class action vehicle where CDCR is not as easily able to retaliate against specific inmates who are prosecuting an action through class representatives.

857.    In summary, pursuant to Rule 23(b)(1), this case is appropriate as a class action suit because questions of fact and law common to the class predominate over the questions affecting only individual members of the classes. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by the vast majority of individual class member is disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to remedy Defendant's illegal conduct and actions.

**D.  Compensatory Damages – Models**

858.    Plaintiff seeks compensatory damages, because the American legal system achieves justice through such damages. Damages are case specific. This section sets forth a model pertaining to Covid class action damages, for reasons discussed below.

859.    There are essentially three categories of compensatory damages associated with a wrongful case of Covid-19 contraction:

**Type 1**:  death, for which the usual tort rules apply;

**Type 2**:   temporal Covid, in which the ailment comes and goes sort of like the flu and damages are comparatively modest; and

**Type 3**:   long-term Covid-19, which involves ongoing symptoms and disability from the ailment, which can only be assessed on a case-by-case basis.

860.   For estimation purposes in **Schedule 1** below, Plaintiff has selected high and low estimates for each type of damage.

861.   **For Type 1 cases** (death): $1M was chosen as a low estimate and $5M for a high estimate, type 1 cases.  According to CDCR data, at least 18 inmates died from Covid-19 in the class window.

862.   **For Type 2 cases**: Plaintiff selected $10K for a low estimate for a temporal Covid case and $20K for a high estimate, type 2 cases.  Average hospitalization costs for Covid-19 in 2020 are reported to be approximately $40,000. CTF prisoners do not pay their own hospital bills, but this figure informs a prototypical type-2 case's non-economic value: such damages would probably be $10-20,000.

863.   **For Type 3 cases**: Plaintiff chose a low estimate of $100,000 for a long Covid case and a high figure of $200,000.

864.   The Mayo Clinic reports that 11 months after having Covid-19, 20% of people ages 18 to 64 have at least one ongoing medical condition potentially attributable to it.  Among people age 65 and older, 25% have at least one such condition.  However, another study reported a figure of only 6%.[9]  For estimation purposes, Plaintiff chose the lower figure.

865.   These long-term risks are thought to be a product of injury sustained during the active Covid infection, such as organ damage.  People who suffered severe illness during their Covid infection, or perhaps are more vulnerable to respiratory infections (such as William Milton who suffers from a pre-existing case of valley fever,

---

[9]   Popescu, Saskia, "*Long-COVID: How Common Is It?*" Website: https://www.contagionlive.com (Oct. 26, 2022).

which CDCR also gave to him) might have damaged their heart, kidneys, skin, or brain. Inflammation and problems with the immune system can also occur.

866.   All of Plaintiff's figures are conservative.[10]

867.   The seriousness, severity, and potential damages associated with conducting biological warfare no doubt explain why a person can be convicted of a federal crime for even *falsely claiming* (to a single private individual) that he mailed a package containing a deadly virus.[11]

868.   Below is Schedule 1 setting forth high and low estimates for five different scenarios of the percentage of responsibility Operation Akili bears for the 2020-2021 epidemic at CTF:

   (1)   **Column B**: Operation Akili is responsible for 100% of the cases in Central through November 4, 2020 and 49% of Facility C's cases thereafter (397 cases of contraction, in total)

   (2)   **Column C**: Operation Akili is responsible for 100% of the cases in Central for the whole epidemic, but only Central (544 cases).  It is not responsible for cases in CTF North.

   (3)   **Column D**: Operation Akili is responsible for 100% of the cases in Central through November 4, 2020, 49% of Facility C's cases thereafter and 49% of North's cases thereafter (1,477 cases). Plaintiff's believes this is the closest model to the epidemiological truth.

   (4)   **Column E**: Operation Akili is responsible for the entire epidemic (2,724 cases)

_____

[10]   *See* Exhibit 110 (Cutler, et al, "*The COVID-19 Pandemic and the $16 Trillion Virus*," American Medical Association, JAMA Network (https://jamanetwork.com) (2020).

[11]   *See United States v. Hale*, 762 F.3d 1214, 1225 (10th Cir. 2014) (affirming a biological warfare conviction in which Defendant Hale tried to minimize his *false* claim that he sent a package to a romantic rival containing Hanta virus, with sobering commentary on the seriousness of such misconduct; here, of course, Defendants delivered the virus and caused some portion of an epidemic and deaths).

## SCHEDULE 1

| | HIGH/LOW DAMAGE ESTIMATES BASED ON VARYING IMPACT PROPORTIONS OF AKILI | | | |
|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** |
| **Damage Category** | **100% CTF Central to 11/4, 49% of Central After (0% North) (397 Cases)[12]** | **100% of CTF Central, 0% of North (544 Cases)[13]** | **Column B Plus 49% of North (1,487 Cases)** | **100% of Central and North (All) (2,724 Cases)** |
| **(Number of Cases) / Damages (Millions)** | | | | |
| **Low End (10K/case, 1M/death, 100K per long case)** | | | | |
| Type 1 ($1M)[14] | (2.5 Cases>3) 3 | (4) 4 | (9.8>10) 10 | (18) 18 |
| Type 2 (10K)[15] | (370) 3.70 | (507) 5.07 | (1388) 13.88 | (2,542) 25.42 |
| Type 3 (100K)[16] | (24) 2.4 | (33) 3.3 | (89) 8.9 | (163) 16.3 |
| **Total (Low)** | (397) 9.1 | (544) 12.37 | (1,487) 32.78 | (2724) 60.72 |
| **High End (20K/case, 5M/death, 200K per long case)** | | | | |
| Type 1 ($5M) | (3) 15 | (3.6>4) 20 | (10) 50 | (18) 90 |
| Type 2 (20K) | (370) 7.4 | (507) 10.14 | (1,388) 27.76 | (2,542) 50.84 |
| Type 3 (200K) | (24) 4.8 | (33) 6.6 | (89) 17.8 | (163) 32.6 |
| **Total (High)[21]** | (397) 27.2 | (544) 36.74 | (1,487) 95.56 | (2724) 173.44 |

[12] CDCR did not break down the number of cases between Central and North. Based on Figure 8, Plaintiff estimates that Central accounts for 25% of cases. Based on this estimate, Central's total is 544 cases. 100% of Central's cases through 11/4 is estimated (100% attributable to Akili) to be 250 cases (CDCR reported 261 cases through 11/4, the vast majority of which must have been in Central, *see* Figures 1-8). Forty-nine percent (49%) thereafter [(544-250)/2] adds another 147 cases after 11/4 for a total of 397 (250+147) Central cases for Column B.

[13] For Column C, based on CDCR's report of 2,724 total cases, 25% of cases translates to 544 cases in Central total. This makes the remainder in North 2,180.

[14] CDCR reported 18 deaths in its 2020-2021 Covid-19 epidemic detail, in the applicable window. (An early CDCR graph reports 17.) Plaintiff estimates the low end of a wrongful death case to be worth $1M; the high end $5M.

[15] Plaintiff provides two estimates for temporal Covid cases, $10K and $20K.

[16] Plaintiff estimates the percentage of Long Covid cases at 6%. Popescu, Saskia, "*Long-COVID: How Common Is It?*" Website: https://www.contagionlive.com (Oct. 26, 2022). We use estimates of $100K for low and $200K for high. This might be too low altogether. Exhibit 110.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

869.   As reflected by **Schedule 1** above, depending on the assumptions one makes about the impact Akili had on CTF Covid cases and the figures assigned to each kind of Covid-related damage (death, modest, long), the range of damages for the class is between $9M and $173M, the latter figure which assigns high figures to each form of damage and assumes that Akili was 100% legally responsible for the entire epidemic.

870.   Notably, the originally targeted inmates – members of CTF's Black population – were peacefully engaged in CTF's rehabilitative program only to be attacked, debilitated, and murdered by CTF officials, who decided to vent their anger about race issues – about murders from the 1970's, about the July 13, 2020 Harris stabbing, and about the rise of BLM in Minnesota – *none of which had anything to do with CTF Black inmates' own conduct*.

871.   On July 30, 2020, the California Department of Finance estimated CDCR's Covid-19 related costs as of that date, just four months into the epidemic, at $137M, which solely related to testing, equipment, tents and other logistic items. This figure excluded medical costs.

872.   The percentage of prison-age men (*viz*., no children) that require hospitalization after contraction of Covid is estimated to be 5%.  CTF's estimated hospitalization cost for 5% of 2,700 infections, at $40,000 per case, is $5.4M.

873.   CDCR's total hospital bill based on the same model, for the approximately 45,000 prisoners that caught Covid during the 2020 epidemic, and based on a 5% hospitalization rate, is estimated to be $90M, which frankly seems like an order of magnitude too low, given its other Covid-19 related expenses.

874.   Plaintiff and the class are entitled to recognition through such an award, and the associated public vindication that such an award conveys to the public, that Operation Akili was a biological warfare caliber wrong committed by prison officials against CTF's Black inmates (and on the larger inmate population) and caused an immeasurable amount of harm – besides death, Long Covid is not well understood – against CTF's targets and the larger inmate population.

875.   CTF Black inmates are especially entitled to be publicly vindicated as peaceful, and to earn a formal judicial declaration through this case outcome that CTF prison officials are not.

876.   CTF guards murdered and debilitated its inmates in 2020.  They called Black inmates every racial epithet imaginable.  Yet, despite all this, the inmates did not retaliate in kind.  As reflected by the writings of Talib Williams, who is litigating a related action, CTF Black inmates have elevated beyond the decisions of earlier Black CTF inmates who faced the same dilemma in the 1970's, after five Black inmates were murdered by CTF officials from 1968-1970.

877.   For current CTF Black (and other) inmates, it undoubtedly took a Biblical amount of internal strength, restraint, and personal courage to fire *pleadings* at CTF prison officials in response to Operation Akili, in lieu of home-made prison bullets, shanks to stab guards with, and/or embark upon other violent retaliatory measures.

878.   CTF Black inmates have instead, and in good faith, placed their trust in the peaceful dispute resolution process of the American federal court system.  They have put their trust in this Court.  They have foregone violence, despite having suffered a massive amount of violence committed against them.  This Court should not fail to give Plaintiff the opportunity to have their remarkable conduct and incredible restraint recognized.

879.   Most importantly of all, Plaintiff seeks for the federal legal system to broadcast a message to CDCR through this case's outcome, and the kind of attention that a significant award attracts, that will reverberate throughout the state prison system as a deterrent.

880.   The message, through this case's potential outcome, is that CTF officials (and other prison officials) must stop their murderous race war waged unilaterally against Black inmates (and other inmates, who were here effectively collateral damage), but if they will not, they will face, here to start and for now on, expensive legal consequences.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## IV.

## FOURTH CAUSE OF ACTION

## CONSPIRACY TO VIOLATE FEDERAL CIVIL RIGHTS

## CLASS ACTION

## EIGHTH AMENDMENT –DISEASE

## (42 U.S.C. § 1985)

### (By Class Representative Lawrence Brown on Behalf of all CTF Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021, Against All Defendants Except Defendant 1)

881. Plaintiff incorporates paragraphs 1-880, as if fully set forth into this cause of action.

882. Each plaintiff had a federally-protected right to be protected from conspiracies to violate their constitutional rights, including their right to be free from cruel and unusual punishment, a right secured by the Eighth Amendment to the United States Constitution, enabled for federal enforcement via 42 U.S.C. § 1985.

883. Some number of days, weeks or maybe even months before July 20, 2020, Defendants formed, planned and agreed-on Operation Akili: a mass, gratuitously-violent attack on the inmates without Covid-19 safety protocols being respected that resulted in numerous needless direct physical injuries and resulted in a Covid-19 epidemic that spread throughout the entire prison.

884. On information and belief, the operational plan of Operation Akili is supported by written detail that outlines Defendants' meeting of the minds to its objectives, plan, execution, and infectious outcome.

885. Defendants' coordinated action, and infectious results obtained, reflects their meeting of the minds in terms of the purpose and objective of the raid and conspiratorial nature of the raid.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

886.   Defendants acted under color of state law in that Defendants are state employees, operate the state prisons, and carry out the acts, omissions, policies, and practices described herein as CDCR state agents.

887.   In short, Defendants conspired through Operation Akili to mass infect the Black inmate population and successfully infected half of the entire CTF prison population, in violation of 42 U.S.C. § 1985, as reflected by the extensive set of facts alleged above.

## V.

### FIFTH CAUSE OF ACTION

### MASS PHYSICAL ATTACK AND DELIBERATE INFLICTION OF COVID-19 FOUNDED ON RACIAL DISCRIMINATION

### TORT ACTION AND CLASS ACTION

### (42 U.S.C. § 2000d)

**(By Plaintiff Lawrence Brown as Class Representative on Behalf of All CTF Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021, Against Defendant 1, CDCR)**

888.   Plaintiff incorporates paragraphs 1-887, as if fully set forth into this cause of action.

**A.  History of Racial Animosity Between Guards and Blacks**

889.   There is a 50-year history of animosity by CTF guards toward African-American inmates.  This violence was started by the guards – by a series of murders of Black inmates beginning in 1968 – and whose last installment (for the moment) was also by the guards, when they murdered 19 inmates as a product of infecting them with Covid-19 during Operation Akili.

890.   Prison officials generally murder inmates by one of four methods.  They:

    (1)   arrange for a target to be isolated in a contained area in the presence of his enemies, in which the enemies murder the target using various homemade weapons, most commonly a shank of some sort.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(2)  execute inmates from afar by rifle, after arranging for conflicting groups to interact on the yard, which provides the homicidal guard a putative basis to claim there was a potentially fatal event in progress and that he fired to protect human life.

(3)  Guards beat inmates to death, in close encounters, usually near their cell.

(4)  In more recent history, they infect inmates with deadly diseases.

891.  In April 1968, CTF guards arranged for the murder of Black inmate Clarence Causey, by the first method.  They arranged for Causey to be trapped in the presence of six rival Hispanic inmates who stabbed him to death.

892.  Six months later, in December 1968, CTF guards murdered William Powell.  When he would not leave his cell, guards dragged him out of it and beat him to death, which is method #3.

893.  Seven months later, in the summer of 1969, W.L. Nolen, a twenty-year-old inmate, began circulating a petition seeking to file a lawsuit against the prison's then-superintendent, Cletus Fitzharris, charging that prison officials were creating racial tensions and thereby putting inmates in harm's way.

894.  Six months later, on January 13, 1970, CTF corrections officers arranged for rival Black and White groups to be in the same prison common area, thereby invoking method #2.  Both sets of inmates thought that guards expected them to fight in order to settle disputes between them, as this was the insinuation of a CTF prison memo circulated before the event.

895.  Instead, however, Corrections officer Opie G. Miller, invoking method #2, murdered three Black inmates by rifle: W. L. Nolen, Cleveland Edwards, and Alvin Miller.  One of the White opposing members, Billie ("Buzzard") Harris, was also shot, but he lived.  This marked CTF guards' fifth murder of a Black inmate in less than two years.

896.  This was the last straw for Black inmates.  Three days later, on January 16, 1970, inmates murdered CTF guard John V. Mills.  The leader of this murderous

response was thought to be George Jackson, who was also a noteworthy scholar and founded a resistance organization named "Black Guerrilla Family," or BGF.  Black inmates left a note at the scene of Officer Mills' murder, "one down, two to go," evidently referring to Officer Miller's own triple murder on January 13, 1970.

897.   Six months later, on July 23, 1970, Black inmates murdered Officer William Shull, as their second installment of retaliation.

898.   A month after that, on August 7, 1970, George Jackson's little brother, Jonathan P. Jackson, stormed into a Marin County courthouse during the criminal trial of James McClain, who was himself on trial for murdering a white guard.

899.   Johnathan, with two others, attempted to free McClain and took hostages as leverage to potentially negotiate George's release.  However, they were gunned down as they fled the courthouse in a van, along with one hostage (notably, the judge presiding over McClain's case, Hon. Harold Haley) who the inmates murdered in the van, in the process of themselves being murdered during the escape attempt.

900.   Seven months later, on March 4, 1971, Officer Robert McCarthy was murdered by Black inmate Yugo Pinell, known by the moniker "Yogi Bear."[17]

901.   Five months after that, on August 21, 1971, as his trial approached for Mills' murder, George Jackson was involved in either an escape attempt or another frame-up by guards (that is, method #2), but either way, three guards, two White inmates and George Jackson were all murdered during the melee.

902.   Over the span of nineteen months from the time of the January 13, 1970 murder of Nolen, approximately forty people were murdered, 19 directly traceable to Nolen's murder.[18]

903.   On the inmate side, 23 inmates were charged with crimes, 21 of which were Black.

---

[17]   Exhibit 101.
[18]   Exhibit 102 (Yee, Min, The Melancholy History of Soledad Prison, Harper's Magazine Press, New York (1973).)

904.   No guards were ever charged.

905.   One might be tempted to assume that murders that occurred 50 years ago would have faded from memory, but any doubt about such forgiveness or forgetfulness is dispelled by CDCR's own conduct and admissions in the present.

906.   On July 5, 2019, CTF guards held a memorial service for Mills, Shull, and McCarthy (and a fourth guard, Conant, but he was murdered by White inmates), by naming street signs after the three.  Former Warden Koenig, and current lead individual defendant, presided over the event.  "Acting Warden C. Koenig addressed staff and guests and paid his respects to the fallen officers and their families. *Their sacrifice impacts our staff today. The staff was challenged and encouraged to never forget these fallen officers.*"[19]

907.   A photo taken of the event appears to depict him (third from the right) with other CTF staff, along with mock-ups of the street signs for McCarthy, Shull, and Conant (it is not clear why Mills did not get a street):

---

[19]   Exhibit 106 (Koenig, Craig, CTF Announcement, "*Street Signs Honor Fallen Correctional Training Facility Staff,*" Website: www.cdcr.ca.gov (July 5, 2019)).



908.   It is almost certainly impossible for current CTF staff to forget these historical events when they confront their memory in their daily driving on the streets in, around and/or near the prison, as well as holding public memorials that highlight these murders in the present, including to emphasize the loss suffered by the women and children of the fallen officers and by instructing current staff to "never forget."

909.   Hugo Pinell, the Black inmate that murdered Robert McCarthy, was kept in solitary confinement for approximately 45 years, putatively with his consent as a safety precaution to avoid being murdered, by method #1.[20]

---

[20]   Exhibits 104, 105, 111 (Azikiwe, Abayomi, "*Former Black Panther Killed in California Prison*," Worker's World (https://www.workers.org) (August 12, 2015); Cahill, Nick, "*State Sued Over Murder of 'San Quentin 6' Inmate*," Courthouse News (www.courthousenews.com) (September 27, 2016); *Estate of Hugo Pinell v. State of California*, Case No. 2:16-cv-02309, Dkt. 1 (N.D. Cal. 2015)

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

910. But in 2015, now housed at nearby Folsom Prison, Pinell was released by CDCR officials into the general yard and promptly murdered by members of the Aryan Brotherhood.

911. CTF and/or Folsom officials evidently invoked method #1 to murder Pinell, even though by 2015 he was an old man and he had been punished by having to live in solitary confinement for over 40 years, a punishment that reportedly drove him to, or over, the point of insanity.

912. Consequently, the history of animosity between White guards and Black inmates was still at the forefront of CTF officials' institutional memory when, after many years of relative peace (inasmuch as after 1971, the string of tit-for-tat murders seems to have subsided, probably because of Judge Haley's death), CDCR officials murdered Pinell in 2015.

913. Five years later, on July 13, 2020, a Black inmate named Michael Gregory Harris stabbed two guards at Folsom.[21]

914. This was just seven days before Operation Akili.

915. However, to the best of Plaintiff's information, although Harris was Black and although he was a Los Angeles gang member,[22] he was not part of BGF or any resistance movement by Folsom Black inmates intending to retaliate for Pinell's murder.

916. To the best of Plaintiff's information, Harris suffers from mental issues and is reportedly housed on an EOP (Enhanced Out Patient) yard. EOP yards, as described by CDCR, are for inmates with "chronic symptoms of mental illness."

917. CTF Black inmates have internalized the inadvisable risk of violent retaliatory behavior in prison. As related by Talib Williams in his 2020 article published in the wake of Operation Akili:

---

[21]  Exhibit 108 (Associated Press, "*Two guards stabbed at high-security prison in Folsom*," Fox 40 News (website: https://fox40.com) (July 13, 2020).

[22]  Exhibit 103 (*Finister v. R.T.C. Grounds*, 2015 U.S. Dist. Lexis 178861, Case No. CV 12-3717-SVW (PJW), (C.D. Cal. October 28, 2015).

The reality is, there has been no Black STG activity here at Soledad whatsoever. In fact, ask CDCR and Soledad CTF officials to release a report stating how many weapons Black incarcerated people have been found in possession of and how many STG related incidents in the last 10 years have Black incarcerated people been involved in, and I guarantee the answer will shock you.

I was able to obtain every single Program Status Report (PSR) from 2017 to 2020 and not one single report refers to a single STG activity involving the population of incarcerated Black people, not even in the days surrounding the raid. But herein lies the reason why: CDCR officials can't wrap their heads around the fact that incarcerated Black people throughout the entire state of California aren't involved in any STG gang activity.

As I've been highlighting in my writing these past couple of years, the criminal mentality of old that most people have been conditioned to associate with prison does not exist. Incarcerated people throughout California realize that the days of languishing in prison until one is useless and unable to contribute to society are over. …

… incarcerated people know that it is counter-productive to commit acts that justify one's incarceration. Not only are incarcerated people politically aware of the effects of violence, but thanks to Black resistance authors such as Bell Hooks, we are aware of the effects of violence in a more holistic way to where non-violence becomes a lifestyle as well as a rock to be used against a system that bases its very existence on our disfunction. It is incarcerated people who promote non-violence that make prisons obsolete.

918.   This reality, however, did not stop CTF guards from interpreting the Folsom stabbing by Harris as a response to Pinell's murder and plotting their own retaliation.

919.   As reflected by a declaration filed in the *Armstrong* case, an anonymous inmate subjected to Operation Akili reports: "They asked me if I was part of the gang 'BGF' or 'Black Guerrilla Family,' which was a group in the 1970s. I do not know if that

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

gang exists anymore. *They asked me if I knew anything about an incident at Folsom State Prison, where an officer was attacked by a Black incarcerated person*. I said that I knew nothing about the incident."[23]

920.   CTF guards are still emotionally invested and at times engulfed by the murderous events of the 1970's. They are still committing murders and other violent attacks in the present to "never forget" these conflicts.

921.   While Black inmates have elevated beyond this history toward normative American methods of dispute resolution, CTF guards have retreated to the tactics of the 1860's. A hallmark of KKK tactical history is the nighttime attack by White men in disguise. In its most active phase during the 1860's, White men routinely murdered Black people at night, using white hoods to disguise their identity and thereby avoid accountability.[24]

---

[23]   *Armstrong v. Newsom*, N.D. Cal. Case No. 4:94-cv-02307-CW, Dkt. 3227, pdf p. 77, ¶ 18 (italics added).

[24]   *See, e.g.* Poland, Senate Report, "*Affairs in the Late Insurrectionary States*," pp. 2, 7, 20, 22, 46, 57, 61, 62, 67-68, 72, 75, 77, 83, 99, 268, 369, 378, 448, 463, 474 477 (February 19, 1872) (referencing various acts of violence by KKK members in disguise, for example:
- Page 2: "The proceedings and debates in Congress show that, whatever other causes were assigned for disorders in the late insurrectionary States, the execution of the laws and the security of life and property were alleged to be *most seriously threatened by the existence of acts or organized bands of armed and disguised men*, known as Ku-Klux");
- Page 20: "There can be no doubt of the existence of numerous *insurrectionary organizations known as "Ku-Klux Klans," who shielded by their disguise*, by the secrecy of the movements, and by the terror which they inspire, perpetrate crimes with impunity."
- Page 99: "The law of 1871 has been effective in suppressing for the present, to a great extent, *the operation of masked and disguised men* in North and South Carolina."

*Monroe v. Pape*, 365 U.S. 167, 175 (1961) (quoting Sen. Lowe of Kansas during Congressional debates for precursor to today's 42 U.S.C. 1983 civil rights law, "While murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens, the local

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

922.   Operation Akili's nighttime attack by men in disguise shares many of the same tactical features, tone, and advantages used by Civil-War-era KKK members.

923.   True to Williams' observation, Plaintiff's review of CTF's daily diary from 2018 to present, what the institution calls its "Daily Program Reports," reveals that no Black gang activity was recorded as a problem at CTF from reports dating back to October 2018.

924.   Indeed, a search of over 500 daily reports from 2018 to the present did not return a single hit for "BGF," "guerilla,", "black," or "BLM."

925.   In the lead-up to Operation Akili, a review of these reports consistently reflects that CTF guards *were* concerned about two events *unrelated* to Black inmates that animated their daily policy decisions:

(1)   an October 16, 2018 "mass disturbance … involving STG-11 Fresno Bulldogs, Surenos, and STG-1 Mexican Mafia."

(2)   an August 14, 2019 "large scale riot involving STG-11 Fresno Bulldogs, Surenos. Paisa and STG-1 Mexican Mafia."

926.   According to the daily reports, some of these Hispanic groups were additionally perpetuating violence on non-affected inmates, and for these reasons, they were placed on a modified program.  This modification program limits the prison activity by these groups in various particulars.

927.   Regardless, it is clear from a review of CTF's daily journal that there was no Black gang activity raising concerns; therefore, the idea that Operation Akili was a necessary response to Black gang activity or BGF activity, Black violence, BLM, or other Black misconduct is simply fiction – a pretext for guards to commit violence on Black inmates for some other reason: the Harris stabbing chief among them, which guards assumed to be an organized response to the Pinell murder.  But it was not.  It was just a

administrations have been found inadequate or unwilling to apply the proper corrective. Combinations, darker than the night that hides them, conspiracies, wicked as the worst of felons could devise, have gone unwhipped of justice.")

random act of violence at another prison by a disturbed person. It had nothing to do with CTF or its peaceful Black population. Nor could CTF Black inmates exercise any control over the BLM events in Minnesota that spread nationally, other than to remain peaceful. Which they did.

928. In summary, the evidence that Operation Akili was a product of not only racial animus, *but entirely unwarranted racial animus*, is compelling:

(1) Guards initiated the raid just 7 days after a stabbing of two guards at Folsom by a Black inmate, even though this was a random event by a mentally disturbed prisoner at a different prison and not a response or retaliation by anyone, much less the targeted Black inmates at CTF;

(2) CTF guards harbor, perpetuate and relive murders from 50 years ago, even though the guards back then themselves started that violence: they murdered five Black inmates between 1968 and 1970, using methods 1-3 in their murder toolbox. The Black inmates only responded in kind after this quantum of bloodshed. Today's Black inmates at CTF have no affiliation with BGF or any violence it may philosophically authorize; CTF's daily record proves this.

(3) Still aggravated by these murders, guards in 2015, 45 years after the murder spree on both sides in the early 1970's, murdered Hugo Pinell using murder method #1, who was by then an old man and not a threat to guards. Black inmates at CTF had no connection to these events.

(4) Operation Akili exclusively targeted Black inmates, even though CTF Black inmates have no recent history of gang activity and have been peacefully using the 602 administrative system and the civil justice system to address their disputes, as does mainstream America. This seems to infuriate the guards in a different way, because the absence of Black violence results in the deterioration and incremental disempowering of CDCR's white-power, prison-industrial complex;

(5) The raid itself contained a singularly massive quantum of racist vitriol, as partly depicted in Table 1, reflecting guards open willingness to employ taboo racial epithets, as well as punishing

---

BROWN, *et al.* v. CDCR, *et al.*
FIRST AMENDED COMPLAINT – PAGE 186

Black inmates at CTF for the Harris stabbing and the BLM uprising in Minnesota – neither of which had anything to do with the Black inmates at CTF Soledad.

929.   In short, Defendants seem to eagerly embrace any opportunity to punish CTF Black inmates by murdering them: for wrongs in the 1970's that these inmates did not commit; for wrongs in 2020 that these inmates did not commit; and for BLM wrongs in Minnesota (notably, in response to yet another white law enforcement officer murdering a Black person) that these inmates also did not commit.[25]

930.   In fact, CTF guards seem to interpret any act of violence by a Black person against any White person as cause to attack *CTF* Black inmates, which is a profoundly disturbing and plainly illegal philosophy undergirding an equally illegal practice of CDCR vigilantism.

931.   CTF guards seem to be fighting a unilateral racial vigilante war against Black inmates.  In contrast, if Black inmates are fighting any war it all, it is a philosophical and legal (paper) war that is non-violent and complies with the recognized methods that all U.S. citizens are permitted to utilize to fight their battles.  It includes this lawsuit.

932.   It goes without saying that official vigilantism by CDCR's habit of murdering Black inmates (and/or physically debilitating them), here by the technique of attacking them and infecting them *en masse* with disease, and especially based on imagined provocations, merits uniquely harsh consequences by the civil justice system.

**B.  Satisfaction of 42 U.S.C. § 2000d Elements**

933.   Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, in programs or activities receiving federal financial assistance.

934.   Defendant CDCR receives federal financial assistance from the United States Department of Justice and related federal entities. CDCR is thus bound to comply

---

[25]    Exhibit 109 (Chart: "Tit-For-Tat Murder Chronology")

with Title VI and its implementing regulations, including 28 C.F.R. Sections 42.01 et seq.

935. A litigant bringing a claim for racial discrimination must assert that the agency in question does receive federal assistance and that the entity involved has engaged in racial discrimination causing the injury in question. Notably, the elements of the claim do not appear to require the victim to be a member of the targeted racially discriminatory act.

936. As to the first element, CDCR's budget for 2018, 2019, and 2020 reflects contributions from the "federal trust fund" to CDCR's budget.[26]

937. As to the second, CDCR officials conducted a raid denominated Operation Akili targeting approximately 100 CTF Black inmates, solely based on their race, by violently extracting them from their cells in the middle of the night, infecting them with Covid-19 in the process, and ultimately infecting half of the prison.

938. They liberally invoked racist vitriol against the Black inmates. It establishes Operation Akili as a race-motivated attack on CTF's Black inmates, in order to vent CTF prison officials' larger race grievances, such as the rise of BLM, murders of white guards in the 1970's, and a stabbing of white guards by a Black inmate at Folsom a week before the raid. However, none of these race-based grievances were attributable to CTF's Black population.

939. Accordingly, for clarity's sake, this cause of action contains two types of claims: (1) a claim by the Black targeted inmates that they were subjected to (as detailed above, *entirely unwarranted*) racial discrimination concomitant to Operation Akili; and (2) a claim by CTF's 2,700 infected inmates, Black or not, that Operation Akili, as a race-based tort, proximately caused them damage because this it acted as a superspreader disease event.

---

[26]   Exhibit 107 (excerpt of CDCR's state budget's federal contributions)

940.   Although a cause of action under 42 U.S.C. § 2000d does not require the racial wrong to itself be illegal – it merely needs to be an act that reveals race discrimination and causes damage – Plaintiff notes that Title 18 U.S.C. § 175 makes it a federal crime to wage biological warfare, for racial reasons or not.

941.   Defendants appear to satisfy the elements of the criminal statute, by volitionally transferring a biological infectious disease agent to the Black inmate population, and half of CTF's entire inmate population "for purposes of a weapon."

**C.  CDCR's Pathologically False Explanations for the Raid.**

942.   CDCR's explanation for the raid amounts to a pathological exercise in denial.   In the wake of protest after it, on July 21, 2020, the day after the raid, then-Warden Koenig described the raid as "efforts that help the men rehabilitate," even going so far as to say that:

> [A]n investigation was held as the result of STG behavior that
> has been ongoing at CTF. The incarcerated people in the
> investigation were not identified based on their race, and all
> safety protocols were followed through the investigation."
> Warden Koenig personally toured during the investigation to
> ensure it was being conducted safely and appropriately.
> Nobody was harmed and the institution's normal operations
> resumed quickly.

943.   Former Warden Koenig's argument that STG activity justified the raid is pathologically inaccurate.  As reflected by the daily program reports, Black gang activity was totally non-existent at CTF.  Koenig clearly knew this; he personally signed off on the daily reports.

944.   Warden Koenig's suggestion that no one was harmed during the raid is also preposterous, a blatant and obvious lie.  Numerous inmates needed medical care, numerous were injured in various particulars, not to mention the deadly infectious consequences of the raid, which resulted in Raemon Pardue's death and at least 17 others.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

945.  By Koenig's public example, CTF guards and officials were effectively authorized by him to engage in similar outright prevarication about the raid, and as a result, CDCR guards and officials also lied about these events in a brazen fashion.

946.  As just one example, there was a mountain of racist vitriol hurled at inmates during the raid.  But according to one of the more depraved guards (who in 2015 reportedly lit inmate Josh Soto on fire), Sergeant Josh Peffley (in a 602 response given to Reginald Ware), "he [Peffley] never observed or heard derogatory or inappropriate statements being used by staff and no inmates reported anything to him."

947.  Consequently, CDCR's version of these events is, and is expected to be, particularly unreliable.

## VI.

## SIXTH CAUSE OF ACTION

## STATE CLAIM

## VIOLATION OF CALIFORNIA RALPH ACT

## (Against All Defendants)

948.  Plaintiff incorporates paragraphs 1-947, as if fully set forth into this cause of action.

949.  California Civil Code section 51.7(b)(1) contains the operative text of the Ralph Act.  Its aim is to carry out the policy of the State of California to protect all persons from discrimination-based violence:

> All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51[27] … or because another person perceives them

---

[27]  Section 51(b) states in turn: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, *race*, color, religion, [*etcetera*] are entitled to

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

to have one or more of those characteristics. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive.

950. As detailed above, because of his racial characteristic of being African-American, Plaintiff was subjected to violence by CDCR guards on July 20, 2020 during Operation Akili.

951. As detailed in a representative format in Table 1 and Table 6 and by virtue of the individual stories of the inmates themselves – at a time when African Americans as a whole at CTF were programming and were not engaged in violence – the guards carried out a violent operation exclusively against them.

952. In doing so, the guards made overt, repeated, and vulgar references to racism. They subjected the inmates to significant violence in pulling them out of bed. They violently subdued, dragged, beat, punched, and choked inmates, in various degrees. The guards then rounded up by the inmates in one spot to catalyze a super-spreader Covid-19 disease epidemic event against the inmates, and they accomplished that purpose.

953. Given the detail documented above, racial animus was a substantial motivating factor of Operation Akili.

954. Plaintiff was injured in various particulars, as documented above.

955. Defendants' conduct was the direct cause of the inmates' immediate injuries, and to the extent that contraction of disease was a consequence for some, Operation Akili was at least a substantial factor in causing the resulting harm.

956. Pursuant to Civil Code section 52, Defendants' violation of the Ralph Act entitles Plaintiff to actual damages, punitive damages, a civil penalty (of $25,000), attorney's fees and injunctive relief.

---

the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

957.    Injunctive relief here is warranted to prevent agents of CTF, including Warden Koenig, of carrying out additional "Operation Akilis" directed against other minority groups or again directed at African Americans.

958.    Pursuant to Civil Code section 52(b), "[w]hoever denies the right provided by Section 51.7 or 51.9, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right and, in addition, the following:

(1)    An amount to be determined by a jury, or a court sitting without a jury, for exemplary damages.

(2)    A civil penalty of twenty-five thousand dollars ($25,000) to be awarded to the person denied the right provided by Section 51.7 in any action brought by the person denied the right… .

(3)    Attorney's fees as may be determined by the court."

959.    Plaintiff requests these remedies, as well as all other traditional legal remedies.

960.    Furthermore, pursuant to Civil Code section 52(b), all Defendants participating in Operation Akili are equally liable for the acts committed during it, as co-conspirators to a mass tort Ralph Act violation.

## VII.
### SEVENTH CAUSE OF ACTION
### STATE CLAIM
### VIOLATION OF CALIFORNIA BANE ACT
### (Against All Defendants)

961.    Plaintiff incorporates paragraphs 1-960, as if fully set forth into this cause of action.

962.    For at least the prior two years before July 20, 2020, Plaintiff and the larger African-American population at CTF were peacefully engaged in rehabilitative

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

programs (aka "programming") and were thereby exercising their civil rights to pursue liberty, safety and other civil rights (all thoroughly delineated in sections 1-7 of Article I of the California Constitution)[28], by slowly minimizing and removing the need for them to be punished or further incarcerated for their earlier criminal offenses.

963.   Defendant CDCR agents formulated Operation Akili, and pursuant to it, committed gratuitous violence, utilized provocative threats, and engaged in other acts of violent intimidation in order to force inmates to assemble without safety devices or precautions, in CTF central dining hall, at which time they were subjected to a super-spreader disease event designed to mass infect them with Covid-19.

---

[28]   Article 1 contains a long series of personal rights under the California Constitution, including:

**Section 1:**   "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

**Section 2(a):**   "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

**Section 3(a):**   "The people have the right to … petition government for redress of grievances, and assemble freely to consult for the common good." [Which, parenthetically, would permit – and prohibits retaliation for – the invocation of the 602 grievance process].

**Section 4:**   "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion.

**Section 6:**   "Slavery is prohibited. Involuntary servitude is prohibited except to punish crime." [Notably, incarceration requires inmates to work for slave wages.]

**Section 7(a)**: "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws…"

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

964. Defendants carried out Operation Akili to interrupt plaintiff's, and the larger African Americans inmate population's, peaceful attempt to rehabilitate. It did so to provoke violence or resistance in response that would give CDCR agents fresh cause to punish and continue incarcerating them.

965. Defendants' operation was designed to promote further violence; to disrupt, injure and provoke Plaintiff and other inmates peacefully exercising myriad rights designed to lift themselves out of their plight of long-term incarceration; and to retaliate against them for not meeting guards' violence with violence.

966. By carrying out Operation Akili in its several elements, Defendants intended to disrupt and deprive Plaintiff from pursuing his Article 1 state constitutional rights.

967. In addition, during the operation, Defendants made it clear through conduct that witnesses were not to recount their percipient observations, by offering to take their statements in front of a group of hostile CDCR agents colloquially known as the "goon squad." They thus committed a separate Bane Act violation, in this particular.

## VIII.

## EIGHTH CAUSE OF ACTION

## STATE CLAIM

## CALIFORNIA COMMON
## LAW ACTION FOR ASSAULT

## (Against All Defendants)

968. Plaintiff incorporates paragraphs 1-967, as if fully set forth into this cause of action.

969. Assault occurs when a defendant acts, intending to cause harm, that causes a plaintiff to believe he is about to be harmed, or, a defendant threatens and/or gestures in a way to make it appear that plaintiff would be harmed by that defendant.[29]

---

[29] CACI 1305.

970.   On July 20, 2020 Defendants acted, intending to cause physical harm to Plaintiff, by, among other things, violently removing him out of bed and physically attacking him, as well as creating close proximity contact without protection or social distance.

971.   After being awoken while sleeping, Plaintiff reasonably believed that he would be contacted in a harmful manner.

972.   Defendants were in a position to carry out such harmful contact, and they did so by inflicting injuries on Plaintiff as well as subjecting him to the risk of contraction of Covid-19 and ultimately infecting some of them by virtue of intentionally creating a "super-spreader event."

973.   At no time did Plaintiff consent to such conduct, provoke it, or act in any way that would make them responsible for it.

974.   Plaintiff was harmed.  He suffered physical and mental injuries as a result of Operation Akili, as referenced herein and to be detailed at trial.

## IX.

## NINTH CAUSE OF ACTION

## STATE CLAIM

## ACTION FOR BATTERY

## (Against All Defendants)

975.   Plaintiff incorporates paragraphs 1-974, as if fully set forth into this cause of action.

976.   On July 20, 2020, through Operation Akili, Defendants touched Plaintiff, intending to cause physical harm to him, by, among other things, violently removing him out of bed, and then attacking him as detailed above, and also yelling at him in close proximity, without protection or social distance, so as to maximize the chance of actual contraction of this disease, which did in fact occur.

977.   Plaintiff was in fact injured and infected.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

978.    Plaintiff did not consent to these acts.

979.    A reasonable person in Plaintiff's situation would have been offended by the unprovoked attack by Defendants.

# X.

## TENTH CAUSE OF ACTION

## STATE LAW BATTERY CLAIM

## CLASS ACTION

## WEAPONIZATION OF COVID-19 VIRUS

**(By Class Representatives Lawrence Brown on Behalf of All CTF Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021, Against All Defendants)**

980.    Plaintiff incorporates paragraphs 1-979, as if fully set forth into this cause of action.

981.    Defendants' Operation Akili was designed as an exercise in forcibly removing 100 inmates from their cells (45 are identified here), in the middle of the night while they were sleeping, in order to herd them into CTF's central dining hall #1 in close proximity.

982.    The guards forced extracted them in a nude or partial nude state, did not respect social distancing rules, did not allow inmates to use their own masks, and did not provide them with masks.  The guards did not observe standard safety precautions for minimization of disease spread; in fact, they maximized the risk that the inmates would get infected.

983.    CDCR agents then individually interrogated the inmates individually about their gang affiliations while the larger group remained in this congested state of close physical proximity.

984.    Meanwhile, Defendants informed the inmates, using abjectly unacceptable racial epithets, that they were deliberately exposing them to Covid-19, that

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

the inmates were going to get infected, and that they were now infected. Tables 6-7 set forth a representative sample of witness accounts.

985. As reflected by Table 6, Defendants showered the inmates with Covid-related invective, announcing their infectious intentions.

986. Before Operation Akili, as of July 20, 2020, CTF Soledad did not have any cases of Covid-19. As can be seen by CDCR's graph of CTF Covid-19 detail (above), after July 20, 2020, CTF reported its first batch of cases and then slowly but steadily over the next few months its rate increased and then it turned into a spiraling epidemic, peaking in mid-December at over 500 active cases at any one time.

987. Accordingly, CDCR's own statistics illustrate that the July 20, 2020 raid was in fact a "super-spreader" event in that the mass aggregation of inmates in close proximity to one another (and to the guards) without safety precautions introduced and catalyzed the viral spread of the disease to the entire prison, to what ultimately became 2,743 infections and at least 19 deaths.

## A. Class Action Allegations

988. Class representative Lawrence Brown brings this cause of action on behalf of himself and the approximately 2,743 CTF inmates who ultimately contracted Covid-19 from July 20, 2020 through March 15, 2021, pursuant to Federal Rules of Civil Procedure, Rule 23.

989. For the same reasons that a class action is certifiable in Cause of Action III, a class action for weaponization of disease as a matter of state law battery is certifiable.

990. Pursuant to Federal Rules of Civil Procedure, Rule 23, questions of facts and law are common to the class, including common issues set forth above (in Cause of Action Three).

991. In particular, Brown's contraction of Covid-19 represents a typical claim in that he was a direct victim of the July 20, 2020 raid, was not afforded Covid-19 safety

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

precautions during the round-up, and was exposed to and subsequently contracted Covid-19 as a result of the July 20, 2020 event as the catalyst.

992.    Defenses to the claim would also be common to all members of the class, including but not limited to, the defense's attempt to prove that the July 20, 2020 event was not a super-spreader event, that other paths were the primary cause of the subsequent spike of Covid-19 infections, that guards were following requisite safety protocols on July 20, 2020, and that they adhered to regulatory procedure in adopting and carrying out Operation Akili.

993.    Plaintiff Brown and his counsel will adequately protect the interests of the class.  They have no known conflicts of interest.  Plaintiff's counsel does not represent guards, police, or other state agents.  Plaintiff counsel is a 29th-year civil trial, civil rights, and appellate litigator, and is experienced in prison mass tort litigation.

994.    The questions of law and fact common to the members of the class predominate over any questions that may affect only individual members.  Like any disease event, individual contraction stories will of course have a level of uniqueness to them, in much the same random walk that ten dollars' worth of quarters (later learned to be toxic) might get distributed and passed around in a prison.

995.    But if a single super-spreader event is considered the original legal cause of the resulting infections – in other words, if for example $10 worth of toxic quarters should never have been introduced into the prison in the first place (even if the exact timing or exact method of transmission and distribution of the virus varies between individuals in the same way the journey of a given toxic quarter ends up in a particular prisoner's hands) – then the common legal issue of whether that original introduction caused all infections predominates over the particular contraction story of any given individual.

996.    For the victims of the CTF Covid-19 epidemic, a class action is equivalent or superior to other available methods for the fair and efficient adjudication of this

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

controversy.  Joinder of all individual victims that contracted Covid-19 would be impracticable.

997.    The class is readily definable as all persons who suffered contraction of Covid-19 from July 20, 2020 to March 15, 2021.  Prosecution as a class action will eliminate the possibility of duplicative litigation, while also providing redress for individual claims that would otherwise be too small, too difficult, and too burdensome to support the expense of individual litigation.

998.    The class of victims was damaged by the trauma and debilitation of being exposed to, and contraction of, the Covid-19 virus.  Most recovered, such that tort damages are modest but certainly not negligible.  However, some suffered more serious consequences, up to and including death, such that damages are higher

## XI.

## ELEVENTH CAUSE OF ACTION

## STATE LAW

## INTENTIONAL INFLICTION
## OF EMOTIONAL DISTRESS

### (Against All Defendants)

999.    Plaintiff incorporates paragraphs 1-998, as if fully set forth into this cause of action.

1000.    Defendants' Operation Akili was outrageous: the idea of committing systematic gratuitous violence against inmates to accomplish the logistic goal of moving them in close proximity to a dining hall without safety precautions, terrorizing them in numerous particulars along the way, conjoined with the decision to shower them with racial epithets during the process, and the larger plan to infect them with Covid-19 by creating a super-spreader disease event exceeds all bounds of conduct tolerated by a civilized society.

1001.    Defendants intended to cause the inmates, including Plaintiff, emotional distress during the process, by committing aforesaid gratuitous violence, humiliating,

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

and stripping their dignity with racial epithets, and telegraphing to them that they would be the subject of Covid-19 contraction, a potentially fatal event.

1002.   Plaintiff suffered severe emotional distress by being subjected to gratuitous violence, racial epithets, and the potential contraction of disease, as detailed in the individual accounts.

1003.   Defendants' conduct above was a substantial cause of each individual's distress.

## XII.

## TWELFTH CAUSE OF ACTION

## STATE LAW CLAIM

## NEGLIGENCE

## (Against All Defendants)

1004.   Plaintiff incorporates paragraphs 1-1003, as if fully set forth into this cause of action.

1005.   As prison officials and agents, Defendants were obligated to numerous standards: a standard to only use as much force as necessary to accomplish any particular prison objective; standards to employ careful safety protection and social distancing protocols to avoid the spread of disease; standards to avoid unprofessional behavior; standards to minimize the spread of infectious diseases.

1006.   Defendants shattered all of these standards, by resorting to excessive force to wake inmates up and move them to different places within the prison; by using guards from other prisons to conduct the raid, one of which started a viral epidemic; by not only not following standard safety protocols but intentionally placing inmates in close quarters in order to proactively accomplish the spread of disease among the African-American population; and by authorizing, ventilating and openly expressing their most basic racial hatred toward Plaintiff, in language that categorically defies all societal and professional norms.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1007.    Plaintiff was damaged by these actions, and inactions, by being physically brutalized, exposed to disease, and wrongfully vilified for the audacity of peacefully participating in the very programs designed to achieve rehabilitation.

## XIII.

## THIRTEENTH CAUSE OF ACTION

## STATE LAW CLAIM

## NEGLIGENT SUPERVISION

## (Against All Defendants who acted in a Supervisory Capacity)

1008.    Plaintiff incorporates paragraphs 1-1007, as if fully set forth into this cause of action.

1009.    On information and belief, a number of defendants present during Operation Akili served in a supervisory capacity:

1010.    As mentioned above, Plaintiff was subjected to CDCR supervisors who embraced their subordinates' racism, permitted their violent tendencies, and executed a plan with them to infect the inmates by proactively creating a super-spreader disease event.

1011.    Defendant supervisors were unfit, incompetent, and violated the standard of care to supervise the tasks of associated with Operation Akili, of moving inmates safely in order to putatively carry out a search of cells and an interrogation session looking for gang affiliation paraphernalia, for all the reasons set forth above: the raid turned out to be a violent, racist, disease-spreading mass murder.

1012.    Defendants' supervisory function was conducted below the standard of care for such a position because:

    (1)    They agreed to perform a supervisory role in Operation Akili at all;

    (2)    They selected, or permitted to be selected, subordinate officers that were incompetent, violent, racist, emotionally unstable (either generally or that day), and otherwise deliberately indifferent to the health and safety of the inmate population;

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(3)   They agreed to supervise anyone for an operation that was fundamentally racist, violent, and illegal;

(4)   When they observed subordinate officers behaving in a violent, inappropriate, or illegal manner, they did not step in (or they participated);

(5)   When they observed subordinate officers not conducting themselves in accordance with appropriate Covid-19 safety measures, they did not step in (or they participated);

(6)   When they observed subordinate officers not shielding their name tags, they did not step in (or they participated);

(7)   When they realized Operation Akili was fundamentally dangerous in terms of aggregating inmates in close proximity, they did not step in (or they participated);

(8)   They knew that Black CTF inmates were not engaged in gang behavior but decided to supervise their interrogation as if they were;

(9)   They supervised the punishment of Black inmates for actions not taken by them, such as murders from the 1970's, the rise of BLM, or the stabbing at Folsom prison by Harris;

(10)  such other acts and omissions below the standard of care for supervisory personnel as may be developed at trial.

1013.   Because Defendant Supervisors violated the standard of care for professional corrections supervisors in the above particulars, they behaved in a negligent supervisory fashion.

1014.   Plaintiff was harmed in various particulars, as detailed in the individual accounts, as Defendants' acts and omissions caused his injuries, infections, and other damages.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## PRAYER

*Wherefore*, Plaintiff and the Class pray for the following relief:

**On his First Cause of Action for Violation
of 42 U.S.C. § 1983, Plaintiff seeks:**

(1)     declaratory findings of co-conspirator and agency liability as between defendants;

(2)     economic damages;

(3)     non-economic damages;

(4)     punitive damages;

(5)     pre-judgment and post-judgment interest;

(6)     costs, to be determined;

(7)     attorney's fees as available by law;

**On his Second Cause of Action for Conspiracy
to Violate Federal Civil Rights under 42 U.S.C. §
1985, Plaintiff seeks:**

(8)     declaratory findings of co-conspirator and agency liability as between defendants;

(9)     economic damages;

(10)    non-economic damages;

(11)    punitive damages;

(12)    pre-judgment and post-judgment interest;

(13)    costs, to be determined;

(14)    attorney's fees as available by law;

**On his Third Cause of Action for Mass Infliction
of Disease Under 42 U.S.C. § 1983, Plaintiff and the Class Seek:**

(15)    certification of case as a class action;

(16)    declaratory findings of co-conspirator and agency liability as between defendants;

(17)    economic damages;

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(18)    non-economic damages;

(19)    punitive damages;

(20)    pre-judgment and post-judgment interest;

(21)    costs, to be determined;

(22)    attorney's fees as available by law;

**On their Fourth Cause of Action for Conspiracy to Mass Inflict Disease Under 42 U.S.C. § 1985, Plaintiff and the Class Seek:**

(23)    certification of case as a class action;

(24)    declaratory findings of co-conspirator and agency liability as between defendants;

(25)    economic damages;

(26)    non-economic damages;

(27)    punitive damages;

(28)    pre-judgment and post-judgment interest;

(29)    costs, to be determined;

(30)    attorney's fees as available by law;

**On their Fifth Cause of Action for Violation of 42 U.S.C. § 2000d, Racial Discrimination, Plaintiff and the Class Seek:**

(31)    certification of the disease aspect of the claim as a class action and declaratory findings of co-conspirator and agency liability as between defendants;

(32)    economic damages;

(33)    non-economic damages;

(34)    punitive damages;

(35)    pre-judgment and post-judgment interest;

(36)    costs, to be determined;

(37)    attorney's fees as available by law;

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**On their Sixth Cause of Action for Violation**
**of the California State Ralph Act, Plaintiff and the Class Seek:**

(38)    declaratory findings of co-conspirator and agency liability as between defendants;

(39)    economic damages;

(40)    non-economic damages;

(41)    civil penalties;

(42)    punitive damages;

(43)    statutory damages;

(44)    injunctive relief;

(45)    pre-judgment and post-judgment interest;

(46)    costs, to be determined;

(47)    attorney's fees as available by law;

**On his Seventh Cause of Action for Violation**
**of the California State Bane Act, Plaintiff Seeks:**

(48)    declaratory findings of co-conspirator and agency liability as between defendants;

(49)    economic damages;

(50)    non-economic damages;

(51)    civil penalties;

(52)    punitive damages;

(53)    statutory damages;

(54)    injunctive relief;

(55)    pre-judgment and post-judgment interest;

(56)    costs, to be determined;

(57)    attorney's fees.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**On his Eighth Cause of Action for Assault, Plaintiff seeks:**

    (58)    declaratory findings of co-conspirator and agency liability as between defendants;

    (59)    economic damages;

    (60)    non-economic damages;

    (61)    punitive damages;

    (62)    pre-judgment and post-judgment interest;

    (63)    costs, to be determined;

**On his Ninth Cause of Action for Battery, Plaintiff seeks:**

    (64)    declaratory findings of co-conspirator and agency liability as between defendants;

    (65)    economic damages;

    (66)    non-economic damages;

    (67)    punitive damages;

    (68)    pre-judgment and post-judgment interest;

    (69)    costs, to be determined;

**On their Tenth Cause of Action for Battery, Plaintiff and the Class Seek:**

    (70)    certification of case as a class action;

    (71)    declaratory findings of co-conspirator and agency liability as between defendants;

    (72)    economic damages;

    (73)    non-economic damages;

    (74)    punitive damages;

    (75)    pre-judgment and post-judgment interest;

    (76)    costs, to be determined;

    (77)    attorney's fees as available by law

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**On his Eleventh Cause of Action for Intentional Infliction of Emotional Distress, Plaintiff Seeks:**

    (78)    declaratory findings of co-conspirator and agency liability as between defendants;

    (79)    economic damages;

    (80)    non-economic damages;

    (81)    punitive damages;

    (82)    pre-judgment and post-judgment interest;

    (83)    costs, to be determined;

    (84)    attorney's fees as available by law.

**On his Twelfth Cause of Action for Negligence, Plaintiff seeks:**

    (85)    declaratory findings of co-conspirator, agency and entity liability as applicable to each Defendant;

    (86)    economic damages;

    (87)    non-economic damages;

    (88)    punitive damages, given a finding of gross negligence by Defendants;

    (89)    pre-judgment and post-judgment interest;

    (90)    costs, to be determined;

**On his Thirteenth Cause of Action for Negligent Supervision, Plaintiff Seeks:**

    (91)    declaratory findings of co-conspirator, agency and entity liability as applicable to each Defendant;

    (92)    economic damages;

    (93)    non-economic damages;

    (94)    punitive damages;

    (95)    pre-judgment and post-judgment interest.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(96)     costs, to be determined.

Date: October 6, 2025                          PAVONE & FONNER, LLP

_____
Benjamin Pavone, Esq.
Attorneys for Plaintiff and the Class

## REQUEST FOR TRIAL BY JURY

Plaintiff respectfully requests trial by jury.

Date: October 6, 2025                          PAVONE & FONNER, LLP

_____
Benjamin Pavone, Esq.
Attorneys for Plaintiff and the Class

# EXHIBIT 101

# Guard Killed By Inmate At Soledad

*From Our Correspondent*

Soledad,
Monterey county

A Soledad Prison correctional officer died early yesterday after being stabbed in the neck late Wednesday by an inmate in the institution's "X" wing adjustment center.

Officer Robert J. McCarthy, 43, was the eighth man — including three officers to be killed at Soledad in the past 13 months.

Hugo Pinell, 26, an inmate convicted of rape in San Francisco in 1965, and currently serving a life sentence for attacking a San Quentin correctional officer in 1968, was being questioned yesterday by Monterey county district attorney investigators.

Pinell, a Nicaraguan, was also convicted of assaulting another inmate at Folsom Prison last year and is awaiting trial on charges of stabbing Correctional Officer William Monaghan at Soledad last December. Monaghan recovered from his wounds.

According to prison officials, Officer McCarthy was

*See Back Page*

# Soledad Guard
# Stabbed to Death

From Page 1

making a routine count of inmates in the harsh maximum-security wing about 11:10 p.m. Wednesday when Pinell summoned him back, saying he wanted to mail a letter.

Officers who witnessed the incident said McCarthy stepped up to Pinell's cell door to take the letter and the inmate suddenly lashed out through a small iron flap in the door, stabbing the officer in the neck.

### PENS

Authorities declined to identify the weapon or say whether it was found, but indicated that weapons in the tight adjustment center are sometimes fashioned from such items as ballpoint pens and toothbrushes.

The stabbing severed an artery in McCarthy's neck, according to officials, and he was rushed to the prison hospital with Sergeant Dwight Phierolf, 46, holding his finger over the wound to halt the bleeding.

Emergency surgery was performed at the prison hospital and McCarthy, a retired Army veteran, was transferred to Fort Ord hospital where he died at 6:37 a.m. yesterday.

### WIFE

McCarthy, who had been an officer at Soledad since 1966, leaves a wife and two children at the family's home in Marina. He had been working full-time in "X" wing since August, 1969.

Pinell was taken from his cell to another maximum security section of the prison and was undergoing questioning yesterday while other inmates in "X" wing were locked in their cells to permit a complete search of the area.

So far this year, five correctional officers have been stabbed in Soledad's



*AP Wirephoto*

**ROBERT McCARTHY**
**Fatal neck wound**

"X" and "O" wing adjustment centers — referred to in the prison as "the hole." At least one inmate has also suffered stab wounds in an attack by other inmates.

### BRAWL

Soledad's adjustment center has been almost continually in the news since an eruption of violence in January, 1970, when a white officer shot and killed three black inmates to break up what authorities said was a racial brawl in the prison's "O" wing exercise yard.

Three days later, a young white officer was thrown to his death over a railing in one of the prison's wings.

The three black inmates charged with that crime became known as the "Soledad Brothers," and are being held in San Quentin awaiting trial. Their case has become a major subject of activist protest throughout the country.

Another guard was killed at Soledad in July of last year, and a total of five inmates were killed in separate incidents before the year was out.

# EXHIBIT 102

# The Melancholy History of Soledad Prison *In Which*

## *a Utopian Scheme Turns Bedlam*

## Min S. Yee

COMMUNITY COLLEGE OF DENVER
RED ROCKS CAMPUS

## HARPER'S MAGAZINE PRESS

Published in Association with Harper & Row, New York

entering yet another bad conduct report in his file to "further arouse the hostility" of the Adult Authority parole board. He reminded the court that the parole officials are "guided solely by the reports and recommendations of the prison officials."

The last allegation in Nolen's suit was even more damaging to the prison. He swore that Soledad officials were "willfully creating and maintaining situations that creates and poses dangers to plaintiff [Nolen himself] and other members of his race." Nolen said he "feared for his life." The case never came to trial; four months after he wrote the petition Nolen was shot to death by an O-wing guard. Two other black inmates, one of whom signed Nolen's petition, were also shot to death.

The killing of W. L. Nolen, on January 13, 1970, began an incredible chain of tragedies that led the California prison system to disaster. The initial consequence was the first killing of a guard in Soledad history, a revenge murder, and from there the poison spread. In the nineteen months following the January 13 incident, at least forty persons were killed as a result of events and circumstances in the California prison system. Of the forty, nineteen murders are directly linked to the series of tragedies which began with the shooting of W. L. Nolen. For the killing of seven guards, two CDC staff members and a Marin County judge, twenty-one blacks and two whites, all inmates, have been charged. No CDC guards or staff have been charged with the shooting deaths of seven black inmates.

These men died:

W. L. Nolen, black inmate, shot by white guard, O. G. Miller.
Cleveland Edwards, black inmate, shot by white guard, O. G. Miller.
Alvin Miller, black inmate, shot by white guard, O. G. Miller.
John V. Mills, white guard, beaten and shoved to his death; George Jackson, Fleeta Drumgo and John Clutchette, three black inmates, charged, acquitted.

36 ]    The Melancholy History of Soledad Prison

William Shull, white guard, stabbed to death; seven blacks charged, three went to trial, all acquitted.

Robert J. McCarthy, white guard, stabbed to death; Hugo Pinell, black inmate, charged.

Kenneth Conant, white prison administrator, stabbed to death; two whites charged.

William Christmas, black inmate, shot to death at the Marin Civic Center.

James McClain, black inmate, shot to death at Marin.

Jonathan Jackson, black youth, shot to death at Marin.

Harold J. Haley, white judge, shot to death at Marin; Ruchell Magee and Angela Davis charged; Davis acquitted, Magee on trial as this is written.

Richard L. McComas, guard lieutenant, gun suicide, after about a hundred Soledad inmates were transferred to Deuel; reportedly committed suicide because he feared for the lives of his men.

Leo Davis, white guard, stabbed to death while guarding a "snitch" who testified in the murder of guard Shull.

Paul Krasenes, white guard, stabbed and strangled to death.

Frank DeLeon, white guard, stabbed and shot to death.

Jere Graham, white guard, stabbed and shot to death; five blacks—Hugo Pinell, Fleeta Drumgo, John Larry Spain, David Johnson and Willie Tate—and two whites—an inmate named Luis Talamantes and an attorney named Stephen Bingham—charged with the three guards' deaths and the two stabbing deaths of:

John Lynn,

Ronald Kane.

George Jackson, shot to death by two white guards.

James Carr, considered George Jackson's closest friend on the outside, shot to death on lawn of his home; two whites charged.

Four other people were critically wounded in two of the above incidents but they survived:

Gary Thomas, assistant district attorney, Marin County, paralyzed from the waist down by gunshot wound to spinal column.

Kenneth McCray, white guard, throat slashed from ear to ear.

Charles Breckenridge, white guard, throat slashed badly.

Urbano Rubiaco, white guard, minor throat slashes, deep stab wounds to throat.

# EXHIBIT 103

# Finister v. R.T.C. Grounds

United States District Court for the Central District of California

October 28, 2015, Decided; October 28, 2015, Filed

CASE NO. CV 12-3717-SVW (PJW)

**Reporter**

2015 U.S. Dist. LEXIS 178861 *

DASHAUN FINISTER, Petitioner, v. R.T.C. GROUNDS, Warden of SVSP, Respondent.

**Subsequent History:** Adopted by, Writ of habeas corpus denied, Dismissed by, Certificate of appealability denied Finister v. R.T.C. Grounds, 2016 U.S. Dist. LEXIS 82004 (C.D. Cal., June 22, 2016)

**Counsel:  [*1]** Dashaun Finister, Petitioner, Pro se, Soledad, CA.

For R T C Grounds, warden of SVSP, Respondent: Dana M Ali, CAAG - Office of Attorney General, California Department of Justice, Los Angeles, CA.

**Judges:** PATRICK J. WALSH, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** PATRICK J. WALSH

## Opinion

REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This Report and Recommendation is submitted to the Hon. Stephen V. Wilson, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California. For the reasons discussed below, it is recommended that the Petition be denied and the action be dismissed with prejudice.

I.

SUMMARY OF PROCEEDINGS

A. State Court Proceedings

In July 2009, a jury in Los Angeles County Superior Court found Petitioner guilty of first degree murder during an attempted robbery and attempted murder. (Clerk's Transcript ("CT") 260-61.) The jury found that he committed the offenses for the benefit of a criminal street gang and that a principal used and discharged a firearm during the commission of the crime, causing great bodily injury. (CT 260-61.) He was sentenced to life in prison without parole plus 90 years to life.[1] (CT 274-76.) **[*2]**

---

[1] Petitioner was tried jointly with co-defendant Michael Gregory Harris, who was also convicted of first degree murder and attempted murder. (CT 262-63, 277-79.)

Petitioner appealed to the California Court of Appeal, which reduced his sentence but, in all other respects, affirmed the judgment in a written opinion.[2] (Lodged Document Nos. 4-8.) He then filed a petition for review in the California Supreme Court, which was summarily denied. (Lodged Document Nos. 9-11.)

B. Federal Court Proceedings

Thereafter, Petitioner, proceeding *pro se*, filed a Petition for Writ of Habeas Corpus and, ultimately, a Second Amended Petition (hereinafter "Petition") in this court, pursuant to 28 U.S.C. § 2254, claiming that the trial court violated his constitutional rights by failing to *sua sponte* instruct the jury with CALCRIM No. 703, governing accomplice liability in felony murder prosecutions.[3] (Petition at 8-9.)

II.

STATEMENT OF FACTS

The following statement of facts was taken verbatim from the California Court of Appeal's opinion affirming Petitioner's conviction:

**The burglary**

On January 31, 2008, Luz Gonzalez (Gonzalez) pulled into her driveway and noticed that the front door was ajar and the back door was wide open. When she called her husband on her cell phone he assured her that he had locked the doors before leaving the house that morning. Gonzalez walked into the house and saw that the house had been burglarized. Missing possessions included a large screen television, a camera, jewelry, an iPod, cash, a .45-caliber Para-Ordnance semi-automatic pistol, a .380-caliber Colt Mustang rifle, and a .38-caliber Colt gun. The guns were registered to Gonzalez's husband. Prior to the burglary, Gonzalez's husband had loaded Winchester .45-caliber bullets into the .45-caliber pistol. After the burglary, Gonzalez found the box of Winchester .45-caliber ammunition in a closet and turned it over to the police.

**The murder and attempted murder**

On February 1, 2008, [Steven] Harvey returned home to his duplex residence after taking his son to school. Harvey lived in the rear unit **[*4]** with his father, and his aunt lived in the front unit. Harvey closed the screen door, but not the wooden door leading to the outside. Harvey's cousin [Larry] Fulton was waiting for Harvey in the living room. The two sat down to play a video game. [Harris and Petitioner] then burst through the screen door, brandishing weapons and shouting "Give us all your money. It's a stick-up. It's not a game. Give us the money." Harvey initially stared at [Harris and Petitioner] in astonishment. Harvey got a good look at [Petitioner] and identified him from a photographic lineup and at trial. Harvey testified at trial that [Harris] looked like the second man, but he was not 100 percent sure.

---

[2] Petitioner's sentence was modified to life without the possibility of parole, plus 57 years to life. (Lodged Document No. 8 at 3, 23-24.)

[3] Although Petitioner has listed five separate claims for relief in his Petition, the claims are interrelated and each depends upon a finding that the court erred by failing to give **[*3]** CALCRIM No. 703 to the jury.

[Petitioner] was carrying either a nine-millimeter or .45-caliber handgun. Harvey told [Harris and Petitioner] that he had about $600 in the dresser in his bedroom and that he did not have any weapons. [Harris and Petitioner] took Harvey and Fulton to the bedroom with guns pointed at and touching their hands which were clasped behind their heads. [Harris and Petitioner] said that they needed at least $1,000. [Harris and Petitioner] threatened to blow Harvey and Fulton's heads off if they did not give [Petitioner **[*5]** and Harris] the rest of the money. [Harris and Petitioner] assured Harvey and Fulton that the threats were made "on the hood cuz," which is akin to a solemn oath made on the neighborhood. Fulton then gave the men $100 from his wallet. [Harris and Petitioner] herded Harvey and Fulton into the hallway, where they stood shoulder to shoulder. [Harris] was standing directly behind them and [Petitioner] was standing about six to ten feet away in the living room near the couch. Harvey began to fidget with anxiety, which seemed to upset [Harris and Petitioner]. Fulton assured them that Harvey was just jumpy and they intended to comply with [Harris and Petitioner's] demands. Harvey and Fulton never resisted or struggled with [Harris and Petitioner]. [Harris and Petitioner] ordered Harvey and Fulton to kneel with their hands behind their heads. Fulton immediately knelt, but Harvey continued to fidget. [Harris and Petitioner] argued between themselves about what to do with their captives. One of the assailants said that they should take Harvey and Fulton with them. The other shouted "No. Fuck that" and fired two shots as Harvey began to kneel next to Fulton. One shot hit Fulton in the back of **[*6]** the head and the other hit Harvey in the leg. [Harris and Petitioner] then fled. Harvey saw Fulton lying in a pool of blood and that his lips were moving.

Harvey's aunt saw [Harris and Petitioner] running out of the rear unit. She summoned emergency services when she saw that Harvey was wounded. Harvey and Fulton were taken to the hospital by ambulance. Fulton had suffered a fatal bullet wound to the head. The bullet entered the back of his head, perforated the right lung, and fractured the fourth cervical vertebrae. Harvey suffered a bullet wound to his thigh and was hospitalized overnight. He still had a scar at the time of trial.

**The investigation**
An expended .45-caliber bullet was recovered near the couch, a jacketed bullet fragment was found near a pile of clothing in the hallway, and an expended .45-caliber casing was also found in the hallway. Harvey's father found another .45-caliber casing in a pile of clothing in the hallway the day after the shooting. The casings were manufactured by Winchester. The casings and cartridges had been fired from the same .45-caliber firearm. The .45-caliber Para-Ordnance handgun is one of five weapons that could have fired these bullets.

Los Angeles **[*7]** County Sheriff's Department (LASD) Deputy Edmund Anderson testified that the casings and cartridges recovered from the Harvey house were consistent with the bullets found in Gonzalez's box of ammunition. The bullet removed from Fulton's body was the same grain size as the Gonzalez ammunition.

Deputies arrested [Petitioner] at an apartment in Long Beach where Harris's girlfriend Madalion Bradley (Bradley) lived with Domenique Lewis (Lewis). Items stolen from the Gonzalez residence were recovered from the same Long Beach apartment. Harris, who was not arrested at that time, was outside the apartment when [Petitioner] was detained.

**Harris's statements**

Three weeks after [Petitioner]'s arrest, Harris contacted authorities and arranged to meet LASD Deputy Todd Anderson in front of the Compton courthouse. Harris admitted his membership in the Acacia Block Crips gang and that his moniker was "Rocca." He eventually admitted his involvement in the Gonzalez burglary and that he had stolen a large screen television, some jewelry, an MP3 player, an iPod, a gold .38-caliber pistol, a .380-caliber pistol, and a black .45-caliber Para-Ordnance semi-automatic pistol. Harris said he put the items in a **[*8]** backpack and hid it near a canal, but thereafter could not find it. Later Harris admitted that he took the .45- and .380-caliber pistols to Lewis and Bradley's Long Beach apartment. He also claimed he gave the .45-caliber Para-Ordnance pistol to someone who sold it for $400 the day before the murder of Fulton. Harris said he had given the gold gun to a person named "Weezie." Harris knew that a .45-caliber gun had been used in the murder and the location of the wounds on each victim, even though the police had kept that information from the public. He also knew that one of the victims was named Steve. As he was being arrested, Harris stated: "I don't think that dude ever saw my face."

## Lewis's statements and testimony

In February 2008, Lewis was interviewed by detectives while she was in custody. She told them that [Petitioner] and Harris were at her apartment with a group of other people. [Petitioner] and Harris claimed that they had shot someone and [Petitioner] admitted he was the shooter. At trial, Lewis testified that she had met [Petitioner] a few months before the murder. Harris and [Petitioner], also known as "Baby Tray," visited her apartment occasionally. On the day of the Gonzalez **[*9]** burglary, [Harris and Petitioner] brought a large screen television and jewelry to Lewis's apartment, claiming the items had been taken during a burglary they had just committed. Five days after the Fulton murder, Lewis heard [Harris and Petitioner] talking about shooting someone during a home invasion robbery. [Petitioner] said that when the victim tried to stop him, he shot the victim. When Lewis asked [Petitioner] why he did not just shoot the victim in the knee, [Harris and Petitioner] hung their heads. Lewis saw [Harris and Petitioner] with a black handgun before the day of the murder and noticed them spending more money than usual after the murder. She also testified that she told the truth to the detectives. She denied telling the police what they wanted to hear just so she could get out of jail.

## Gang expert and other witness testimony

LASD Deputy Frederick Reynolds (Deputy Reynolds) testified as a gang expert that [Harris and Petitioner] were members of the Acacia Block Crips gang. The Acacia Block Crips gang makes its money by selling drugs and committing robberies and burglaries. Deputy Reynolds opined that [Harris and Petitioner] committed the murder and attempted murder in **[*10]** order to benefit the Acacia Block Crips because they swore "on the hood," and used a high level of violence during the crime. He testified that gang members maintain respect for the gang by committing murders.

Weezie was arrested after the Gonzalez burglary but before Gonzalez reported the crime to the police. One of Gonzalez's guns was recovered from Weezie when he was arrested. Weezie was incarcerated in juvenile hall on the day Fulton was murdered.

Robert Royce (Royce), a private investigator engaged by [Harris and Petitioner], testified that he interviewed Lewis while she was in custody and that she told him she did not tell the police the truth and that she would say anything they wanted to hear in order to get out of jail. Lewis said that she did

not tell the police that Harris was in possession of a handgun while in her apartment. Royce told her he would report her statements to defense attorneys.

(Lodged Document No. 8 at 4-8.)

III.

STANDARD OF REVIEW

The standard of review in this case is set forth in 28 U.S.C. § 2254:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated **[*11]** on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law if it applies a rule that contradicts Supreme Court case law or if it reaches a conclusion different from the Supreme Court's in a case that involves facts that are materially indistinguishable. *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). To establish that the state court unreasonably applied federal law, a petitioner must show that the state court's application of Supreme Court precedent to the facts of his case was not only incorrect but objectively unreasonable. *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010). Where no decision of the Supreme Court has squarely decided an issue, a state court's adjudication of that issue cannot result in a decision that is contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

Petitioner raised his claim in his **[*12]** petition for review in the California Supreme Court, but that court did not explain its reasons for denying it. (Lodged Document No. 10.) The appellate court, however, did (Lodged Document No. 8), which this Court presumes is the basis for the state supreme court's subsequent decision denying the claim. In this situation, the Court looks to the appellate court's reasoning and will not disturb it unless it concludes that "fairminded jurists" would all agree that the state court's decision was wrong. *Richter*, 562 U.S. at 102; *Johnson v. Williams*, 133 S. Ct. 1088, 1094 n.1, 185 L. Ed. 2d 105 (2013) (approving reviewing court's "look through" of state supreme court's silent denial to last reasoned state-court decision).

IV.

DISCUSSION

Petitioner claims that the trial court should have *sua sponte* instructed the jury with CALCRIM No. 703 because it was not clear from the evidence whether Petitioner or Harris was the shooter.[4] (Petition at 8-9.)

---

[4] CALCRIM No. 703 defines the intent requirement for an accomplice charged with special **[*13]** circumstances felony-murder as follows:

He argues that, without that instruction, the jury could have convicted him of murder without finding that he acted with the intent to kill or with reckless indifference to human life, as required under state law. (Petition at 9.) There is no merit to this claim.

A faulty jury instruction warrants federal habeas relief only if the instruction by itself so infected the entire trial that the resulting conviction violated due process. *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). Where, as here, the alleged error is the failure to give an instruction--as opposed to giving the wrong instruction--the burden on a petitioner is "especially **[*15]** heavy" because any such omission is "less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977). To obtain habeas relief in this circumstance, a petitioner must also show that the error had a substantial and injurious effect or influence on the verdict. *Calderon v. Coleman*, 525 U.S. 141, 145, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998).

In denying this claim, the California Court of Appeal held that the trial court did not have a duty to *sua sponte* instruct the jury with CALCRIM No. 703 because there was evidence that Petitioner was the actual shooter:

> At trial, Lewis confirmed that she told detectives that [Petitioner] shot Fulton. She testified that she confronted [Petitioner] and asked him why he had to shoot the victim. The passages that [Petitioner] cites to in support of his argument that Lewis suggested neither [Petitioner] nor Harris was the shooter or that both were the shooters do not support his interpretation. At one point, Lewis testified: "I said that as far as either one of them just coming out saying, 'Yeah, I killed them' ... I never heard that come out they mouth." Lewis's testimony that [Harris and Petitioner] hung their heads came immediately after she testified that she asked [Petitioner] "Why did you tell anybody?" He responded,

---

If you decide that (the/a) defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance[s] of <insert felony murder special circumstance[s]>, you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life.

In order to prove (this/these) special circumstance[s] for a defendant who is not the actual killer but who is guilty of first degree murder as (an aider and abettor/ [or] a member of a conspiracy), the People must prove either that the defendant intended to kill, or the People must prove all of the following:

1. The defendant's participation in the crime began before or during the killing;

2. The defendant was a major participant in the crime; AND

3. When the defendant participated in the crime, (he/she) acted with reckless indifference to human life.

[A person acts with reckless indifference to human life when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death.]

[The People do not have to prove that the actual killer acted with intent to kill or with reckless indifference to human life in order for the special circumstance[s] of <insert felony-murder **[*14]** special circumstance[s]> to be true.]

[If you decide that the defendant is guilty of first degree murder, but you cannot agree whether the defendant was the actual killer, then, in order to find (this/these) special circumstance[s] true, you must find either that the defendant acted with intent to kill or you must find that the defendant acted with reckless indifference to human life and was a major participant in the crime.]

If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that (he/she) acted with either the intent to kill or with reckless indifference to human life and was a major participant in the crime for the special circumstance[s] of <insert felony murder special circumstance[s]> to be true. If the People have not met this burden, you must find (this/these) special circumstance[s] (has/have) not been proved true [for that defendant].

(Lodged Document No. 8 at 20-21 n.5.)

"Well, what **[*16]** am I going to do?" Moreover, in closing argument, the prosecutor argued that [Petitioner] shot Fulton in the head and Harvey in the leg.

(Lodged Document No. 8 at 21.)

The appellate court also found that any error in omitting the instruction was harmless because the jury necessarily found that Petitioner acted with the requisite intent to kill even if he only aided and abetted the murder:

> Assuming that the evidence did not establish that [Petitioner] was the shooter and that the jury could conclude from the evidence that [Petitioner] or Harris was the aider and abettor to the other, we find that the trial court's failure to instruct with CALCRIM No. 703 was harmless beyond a reasonable doubt.

> Here, the jury was instructed with CALCRIM No. 600 that "To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person. [¶] ... [¶] ... In order to convict the defendant of the attempted murder of Steve Harvey, the People must prove that the defendant not only *intended to kill Larry Fulton but also either intended to kill* **[*17]** *Steven Harvey, or intended to kill anyone within the kill zone*. If you have a reasonable doubt whether the defendant *intended to kill Larry Fulton by harming everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Steve Harvey*." (Italics added.) Thus, given CALCRIM No. 600, if the jury found [Harris or Petitioner] was an aider and abettor, it necessarily found he intentionally aided and abetted the actual killer, who was himself motivated by the intent to kill. By finding [Harris and Petitioner] guilty of the attempted willful, deliberate, premeditated murder of Harvey, the jury found that [Harris and Petitioner] intended to kill Fulton. Therefore, a failure to give CALCRIM No. 703 was harmless because the jury had necessarily found intent to kill under another properly given instruction.

(Lodged Document No. 8 at 21-22 (internal citations omitted).)

The Court agrees. The trial court did not err and, even if it did, the error was harmless. To begin with, the evidence established that Petitioner admitted to Lewis that he was the shooter. (Reporter's Transcript ("RT") 1213-15; CT 133.) Thus, CALCRIM No. 703, the accomplice instruction, was irrelevant. **[*18]**

Petitioner challenges the veracity of Lewis's testimony. He points out that she was in custody at the time she initially spoke to police and, according to a defense investigator, later admitted to him that she would say anything that the police officers wanted to hear in order to get out of jail. This challenge is rejected. The jury listened to Lewis and the defense investigator and, obviously, rejected the investigator's claim that Lewis admitted that she was lying and accepted Lewis's testimony that Petitioner admitted that he shot the victims. This Court is not empowered or inclined to reassess that credibility determination. *See Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004) (per curiam) (holding district court's role in habeas does not include revisiting jury credibility determinations); *Roehler v. Borg*, 945 F.2d 303, 306 (9th Cir. 1991) (finding federal court on habeas review "do[es] not have the jurors' right to weigh the evidence" but may only determine "whether rational jurors could reach the conclusion that these jurors reached"); *United States v. Goode*, 814 F.2d 1353, 1356 (9th Cir. 1987) ("[I]t was the jury's job to decide whether to believe [the witness].").

Finally, even assuming that the trial court erred in failing to instruct the jury with CALCRIM No. 703, the error was harmless. The court charged the jury with CALCRIM No. 600, **[*19]** which required the jurors

to find that the defendants acted with the intent to kill in order to convict them of the attempted murder of Harvey--which the jurors did. As the state appellate court noted, in finding that the defendants intended to kill Harvey, the jury necessarily concluded that Petitioner and Harris also intended to kill Fulton. Thus, even if the jury did not find that Petitioner shot Fulton and Harvey, it did find that Petitioner acted with the requisite intent to kill to support his conviction for first degree murder as an accomplice. *See Stayer v. McDonald*, 2011 U.S. Dist. LEXIS 58360, 2011 WL 2149795, at *32 (E.D. Cal. June 1, 2011) ("Since other given instructions as cited by the state appellate court adequately described the findings the jury had to make with respect to the special circumstance alleged, it is of no moment if the trial court made an error of state law in failing to instruct with CALCRIM Nos. 700 and 703."). Finally, because the evidence was overwhelming that Petitioner was a major participant in an armed robbery in which the defendants held a loaded gun to the victims' heads, there was ample evidence to conclude that he acted with reckless indifference to human life and was, therefore, guilty under an accomplice theory even if he was not the **[*20]** shooter. *See Banister v. McComber*, 2015 U.S. Dist. LEXIS 106306, 2015 WL 4760683, at *9 (CD. Cal. July 21, 2015) (upholding conviction for special circumstances murder because failure to instruct with CALCRIM No. 703 was harmless error in light of "substantial evidence Petitioner was a major participant in the burglary, robbery and beating of [the victim]"); *see also California v. Roy*, 519 U.S. 2, 5, 117 S. Ct. 337, 136 L. Ed. 2d 266 (1996) (holding omission of "intent" element from aiding and abetting instruction subject to harmless error analysis where jury could have found intent based on evidence it considered). For these reasons, Petitioner's claim fails.

V.

RECOMMENDATION

For these reasons, IT IS RECOMMENDED that the Court issue an Order (1) accepting this Report and Recommendation and (2) directing that Judgment be entered denying the Petition and dismissing the case with prejudice.[5]

DATED: October 28, 2015.

/s/ Patrick J. Walsh

PATRICK J. WALSH

UNITED STATES MAGISTRATE JUDGE

---

[5] The Court is not inclined to issue a certificate of appealability in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.") If Petitioner believes a certificate should issue, he should explain why in his objections.

**End of Document**

# EXHIBIT 104



**WORKERS AND OPPRESSED PEOPLES OF THE WORLD UNITE**

Home » Prisons: tear them down » Former Black Panther killed in California prison

# Former Black Panther killed in California prison

By **Abayomi Azikiwe** posted on August 19, 2015

Hugo Pinell, 71, a former comrade of George L. Jackson, was killed on Aug. 12 in California State Prison-Sacramento near Sacramento, Calif.

Pinell, known by many as "Yogi Bear," had recently been released from 46 years of solitary confinement and was the longest serving prisoner held in administrative detention in the state of California. He had written to one of his supporters that he feared for his life at the prison. (KPFA interview with Kiilu Nyasha, Aug. 13)

In 1965 Pinell was given a 3-years-to-life sentence for rape, a crime for which he said he was not guilty. He and his mother were told that if he did not confess, he could face the death penalty.

Pinell was stabbed to death by another prisoner on the first day he was released into general population at CSP-Sacramento. The corporate media described the circumstances surrounding his killing as a "riot" when clashes erupted after Pinell was brutally stabbed in the prison yard.



Hugo Pinell in 1982

His death has sent shockwaves through the ranks of veteran Black Panther Party members, supporters of political prisoners and anti-racist forces.

## San Quentin Six and George L. Jackson

Pinell was a member of the San Quentin Six, who were involved in the attempted prison break to liberate George Jackson on Aug. 21, 1971, where Jackson was gunned down by guards. Three prison guards and two white

**Defend workers' rights, build Workers World!**

**Make a donation to support WW>>>**

**Get Workers World by Email**

EMAIL ADDRESS (REQUIRED)

FIRST NAME

LAST NAME

ZIP CODE

Subscribe

**Stay connected**

   

**This week's PDF**

To search, type and hit enter

Get the latest updates from Workers World

Email address

Subscribe

Long before that, George Jackson was already well known throughout the African-American revolutionary movement and the left as a whole. His prison letters were published in the 1970 book entitled "Soledad Brother: The Prison Letters of George Jackson."

The Soledad Brothers were three African-American prisoners, George Jackson, Fleeta Drumgo and John Clutchette, who were charged with killing a guard at San Quentin in January 1970. Several days earlier, three Black inmates had been killed by white prison guard snipers during a racial melee in the yard.

A national movement arose in defense of the Soledad Brothers, which drew the support of Angela Davis, a Communist Party member and lecturer who had been terminated by the University of California, Los Angeles in 1969 because of her political beliefs.

Jackson had originally been sentenced to a 1-year-to-life sentence in California in 1960 for being in the company of several others who stole $70 from a gas station. During his tenure in prison, Jackson began to read voraciously about history, military science, philosophy and Marxist-Leninist theory.

Prison authorities attempted to break Jackson's confidence and defiance for many years. He became a leader and mentor for other prisoners during a period when the Civil Rights, Black Power, anti-war and left movements were gaining tremendous ground in the U.S.

Pinell spent decades in solitary confinement for refusing to compromise with the system, and was the only one of the San Quentin Six remaining in prison. All the others had been released decades earlier.

**Black August started by political prisoners**

Pinell's killing occurred during Black August, an annual commemoration of the resistance of African Americans to oppression and exploitation. Created by political prisoners years ago, Black August continues to be commemorated across the U.S.

The month-long acknowledgement of resistance stems from the historical fact that many great efforts aimed at liberation took place during August. Such historical developments include the beginning of the Haitian Revolution (1791); Nat Turner's Rebellion in Virginia (1831); John Brown's raid on Harper's Ferry (1859); the Watts Rebellion (1965); the attempt by Jonathan Jackson, the younger brother of George, to free him from prison (1970); the San Quentin Rebellion (1971); and the 2014 police murder of Michael Brown in Ferguson, Mo.



Nov. 17, 2022 issue
Past issues

## Categories

Africa

Asia & the Pacific

Climate and Environmental Crisis

COVID-19 and Health Crisis

Disability rights

Editorials

Europe

Global

Human needs before profits

Im/migrants and Refugees

Latin America & the Caribbean

LGBTQ2+ liberation

Middle East

Mundo Obrero

Prisons: tear them down

Racism and Self-Determination

Reproductive Rights

Revolutionary Theory and Practice

Sports, Arts and Culture

Stop imperialist war and occupation  ▼

Get the latest updates from Workers World

Email address

Subscribe

inside prison walls is continuing today through the rebellions and mass demonstrations in Ferguson, Baltimore and other cities.

African Americans are still jobless at rates at least twice as high as whites. Millions are confined to low-wage jobs with no economic security or social benefits.

Every week news stories report that African Americans are being gunned down by police and vigilantes.

The school-to-prison pipeline is still very much in evidence in urban areas. A disproportionate number of inmates and people under judicial supervision are African Americans and Latinos/as from poor and working-class backgrounds.

There are still many political prisoners inside the U.S. despite the "human rights" posture of successive administrations. Until the system of national oppression and capitalist exploitation is overthrown there is no hope for ending the prison-industrial complex.

African Americans    Black August    California    George Jackson

← **Previous article**                              **Next article** →

---

**Workers unite!**

**Workers World Party**

**Youth and Students**

## WW books



Tibet and the CIA's anti-China crusade

## Archives

Select Month ⌄

---

## Workers World Party

 PDF of November 17 issue

 PDF of November 10 issue

 PDF of October 27 issue

 PDF of October 20 issue

 Ukraine: Wage a class war against imperialist war

Clarion call to the movement
Prepare for the biggest global capitalist crisis in history

## Print issue returns

Due to the COVID-19 pandemic, Workers World suspended printing and mailing of the newspaper in March 2020. We have continued publishing articles on workers.org, along with a weekly PDF of what would have been the printed version. We are pleased to announce that we have resumed printing and mailing on a monthly basis, for now. Subscribers should have received a printed paper since September 2021. Print subscriptions will still be extended in consideration of the temporary suspension of printing and the currently more limited print schedule. We recommend that subscribers with internet access get our free email subscription and share our articles with your contacts and on social media.
— *WW managing editors: John Catalinotto, Martha Grevatt, Deirdre Griswold, Monica Moorehead, Betsey Piette and Minnie Bruce Pratt.*

## Download this week's PDF



Nov. 17, 2022 issue
Past issues

## Contact Info

National Office
147 W. 24th St. 2nd Fl.
New York, NY 10011

Phone: 212-627-2994
E-mail: WWP@Workers.org

## Follow Workers World

   

Copyright © 2021 Workers World. Verbatim copying and distribution of articles is permitted in any medium without royalty provided this notice is preserved.

▼

Copyright © 2021 Workers.org

Get the latest updates from Workers World

Email address

Subscribe

# EXHIBIT 105



# COURTHOUSE NEWS SERVICE

## State Sued Over Murder of 'San Quentin 6' Inmate

**NICK CAHILL** / September 27, 2016

SACRAMENTO, Calif. (CN) — Revered by civil rights activists for his role in California's 1960s prisoner-rights movement and one of the "San Quentin Six," Hugo Pinell was "assassinated" days after being released into general population in 2015 after 43 years in solitary confinement. Pinell's murder sparked a massive inmate riot at a California prison and left his family questioning why the 71-year-old inmate who was serving multiple life sentences was ever allowed on the prison yard.

Claiming a set-up by California prison officials, Pinell's daughter sued the California Department of Corrections and Rehabilitation in Federal Court on claims of wrongful death and negligent supervision on Friday.

Born in Nicaragua, Hugo "Yogi" Pinell was convicted of rape at the age of 19 and sentenced to life in 1965. He soon gained notoriety for his role in a botched 1971 San Quentin Prison escape that left six people dead, including three prison employees and Black Panther Party activist and inmate George Jackson.

In what was at the time the longest trial in California history with more than 23,000 pages of testimony, a Marin County jury convicted Pinell of two counts of felony assault by a prisoner serving a life sentence. The jury deliberated for 24 days and returned six of the 46 charges against the San Quentin Six. Pinell was given a third life sentence for slitting two officers' throats during the failed prison escape.

Pinell languished in solitary confinement for decades before he was released into the general population at California State Prison-Sacramento in August 2015. According to the complaint, the former Black Panther Party member

was killed by two white inmates in a supposedly racially motivated attack 50 years after first being incarcerated.

"Just five days before he was killed, he was released into general population despite the fact that [prison officials] knew that he was targeted by other inmates," Allegra Casimir-Taylor says in her complaint, filed on behalf of herself and Pinell's estate. "They were aware of multiple credible death threats against Pinell including a threat issued by the Aryan Brotherhood."

Pinell's fatal stabbing incited a prison riot at the 2,300-inmate maximum-security prison outside of Sacramento. About 70 inmates were involved with 29 sustaining injuries, according to prison officials.

Jayson Weaver and Waylon Pitchford are awaiting trial for Pinell's murder, with an Oct. 28 hearing scheduled at Sacramento County Superior Court. Weaver was previously convicted of assaulting another inmate, while Pitchford is facing charges for another inmate assault, according to the complaint.

Casimir-Taylor says the department of corrections knew Pinell was a target for assassination and risked his life by placing the elderly inmate into general population. She's suing the state for punitive and exemplary damages for failing to protect Pinell.

"Reportedly [prison officials] placed bets on how long Pinell would survive being in general population," the nine-page complaint states.

Casimir-Taylor's attorney Ashley Amerio did not return an interview request Tuesday. CDCR spokeswoman Terry Thornton declined to comment on the litigation, saying the department hasn't been served with the federal lawsuit.

After Pinell was transferred in 2014 to the maximum-security facility adjacent to the notorious Folsom prison that Johnny Cash famously played for inmates in 1968,Casimir-Taylor says she visited him every weekend. Pinell was an

important figure in his daughter's life and during the visits encouraged her to "renew her vigor" in performing charitable work.

In an article published in the San Francisco Bay View, an inmate claiming to be one of the last people to see Pinell alive says the murder was coordinated by the department of corrections.

"About the time I did reach Yogi, it was too late. Dragging him away from his killers, Yogi's eyes were wide open as he took his last breath. His eyes seem to say it all: 'I've done my part, young brotha. The rest is on you," Devon Bush wrote on January 30.

# EXHIBIT 106

# Street signs honor fallen Correctional Training Facility staff

**JULY 5, 2019**



New street signs honor those who have fallen in service to the Correctional Training Facility.

**By Lieutenant Roland Ramon**

The Correctional Training Facility held a May 10 memorial to unveil newly renamed street signs in honor of the prison's officers who died in the line of duty. The ceremony was held at the facility's memorial garden and included the honor guard performing a flag salute.

The following officers were honored for giving the ultimate sacrifice for the citizens of the great State of California and their families



From left are Correctional Officers John "Jack" Mills, William Shull, Robert McCarthy and Program Administrator Kenneth Conant.

- On Jan. 16, 1970, at 6:35 p.m., while working in Y-Wing at Central Facility, Correctional Officer John V. Mills, at the age of 26, married and a father was murdered in the line of duty.

- On July 23, 1970, at approximately 9:50 a.m., while working in the recreation shack on the 1 Yard at North Facility, Correctional Officer William C. Shull, 40, married with four children, was murdered in the line of duty.

- On March 4, 1971, at 11:15 p.m., while working in X-Wing at Central Facility, Correctional Officer Robert J. McCarthy, 43, married with two children, was murdered in the line of duty.

- On May 19, 1971, at 9:20 a.m., while working in his office in Unit-I at Central Facility, Program Administrator Kenneth E. Conant, 49, married and a father was murdered in the line of duty.

Acting Warden C. Koenig addressed staff and guests and paid his respects to the fallen officers and their families. Their sacrifice impacts our staff today. The staff was challenged and encouraged to never forget these fallen officers.

The staff paid tribute through a moment of silence.

https://www.cdcr.ca.gov/insidecdcr/2019/07/05/street-signs-honor-fallen-correctional-training-facility-staff/

# EXHIBIT 107

*Welcome to California's*

# 2020-21

# Governor's Budget

RELEASED ON JANUARY 10, 2020

# Proposed Budget Detail

The following table presents budget year positions and expenditures for each agency area. These totals are comprised of State funds which include General Fund, special funds, and selected bond funds. These totals do not include federal funds, other non-governmental cost funds, or reimbursements.

| State Agencies | Positions | General Fund* | Special Funds* | Bond Funds* | Total State Funds* |
|---|---|---|---|---|---|
| Business, Consumer Services, and Housing | 6,029.5 | $349,906 | $1,024,591 | $1,082,912 | $2,457,409 |
| **TOTALS** | **384,792.9** | **$153,083,298** | **$63,757,896** | **$5,351,539** | **$222,192,733** |

| State Agencies | Positions | General Fund* | Special Funds* | Bond Funds* | Total State Funds* |
|---|---|---|---|---|---|
| Corrections and Rehabilitation | 57,087.1 | $13,387,521 | $3,129,605 | $- | $16,517,126 |
| Environmental Protection | 5,965.7 | $142,873 | $3,782,578 | $18,066 | $3,943,517 |
| General Government | 12,553.0 | $4,461,466 | $6,692,362 | $8,998 | $11,162,826 |
| Government Operations | 19,436.5 | $1,425,113 | $351,081 | $7,916 | $1,784,110 |
| Health and Human Services | 32,442.5 | $47,476,340 | $23,780,688 | $- | $71,257,028 |
| Higher Education | 163,567.1 | $17,508,587 | $194,848 | $418,503 | $18,121,938 |
| K thru 12 Education | 2,524.7 | $59,638,902 | $427,588 | $1,541,387 | $61,607,877 |
| Labor and Workforce Development | 11,025.1 | $163,643 | $887,133 | $- | $1,050,776 |
| Legislative, Judicial, and Executive | 13,153.5 | $4,382,782 | $3,586,111 | $539,749 | $8,508,642 |
| Natural Resources | 20,541.8 | $3,905,704 | $1,791,831 | $1,106,457 | $6,803,992 |
| Transportation | 40,466.4 | $240,461 | $18,109,480 | $627,551 | $18,977,492 |
| **TOTALS** | **384,792.9** | **$153,083,298** | **$63,757,896** | **$5,351,539** | **$222,192,733** |

* Dollars in thousands

Download CSV    Printable Table

## 5225  Department of Corrections and Rehabilitation - Continued

| | | Positions | | | Expenditures | | |
|---|---|---|---|---|---|---|---|
| | | 2018-19 | 2019-20 | 2020-21 | 2018-19* | 2019-20* | 2020-21* |
| | Administration | | | | | | |
| 4585 | Rehabilitative Programs-Adult Education | 1,357.4 | 1,356.8 | 1,359.1 | 227,143 | 240,985 | 244,089 |
| 4590 | Rehabilitative Programs-Cognitive Behavioral Therapy and Reentry Services | 166.6 | 159.3 | 166.2 | 117,715 | 129,484 | 190,025 |
| 4595 | Rehabilitative Programs-Adult Inmate Activities | 244.6 | 274.8 | 274.8 | 73,961 | 85,418 | 91,073 |
| 4600 | Rehabilitative Programs-Adult Administration | 167.5 | 201.6 | 200.9 | 22,194 | 25,031 | 25,053 |
| 4650 | Medical Services-Adult | 9,554.4 | 9,825.6 | 9,959.4 | 2,085,624 | 2,193,446 | 2,217,380 |
| 4655 | Dental Services-Adult | 964.6 | 1,037.0 | 1,035.3 | 173,176 | 178,336 | 178,935 |
| 4660 | Mental Health Services-Adult | 2,324.8 | 2,757.3 | 2,804.0 | 458,309 | 476,396 | 462,382 |
| 4661 | Psychiatric Program-Adult | 1,489.9 | 2,015.8 | 2,008.8 | 283,104 | 296,605 | 296,552 |
| 4665 | Ancillary Health Care Services-Adult | - | - | - | 393,487 | 413,080 | 435,010 |
| 4670 | Dental and Mental Health Services Administration-Adult | 245.3 | 251.7 | 252.8 | 49,724 | 51,022 | 51,641 |
| **TOTALS, POSITIONS AND EXPENDITURES (All Programs)** | | **57,589.8** | **57,726.6** | **56,998.9** | **$12,597,346** | **$13,320,052** | **$13,394,852** |

| FUNDING | | | | | 2018-19* | 2019-20* | 2020-21* |
|---|---|---|---|---|---|---|---|
| 0001 | General Fund | | | | $12,260,035 | $12,991,819 | $13,088,380 |
| 0001 | General Fund, Proposition 98 | | | | 18,306 | 21,893 | - |
| 0831 | California State Lottery Education Fund California Youth Authority | | | | 63 | 104 | - |
| 0890 | Federal Trust Fund | | | | 1,110 | 1,999 | 1,647 |
| 0917 | Inmate Welfare Fund | | | | 73,961 | 86,418 | 92,073 |
| 0942 | Special Deposit Fund | | | | 2,322 | 1,825 | 1,956 |
| 0995 | Reimbursements | | | | 241,912 | 215,378 | 210,594 |
| 3085 | Mental Health Services Fund | | | | 637 | 1,616 | 1,202 |
| 8059 | State Community Corrections Performance Incentive Fund | | | | -1,000 | -1,000 | -1,000 |
| **TOTALS, EXPENDITURES, ALL FUNDS** | | | | | **$12,597,346** | **$13,320,052** | **$13,394,852** |

## LEGAL CITATIONS AND AUTHORITY

DEPARTMENT AUTHORITY

Government Code Title 2, Division 3, Part 2.5, Chapter 1, Article 14

PROGRAM AUTHORITY

4515-Juvenile Operations and Juvenile Offender Programs:
Government Code section 12838.1. Welfare and Institutions Code sections 1000-1000.7, 1700, 1701, and 1710. Penal Code section 6001.

4520-Juvenile Academic and Vocational Education:
Welfare and Institutions Code sections 1120.1 and 1120.2. Penal Code section 6001.

4525-Juvenile Health Care Services:
Welfare and Institutions Code section 1700. Penal Code section 6001.

4530-4550-Adult Corrections and Rehabilitation Operations - General Security; Inmate Support; Contracted Facilities; Institution Administration: Government Code section 12838.1(c). Penal Code sections 1168, 1170, 1203.03, 2910, 2910.5, 2910.6, 4750-4754, 4758, 5068, 5080, and 6250-6258. Welfare and Institutions Code, Division 3.

4555-4565-Parole Operations - Adult Supervision; Adult Community Based Programs; Adult Administration: Government Code section 12838.1(c). California Code of Regulations, Title 15, Division 3. Penal Code sections 3000-3073, and 5058.

* **Dollars in thousands, except in Salary Range. Numbers may not add or match to other statements due to rounding of budget details.**

# EXHIBIT 108

# Two guards stabbed at high-security prison in Folsom

**LOCAL NEWS**
by: **Associated Press**

**Posted: Jul 13, 2020 / 07:01 PM PDT / Updated: Jul 13, 2020 / 06:54 PM PDT**



FILE – In this Feb. 26, 2013, file photo, inmates walk through the exercise yard at California State Prison Sacramento, near Folsom, Calif. (AP Photo/Rich Pedroncelli, File)

*This is an archived article and the information in the article may be outdated.*

*Please look at the time stamp on the story to see when it was last updated.*

FOLSOM, Calif. (AP) — A convicted killer stabbed two guards at a high-security California prison Monday but both were expected to survive, officials said.

Correctional officers were releasing inmates into a yard Monday morning at California State Prison, Sacramento in Folsom when a prisoner who was being scanned with a metal detector pulled a 7-inch-long homemade weapon and stabbed a guard in the head and neck, according to a statement from the state Department of Corrections and Rehabilitation.

A second officer was stabbed in the right arm and a third officer received a hand injury before the inmate was subdued, authorities said.

One officer was treated at a hospital and released. There was no immediate word on the conditions of the other officers but their injuries weren't believed to be life-threatening, corrections officials said.

The attacker was identified as Michael Harris, who had minor injuries and was taken to a hospital, corrections officials said. He was to be kept in segregated housing while the attack is investigated.

Harris began serving a life sentence without possibility of parole in 2009 for a Los Angeles County shooting. He was convicted of first-degree murder, attempted murder and intentional discharge of a firearm causing great bodily injury or death, corrections officials said.

The prison east of Sacramento houses more than 2,300 inmates.

# EXHIBIT 109

| NO. | DATE | MURDER VICTIM | VICTIM PHOTO | KILLER |
|---|---|---|---|---|
| | | **TIT-FOR-TAT MURDER CHRONOLOGY** | | |
| 1. | 1970-01-13 | W.L. Nolen<br>Cleveland Edwards<br>Alvin Miller | | CDCR Guards |
| 2. | 1970-01-16 | John V. Mills | | Blacks/BGF (George Jackson, et al.) |
| 3. | 1970-07-23 | William Shull | | Blacks/BGF (George Jackson, et al.) |
| 4. | 1971-03-04 | Robert McCarthy | | Blacks/BGF (Hugo Pinell)<br> |
| | | | 45 YEARS GO BY | |
| 5. | 2015-08-07 | Hugo Pinell | | CDCR Guards |
| 6. | 2019-05-00 | CTF Warden Koenig holds Ceremony for 2-4 | "Never forget" | Photo Below |
| 7. | 2020-07-13 | Guard stabbed at | | |

| NO. | DATE | MURDER VICTIM | VICTIM PHOTO | KILLER |
|---|---|---|---|---|
| | | **MURDER TIT-FOR-TAT CHRONOLOGY** | | |
| 8. | 2020-07-20 | Folsom Koenig: Operation Akili | Reason: "BGF Gang Activity" | |



"Acting Warden C. Koenig addressed staff and guests and paid his respects to the fallen officers and their families. Their sacrifice impacts our staff today. The staff was challenged and encouraged to never forget these fallen officers."

Indeed.

# EXHIBIT 110

**VIEWPOINT**

**David M. Cutler, PhD**
Department of Economics, Harvard University, Cambridge, Massachusetts.

**Lawrence H. Summers, PhD**
Harvard Kennedy School, Cambridge, Massachusetts.



Viewpoint pages 1491 and 1493 and Editorial pages 1502 and 1504



Related article page 1562

# The COVID-19 Pandemic and the $16 Trillion Virus

**The SARS-CoV-2** (severe acute respiratory syndrome coronavirus 2) pandemic is the greatest threat to prosperity and well-being the US has encountered since the Great Depression. This Viewpoint aggregates mortality, morbidity, mental health conditions, and direct economic losses to estimate the total cost of the pandemic in the US on the optimistic assumption that it will be substantially contained by the fall of 2021. These costs far exceed those associated with conventional recessions and the Iraq War, and are similar to those associated with global climate change. However, increased investment in testing and contact tracing could have economic benefits that are at least 30 times greater than the estimated costs of the investment in these approaches.

Since the onset of coronavirus disease 2019 (COVID-19) in March, 60 million claims have been filed for unemployment insurance. Before COVID-19, the greatest number of weekly new unemployment insurance claims (based on data from 1967 on) was 695 000 in the week of October 2, 1982. For 20 weeks beginning in late March 2020, new unemployment claims exceeded 1 million per week; as of September 20, new claims have been just below that amount.

> The total cost [of the pandemic] is estimated at more than $16 trillion, or approximately 90% of the annual gross domestic product of the US.

Recessions feed on themselves. Workers not at work have less to spend, and thus subsequent business revenue declines. The federal government offset much of the initial loss owing to the shutdown, which has averted what would likely have been a new Great Depression. But the virus is ongoing, and thus full recovery is not expected until well into the future. The Congressional Budget Office projects a total of $7.6 trillion in lost output during the next decade.[1]

Lower output is not the only economic cost of COVID-19; death and reduced quality of life also can be measured in economic terms. To date, approximately 200 000 deaths have been directly attributable to COVID-19; many more will doubtless occur. In the US, approximately 5000 COVID-19 deaths are occurring per week and the estimated effective reproduction number ($R_t$ [ie, the average number of people who become infected by a person with SARS-CoV-2 infection]) is approximately 1. If these rates continue, another 250 000 deaths can be expected in the next year. Seasonal factors could increase mortality, although whether COVID-19 will display a large seasonal pattern is unknown. In addition to COVID-19 deaths, studies suggest increased deaths from other causes, amounting to almost 40% of COVID-19–related deaths. Thus, if the current trajectories continue, an estimated 625 000 cumulative deaths associated with the pandemic will occur through next year in the US.

Although putting a value on a given human life is impossible, economists have developed the technique of valuing "statistical lives"; that is, measuring how much it is worth to people to reduce their risk of mortality or morbidity. This approach has been used as a standard in US regulatory policy and in discussions of global health policy.[2]

There is a lengthy economic literature assessing the value of a statistical life; for example, in environmental and health regulation. Although no single number is universally accepted, ranges are often used. In environmental and health policy,[3] for example, a statistical life is assumed to be worth $10 million. With a more conservative value of $7 million per life, the economic cost of premature deaths expected through the next year is estimated at $4.4 trillion.

Some individuals who survive COVID-19 are likely to have significant long-term complications, including respiratory, cardiac, and mental health disorders, and may have an increased risk of premature death. Data from survivors of COVID-19 suggest that long-term impairment occurs for approximately one-third of survivors with severe or critical disease.[4] Because there are approximately 7 times as many survivors from severe or critical COVID-19 disease as there are COVID-19 deaths, long-term impairment might affect more than twice as many people as the number of people who die.

Given the predominance of respiratory complications among COVID-19 survivors, affected individuals may be like those with moderate chronic obstructive pulmonary disease, which has been estimated to have a quality-of-life disutility of approximately −0.25 to −0.35. Assuming a total reduction in quality-adjusted life expectancy, including length as well as quality of life, of 35% and taking into consideration the assumed value of a year of life yields an estimated loss from long-term complications of $2.6 trillion for cases forecast through the next year.

Even individuals who do not develop COVID-19 are affected by the virus. Loss of life among friends and loved ones, fear of contracting the virus, concern about economic security, and the effects of isolation and loneliness have all taken a toll on the mental health of the population. The proportion of US adults who report symptoms of depression or anxiety has averaged approximately 40% since April 2020; the comparable figure in early 2019 was 11.0%.[5] These data translate to an estimated 80 million additional individuals with these mental health conditions related to COVID-19. If, in line with prevailing estimates, the cost of these conditions is valued at about $20 000 per person per year and the mental health symptoms

**Corresponding Author:** David M. Cutler, PhD, Department of Economics, Harvard University, 1805 Cambridge St, Cambridge, MA 02138 (dcutler@fas.harvard.edu).

© 2020 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ on 01/22/2023

Opinion Viewpoint

Table. Estimated Economic Cost of the COVID-19 Crisis

| Category | Cost (billions), US$ |
| --- | --- |
| Lost GDP | 7592 |
| Health loss | |
| Premature death | 4375 |
| Long-term health impairment | 2572 |
| Mental health impairment | 1581 |
| Total | 16 121 |
| Total for a family of 4 | 196 475 |
| % of annual GDP | 90 |

Abbreviation: GDP, gross domestic product.

last for only 1 year, the valuation of these losses could reach approximately $1.6 trillion.

The estimated cumulative financial costs of the COVID-19 pandemic related to the lost output and health reduction are shown in the **Table**. The total cost is estimated at more than $16 trillion, or approximately 90% of the annual gross domestic product of the US. For a family of 4, the estimated loss would be nearly $200 000. Approximately half of this amount is the lost income from the COVID-19–induced recession; the remainder is the economic effects of shorter and less healthy life.

Output losses of this magnitude are immense. The lost output in the Great Recession was only one-quarter as large. The economic loss is more than twice the total monetary outlay for all the wars the US has fought since September 11, 2001, including those in Afghanistan, Iraq, and Syria.[6] By another metric, this cost is approximately the estimate of damages (such as from decreased agricultural productivity and more frequent severe weather events) from 50 years of climate change.[7]

For this reason, policies that can materially reduce the spread of SARS-CoV-2 have enormous social value. Consider a policy of wide-scale population testing, contact tracing, and isolation. For example, assuming 100 000 individuals are tested, the cost of testing would be approximately $6 million. According to current values for SARS-CoV-2 prevalence in some areas, approximately 5000 people will test positive.

Many infections could be prevented by this approach. Not every person who tests positive for SARS-CoV-2 is infectious; perhaps 20% of people who test positive are sufficiently late in the course of infection that transmission probabilities are low.[8] In addition, approximately 25% of people who test positive would likely not quarantine.[9] However, given an $R_t$ of about 1, reducing transmission by 45% could lead to approximately 2750 fewer positive cases. This could prevent about 14 deaths (estimated value ≈ $96 million) and about 33 critical and severe cases (estimated value ≈ $80 million). These subsequent cases not occurring could ultimately lead to even fewer cases, but even ignoring that, the projected economic return from the test and trace strategy is approximately 30 times the cost (ie, investment of approximately $6 million leads to averted costs of an estimated $176 million).

The Rockefeller Foundation estimates that a policy of 30 million tests weekly would require an additional $75 billion in spending during the next year[10]; adding the cost of contact tracing might bring the total to approximately $100 billion.

Congress is currently discussing whether to provide economic support to mitigate the economic damage caused by COVID with legislation following up on the Coronavirus Aid, Relief, and Economic Security (CARES) Act. The highest-return investments that should be included in such legislation are increased testing and contact tracing. A minimum of 5% of any COVID economic relief intervention should be devoted to such health measures.

More generally, the immense financial loss from COVID-19 suggests a fundamental rethinking of government's role in pandemic preparation. Currently, the US prioritizes spending on acute treatment, with far less spending on public health services and infrastructure. As the nation struggles to recover from COVID-19, investments that are made in testing, contact tracing, and isolation should be established permanently and not dismantled when the concerns about COVID-19 begin to recede.

## ARTICLE INFORMATION

**Published Online:** October 12, 2020. doi:10.1001/jama.2020.19759

**Conflict of Interest Disclosures:** Dr Cutler reports receiving fees from serving as an expert witness for opioid and vaping litigation, personal fees for article preparation from the Brookings Institution, and research support from the Pharmaceutical Research and Manufacturers of America outside the submitted work. He is also a commissioner of the Health Policy Commission in Massachusetts. Dr Summers reports receiving personal fees from various financial institutions outside the submitted work and personal fees for article preparation from the Brookings Institution.

**Funding/Support:** This work was funded by the National Institute on Aging under award P01AG005842.

**Role of the Funder/Sponsor:** The National Institute on Aging had no role in the preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

**Additional Information:** More information on the calculations is available at http://scholar.harvard.edu/cutler.

## REFERENCES

1. Congressional Budget Office. *An Update to the Economic Outlook: 2020 to 2030*. Congressional Budget Office; 2020.

2. Jameson D, Summers L, Alleyne G, et al Global health 2035: a world converging in a generation. *Lancet*. 2013;382:1898-1955.

3. Robinson L. COVID-19 and uncertainties in the value per statistical life. *Regulatory Review*. August 5, 2020.

4. Ahmed H, Patel K, Greenwood D, et al Long-term clinical outcomes in survivors of coronavirus outbreaks after hospitalization or ICU admission: a systematic review and meta-analysis of follow-up studies. *medRxiv*. Preprint posted April 22, 2020. doi:10.1101/2020.04.16.20067975

5. Centers for Disease Control and Prevention. Mental health: Household Pulse Survey. Accessed September 5, 2020. https://www.cdc.gov/nchs/covid19/pulse/mental-health.htm

6. Crawford NC. United States budgetary costs and obligations of post-9/11 wars through FY2020: $6.4 trillion. November 13, 2019. https://watson.brown.edu/costsofwar/files/cow/imce/papers/2019/US%20Budgetary%20Costs%20of%20Wars%20November%202019.pdf

7. Nordhaus W. Projections and uncertainties about climate change in an era of minimal climate policies. *Am Economic J*. 2018;10(3):333-360. doi:10.1257/pol.20170046

8. World Health Organization. Criteria for releasing COVID-19 patients from isolation. Scientific Brief. June 17, 2020. https://www.who.int/publications/i/item/criteria-for-releasing-covid-19-patients-from-isolation

9. Bilinski A, Mostashari F, Salomon JA. Modeling contact tracing strategies for COVID-19 in the context of relaxed physical distancing measures. *JAMA Netw Open*. 2020;3(8):e2019217. doi:10.1001/jamanetworkopen.2020.19217

10. Rockefeller Foundation. National Covid-19 testing and tracing action plan. July 16, 2020. Accessed September 5, 2020. https://www.rockefellerfoundation.org/wp-content/uploads/2020/07/TheRockefellerFoundation_ExecutiveSummary_7_20.pdf

© 2020 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ on 01/22/2023

# EXHIBIT 111

ASHLEY R. AMERIO, ESQ. (SBN 230469)
JEFFREY FLETTERICK, ESQ. (SBN 270847)
**AMERIO LAW FIRM P.C.**
1651 Response Road, First Floor
Sacramento, CA 95815
Telephone: (916) 419.1111
Email: ashley@ameriolaw.com
        jeff@ameriolaw.com

Attorneys for Plaintiff,
ALLEGRA CASIMIR-TAYLOR

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Estate of HUGO PINELL, deceased, by and through ALLEGRA CASIMIR-TAYLOR, as Successor in Interest and ALLEGRA CASIMIR-TAYLOR, Individually | Case No.: |
| Plaintiff, | **COMPLAINT FOR WRONGFUL DEATH (CCP § 377.60, et. seq.)** |
| v. | |
| STATE OF CALIFORNIA, CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, SCOTT KERNAN, RON RACKLEY, and DOES 1 through 100, inclusive, | |
| Defendants. | |

Plaintiffs ALLEGRA CASIMIR-TAYLOR and the Estate of HUGO PINELL, by and through ALLEGRA CASIMIR-TAYLOR, as Successor in Interest, (herein, "Plaintiffs") for causes of action against Defendants STATE OF CALIFORNIA, DEPARTMENT OF CORRECTIONS AND REHABILITATION (herein after "CDCR"), SCOTT KERNAN, RON RACKLEY and DOES 1 through 100, inclusive and each of them who allege as follows:

**JURISDICTION AND VENUE**

1.    This complaint seeks damages and attorneys' fees pursuant to Title 42 U.S.C. sections 1983 and 1988 for violations of decedent's and survivor's civil rights and violations of

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA 95815

California State law. Jurisdiction is founded upon Title 28 U.S.C. sections 1331 and 1343. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. section 1367.2.

2.    Plaintiffs' claims arose in the County of Sacramento, California. Venue lies in the Eastern District of California pursuant to 28 U.S.C. § 1291(b)(2).

**FACTUAL BACKGROUND**

3.    HUGO PINELL ("PINELL") had gained notoriety during his 43 years of incarceration in which he was isolated in the SHU unit for a majority of the time. He was known as one of the "San Quentin Six" for his alleged participation in a violent attack within the prison in 1971 under the leadership of black militant George Jackson that resulted in the death of correctional officers.

4.    Over the years, PINELL was attacked by other inmates. In 1981, he received lacerations when an inmate threw a homemade bomb at him. In 1984, he was stabbed twice in the back by another inmate.

5.    PINELL spent much of his time in prison in solitary confinement at his request. In 1987, he stated that he stayed in his cell in Folsom to avoid his enemies and was concerned that they're not going to give up now.

6.    CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ('CDCR') employees referred to PINELL as the most dangerous man in the California prison system.

7.    ALLEGRA CASIMIR-TAYLOR reached out to her father, PINELL and started writing her father PINELL on a daily basis. His insight and caring despite his long incarceration was inspiring to her and renewed her vigor in pursuing her charitable work within under-served communities.

8.    PINELL was transferred to California State Prison, Sacramento in January 2014. Once PINELL was transferred, ALLEGRA CASIMIR-TAYLOR started visiting him every weekend and rearranged her schedule on a consistent basis so she would not miss the visitations.

9.    PINNEL was an important figure in ALLEGRA CASIMIR-TAYLOR's life.

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA 95815

2

Complaint for Wrongful Death

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA  95815

## GENERAL ALLEGATIONS

10.     This action arises out of the untimely and avoidable death of HUGO PINELL at New Folsom State Prison officially known as California State Prison, Sacramento ("CSPS") on August 12, 2015.

11.     PINELL was kept in a Security Housing Unit ("SHU") or solitary confinement for 43 years. Just 5 days before he was killed, he was released into general population despite the fact that CDCR knew that he was targeted by other inmates. They were aware of multiple credible death threats against PINELL including a threat issued by the Aryan Brotherhood.

12.     On August 12, 2015, PINELL was attacked by at least two white inmates in a general-population yard at CSPS. Jayson W. Weaver and Waylon D. Pitchford, who both had an extensive history of racially motivated attacks on other inmates, were criminally charged for their alleged role in the assassination.

13.     Defendants knew that Weaver was convicted in 2006 for an assault on another inmate, drawing a life-without-parole sentence and that he had already been serving a sentence of life in prison with the possibility of parole for a 1995 murder conviction.

14.     Defendants knew that Pitchford is facing charges in connection with another violent assault on an inmate at the Folsom prison and that he is accused of attacking another inmate and with possession of a shank in August 2013.

15.     The attack culminated in a prison riot that ended up injuring 29 other inmates. The riot began in a general-population yard at the prison, which houses 2,300 maximum-security inmates. The assassination of PINELL was that catalyst for the melee.

16.     CDCR staff knew that he was a target for assassination by multiple groups of prisoners and that there was substantial risk he would be killed if was taken out of the SHU unit and placed in General Population. Reportedly CDCR employees placed bets on how long PINELL would survive being in general population.

## PARTIES

17.     The full extent of the facts linking the factiously designated Defendants within this cause of action and/or the true names or capacities, whether individual, corporate,

Complaint for Wrongful Death

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA 95815

partnership, associate, or otherwise, of Defendants DOES 1 through 100 are unknown to Plaintiffs. Plaintiffs are informed, believe, and alleged that each of Defendants designated as a DOE is negligently, wantonly, wrongfully and unlawfully responsible in some manner for the events and happenings herein referred to and proximately caused injured and damages to Plaintiffs as herein alleged. Plaintiffs will hereinafter seek leave of Court to amend this Complaint to show said Defendants' true names and capacities after the same have been ascertained.

18. At all times herein mentioned, each Defendant was the agent of each and all other Defendants, and each of them, and said action was within the course and scope of said agency.

19. At all times mentioned herein Plaintiff ALLEGRA CASIMIR-TAYLOR was the daughter of decedent HUGO PINELL, and resided within the State of California.

20. At all times mentioned herein Plaintiff's Decedent, HUGO PINELL, was an inmate at CSPS within the State of California.

21. Plaintiffs are informed and believe and thereon allege that, at all times mentioned herein, Defendants, STATE OF CALIFORNIA and DOES 1 through 10 and STATE OF CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION (CDCR) and DOES 11-20 (hereinafter referred to as "STATE OF CALIFORNIA/CDCR"), was acting under color of state law and were duly organized public entities within the State of California who owned and/or controlled California State Prison, Sacramento (hereinafter referred to as "CSPS") where the subject incident occurred, was acting under color of state law, and are subject to the jurisdiction of this Court.

22. At all times herein mentioned, Plaintiff is informed and believes that SCOTT KERNAN and DOES 21-30 is the Chief of CDCR and was acting under color of state law.

23. At all times herein mentioned, Plaintiff is informed and believes that RON LACKEY and DOES 31-40 is the Warden at CSPS was acting under color of state law.

**COMPLIANCE WITH GOVERNMENT TORT CLAIM PROCEDURES**

24. As a pre-requisite to the state law claims alleged herein against State of California employees/agents, Plaintiffs timely filed governmental claims with the Victims Compensation

Complaint for Wrongful Death

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA  95815

and Government Claims Board. A copy of the Claim is attached as Exhibit A.

25.    By correspondence from the California Victims Compensation and Government Claims Board these claims were rejected. A copy of the rejection is attached as Exhibit B.

26.    This action has been filed within six months of the rejection by the California Victims Compensation and Government Claims Board rejection, as required by law.

### FIRST CAUSE OF ACTION
Deliberate Indifference to Health and Safety
(Violation of the Eighth Amendment to the U.S. Constitution:
Survival Action- 42 U.S.C. §1983)

27.    On behalf of decedent PINELL, Plaintiffs re-allege and incorporate by reference paragraphs 1 through 26, as though fully set forth herein.

28.    Defendants and Does 1 through 100, and each of them, knew that decedent was in imminent danger of serious risk of harm to his health and safety, including being at obvious risk of being targeted for assassination, if he was placed in general population due to (1) multiple death threats (2) various documentation in his transfer paperwork and C-file, which specifically noted that he had could not be placed in general population, and that he was in grave danger and would be killed if he was let out of solitary confinement or SHU and placed in general population.

29.    The imminent danger of death or grievous bodily harm to PINELL that Defendants ignored and failed to take adequate safety precautions against were obvious and immediate substantial threats to his health, safety, and to his very life.

30.    Defendants' acts and/or omissions as alleged herein, including but not limited to the failure to take other measures to protect him from serious harm, constituted deliberate indifference to a substantial risk PINELL's health, safety and well-being.

31.    As a direct and proximate result of Defendants' conduct, decedent PINELL experienced the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his life.

32.    The aforementioned acts and/or omissions of the individually named Defendants, and each of them, were malicious, reckless and/or accomplished with a conscious disregard of

decedent's rights thereby entitling Plaintiffs to an award of exemplary and punitive damages according to proof to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**SECOND CAUSE OF ACTION**
Supervisory Liability based on Customs, Practices or Policies
(Survival Action- 42 U.S.C. §1983)

33.    On behalf of decedent PINELL, Plaintiffs re-allege and incorporate by reference the paragraphs 1 through 21, as though fully set forth herein.

34.    The aforementioned acts and/or omissions of Defendants, and each of the, in being deliberately indifferent to PINELL's  health and safety and in violating decedent's civil rights were the direct and proximate result of customs, practices or policies, or the lack thereof, of SCOTT KERNAN, RON RACKLEY, and DOES 1 through 100, and each of them.

35.    Such customs, practices, polices and/or procedures include, but are not limited to, an ongoing pattern of deliberate indifference to a credible and substantial threat to health and safety of CSPS inmates, including the following: a failure to ensure implementation of appropriate health and safety  plans; a failure to act upon death threats or threats of  grievous bodily harm; a failure to provide appropriate staffing and training at CSPS for providing safety and ensure inmates' civil rights are not violated; a failure to implement a policy to ensure that staff would adequately respond to threats against inmate safety in a  timely manner; a failure to create and/or implement guidelines that must be followed to remove inmates from places and situations that present a serious and imminent risk of death; a failure to create and/or implement protocols for monitoring at-risk inmates removed from protective custody and placed in general custody, a failure to create, implement and/or ensure that staff follow policies, guidelines or steps to be taken when staff observe that an inmate is in imminent danger of death; a failure to adequately train and supervise employees and/or agents to prevent the occurrence of the constitutional violations alleged herein; and a failure to promulgate appropriate policies or procedures or take other measures to prevent the constitutional violations alleged herein.

36.    As a direct and proximate result of the aforementioned customs, practices, policies and/or procedures of said Defendants, or as a result of Defendants' failure to promulgate

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA  95815

6

Complaint for Wrongful Death

appropriate policies or procedures, decedent PINELL suffered the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his life.

**THIRD CAUSE OF ACTION**
Failure to Supervise, Investigate and Discipline
(Survival Action - 42 U.S.C. §1983)

37.     On behalf of decedent PINELL, Plaintiffs re-allege and incorporate by reference the paragraphs 1 through 36, as though fully set forth herein.

38.     The Constitutional violations by Defendants as alleged herein occurred as a result of the failure to adequately supervise, investigate, and discipline.

39.     Defendants SCOTT KERNAN, RON RACKLEY, and DOES 1 through 100, and each of them, failed to adequately supervise, investigate and discipline subordinate employees in regard to preventing deliberate indifference to the serious threats to the health and safety of inmates at CSPS. Said Defendants' failure to supervise, investigate and discipline employees amounted to deliberate indifference to inmates' right to be free of substantial risk of serious harm to their health and safety.

40.     As a direct and proximate result of the aforementioned failure to supervise, investigate and/or discipline, decedent PINELL suffered the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his life.

**FOURTH CAUSE OF ACTION**
Substantive Due Process- Loss of Parent/Child Relationship
(Violation of the Fourteenth Amendment to the U.S. Constitution: 42 U.S.C. §1983)

41.     Plaintiffs re-allege and incorporate by reference the paragraphs 1 through 40 as though fully set forth herein.

42.     The acts and/or omissions of Defendants as alleged herein, of being deliberately indifferent to the serious threat of imminent death of decedent PINELL by failing to take adequate preventative measures after they knew that there was a credible imminent deadly threat to decedent resulted in PINELL's death, which deprived Plaintiffs their liberty interest in the parent-child relationship in violation of their substantive due process rights as defined by the

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA  95815

7

Complaint for Wrongful Death

First and Fourteenth Amendments to the United States Constitution.

43.     Such conduct by said Defendants "shocks the conscience."

44.     As a direct and proximate result of said Defendants' conduct, Plaintiffs suffered injuries and damages as alleged herein including pain and suffering and emotional distress.

45.     The aforementioned acts and/or omissions of the individually named Defendants were willful, wanton, malicious, reckless, and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## FIFTH CAUSE OF ACTION
Wrongful Death
(Cal. Code of Civil Procedure § 377.60 et seq.)

46.     On behalf of decedent PINELL, Plaintiffs re-allege and incorporate by reference paragraphs 1 through 45, as though fully set forth herein.

47.     Plaintiff ALLEGRA CASIMIR-TAYLOR is the daughter of the decedent, who has no surviving spouse or other surviving children. Filed concurrently with this complaint is Declaration of ALLEGRA CASIMIR-TAYLOR complying with Cal. Code of Civil Procedure section 377.32.

48.     The acts and/or omissions with deliberate indifference to a substantial risk of serious harm by Defendants directly and proximately caused the wrongful death of PINELL and were the direct and proximate cause of Plaintiffs' injuries entitling Plaintiffs to recover damages pursuant to Code of Civil Procedure section 377.60 et seq.

49.     That on or about August 12, 2015, Defendants, and each of them expressed a culpable state of mind showing deliberate indifference to a substantial risk to the safety of decedent by recklessly placing him in the general population knowing of the known imminent danger of serious harm to decedent's well-being without adequate means of protection which resulted in his untimely death.

//

//

//

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA  95815

8

Complaint for Wrongful Death

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA 95815

## SIXTH CAUSE OF ACTION
Wrongful Death
(Cruel and Unusual Punishment U.S.C. §1986)

50.     On behalf of decedent PINELL, Plaintiffs re-allege and incorporate by reference paragraphs 1 through 49, as though fully set forth herein.

51.     The acts and/or omissions of Defendants, and each of them, as alleged herein with deliberate indifference to a known substantial risk of serious harm by Defendants directly and proximately caused cruel and unusual punishment to be inflicted upon decedent which resulted in his death. Defendants expressed a willful disregard for decedent's well- being by recklessly placing him in the general population on August 12, 2015 without reasonable diligence in regards to his safety.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs prays for the following relief:

1. For compensatory, general and special damages against each Defendant, jointly and severally, in the amount proven at trial;

2. For punitive and exemplary damages against each individually named Defendant in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

3. For costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and as otherwise authorized by statute or law;

4. For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

Dated: September 23, 2016                    **AMERIO LAW FIRM, P.C.**


                                             **By:** /s/ Ashley R. Amerio
                                             ASHLEY R. AMERIO, ESQ.
                                             JEFFREY FLETTERICK, ESQ.
                                             Attorneys for Plaintiff

9

Complaint for Wrongful Death

# EXHIBIT 112

# EXHIBIT 112

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

**Side 1**

| | IAB USE ONLY | Institution/Parole Region: | Log #: | Category: |
|---|---|---|---|---|
| | | | | |
| | | | *FOR STAFF USE ONLY* | |

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available. See California Code of Regulations (CCR), Title 15, Section 3084.1. You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal. If additional space is needed, <u>only</u> one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process. No reprisals will be taken for using the appeal process.

**Appeal is subject to rejection if one row of text per line is exceeded.**      **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Brown, Lawrence | BJ5119 | CIF-DW-126 | |

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.): Staff complaint pursuant to PC §§2650-2652, 832.5, 148.6 15 CCR §§3391, 3084.9(i)(1)-(i)(6), 3084.5(b)(4),3084 (g); DOM §§54100.25 et seq., 33030.19; and, GC §19572 Re: Wannabe Commandos and OCS #2

A. Explain your issue (If you need more space, use Section A of the CDCR 602-A): I formally accuse state personnel (i.e., Warden C Koening, Wannabe Commandos, OCS Team #2 and all other state officials acting in concert and under color of law noted here as John does 1-150), of committing illegal, malicious, and, sadistic acts consisting of, but not limited to:

B. Action requested (If you need more space, use Section B of the CDCR 602-A): Monetary compensation for all injuries directly or indirectly caused by the events set forth herein. No further retaliation or attacks for the filing of this grievance and forth coming BoardClaim and Civil Rights Complaint. The true names of the Wannabe Commandos, OCS #2,

**Supporting Documents: Refer to CCR 3084.3.**

☒ Yes, I have attached supporting documents.

List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):

Patient Discharge Instructions;Dated: 7-21-2020 & Dated: 7-24-2020 & 7-26-2020.

CDCR 1858 RIGHTS AND RESPONSIBILTY STATEMENT _____

☐ No, I have not attached any supporting documents. Reason :_____

_____

_____

_____

Inmate/Parolee Signature: _____ Date Submitted: JULY/30/2020

[ ] **By placing my initials in this box, I waive my right to receive an interview.**

**C. First Level - Staff Use Only**      Staff – Check One: Is CDCR 602-A Attached?  ☐ Yes  ☐ No

This appeal has been:
☐ Bypassed at the First Level of Review. Go to Section E.
☐ Rejected (See attached letter for instruction) Date: _____ Date: _____ Date: _____ Date: _____
☐ Cancelled (See attached letter) Date: _____
☐ Accepted at the First Level of Review.

Assigned to: _____ Title: _____ Date Assigned: _____ Date Due:_____

First Level Responder: Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.

Date of Interview: _____ Interview Location: _____

Your appeal issue is:  ☐ Granted    ☐ Granted in Part    ☐ Denied    ☐ Other: _____

See attached letter. If dissatisfied with First Level response, complete Section D.

Interviewer: _____ Title: _____ Signature: _____ Date completed:_____
      (Print Name)

Reviewer: _____ Title: _____ Signature: _____
      (Print Name)

Date received by AC:_____

| AC Use Only |
|---|
| Date mailed/delivered to appellant ____ / ____ / ____ |

**Ex. 112:1**

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL FORM ATTACHMENT**
CDCR 602-A (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

**Side 1**

| IAB USE ONLY | Institution/Parole Region: | Log #: | Category: |
|---|---|---|---|
| | | | |
| | | *FOR STAFF USE ONLY* | |

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.

**Appeal is subject to rejection if one row of text per line is exceeded.    WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Brown, Lawrence | BJ5119 | CIF-DW-126 | |

**A. Continuation of CDCR 602, Section A only (Explain your issue)** (Claim #1) Excessive and Unnecessary force; (Claim #2) Conspiracy to Interfere With Civil Rights, 42 U.S.C. §1985, (Claim #3) Civil Rights violation, 42 U.S.C. §1983; (Claim #4) Racial Discrimination; and, (Claim #5) Inefficiency. FACTUAL ALLEGATIONS: On 7/20/2020, at 0300 hrs., I was abruptly awaken by unnamed agents in riot gear who without warning, snatched me off the top bunk, causing me to hit the concrete floor head first, as he simultaneously grabbed my arms to hand cuff me behind my back. I yelled, "I'm not resisting, stop, you're hurting me","Shut the fuck up" he snapped, as he began to drag me out of the cell by my feet. Upon exiting the cell, he bent over placing his knee on my lower back, shoving my face down on the floor with his hand, further threatening to hurt me worse if I didn't shut up. The painful emotional distress caused me to pee on my self. He raised me up by the plastic retrains he cuff me with, further cutting circulation to my hands causing my hands to swell up. He then rammed me into the chow hall despite not wearing anything but my boxers. I was forced to sit down, shoulder to shoulder with more than 100+ blacks that had nothing on but their boxers (i.e., no masks). I asked the agent to loosen the retrains as I could not feel my hands and requested urgent medical attention to no avail. The agent said, "I already told you to shut the fuck up or you will get it worse. Deal with it." I was left in tight restrains for more than seven hours, itt shall be noted that the (operation akili) was racially motivated violation of the law!

Inmate/Parolee Signature: _____ Date Submitted: JULY/30/2020

**B. Continuation of CDCR 602, Section B only (Action requested):** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Inmate/Parolee Signature: _____ Date Submitted: _____

**Ex. 112:2**



CALIFORNIA DEPARTMENT *of*
Corrections and Rehabilitation

# CLAIMANT GRIEVANCE RECEIPT ACKNOWLEDGMENT

**Offender Name:** BROWN, LAWRENCE        **CDC#:** BJ5119

**Date:** 08/03/2020

**Current Location:** CTF-Facility C        **Current Area/Bed:** C YW 1119001L

**From:** Office of Grievances at Correctional Training Facility

**Re:** Log # 000000023996

### Emergency Detected

Upon review, it was determined that one or more claims in your grievance contained information concerning personal safety, institutional security, or sexual misconduct. Therefore, it was provided to the appropriate administrator at Correctional Training Facility so that your claim(s) could be addressed quickly.

Correctional Training Facility should have notified you of its course of action to address your claim(s) within five business days after it received your grievance. If you did not receive a notification contact your counselor or agent.      **Grievance Receipt**

The California Department of Corrections and Rehabilitation Office of Grievances at Correctional Training Facility received your grievance on 08/03/2020. Your grievance has been assigned for review and response.

Pursuant to California Code of Regulations, title 15, the Office of Grievances will complete its review no later than 10/03/2020.

Please be informed that the Office of Grievances will not respond to any inquiries about the status of a grievance prior to the date shown above.

Once you receive a response and if you are dissatisfied with the decision(s), you may file an appeal with the California Department of Corrections and Rehabilitation Office of Appeals.

CDCR SOMS OGTT300
CLAIMANT GRIEVANCE RECEIPT ACKNOWLEDGMENT

CDCR SOMS OGTT300 - OOG Offender Grievance Receipt Acknowledgement

**Ex. 112:3**

# EXHIBIT 113

# EXHIBIT 113

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

### CLAIMANT INFORMATION

| LAST NAME BROWN | FIRST NAME LAWRENCE | MIDDLE INITIAL |
|---|---|---|

INMATE OR PATIENT IDENTIFICATION NUMBER (if applicable) BO5119

BUSINESS NAME (if applicable)

TELEPHONE NUMBER

EMAIL ADDRESS

| MAILING ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|

IS THE CLAIMANT UNDER 18 YEARS OF AGE?
☐ Yes   ☒ No

INSURED NAME (Insurance Company Subrogation)

IS THIS AN AMENDMENT TO A PREVIOUSLY EXISTING CLAIM?
☐ Yes   ☒ No

| EXISTING CLAIM NUMBER (if applicable) | EXISTING CLAIMANT NAME (if applicable) |
|---|---|

### ATTORNEY OR REPRESENTATIVE INFORMATION

| LAST NAME Pavone | FIRST NAME Benjamin | MIDDLE INITIAL |
|---|---|---|

| TELEPHONE NUMBER 619 224 8885 | EMAIL ADDRESS bpavone@cox.net |
|---|---|

| MAILING ADDRESS 600 W. Broadway, Ste. 700 | CITY San Diego | STATE CA | ZIP 92101 |
|---|---|---|---|

### CLAIM INFORMATION

| STATE AGENCIES OR EMPLOYEES AGAINST WHOM THE CLAIM IS FILED CDCR; Warden Craig Koenig | DATE OF INCIDENT 7/20/202 |
|---|---|

LATE CLAIM EXPLANATION (Required, if incident was more than six months ago)

| DOLLAR AMOUNT OF CLAIM Above $25,000 | CIVIL CASE TYPE (Required, if amount is more than $10,000) ☐ Limited ($25,000 or less)  ☒ Non-Limited (over $25,000) |
|---|---|

DOLLAR AMOUNT EXPLANATION
Racist attack.

INCIDENT LOCATION
Correctional Training Facility

SPECIFIC DAMAGE OR INJURY DESCRIPTION
Lower Back   Both Left and Right Knees damage Right Hand my Thumb has limited mobility also wrist Due to Restraints Placed on to tight for 8½ hrs.

CIRCUMSTANCES THAT LED TO DAMAGE OR INJURY
Agents from sacramento Raided cells a CTF because of security threat Groups Known as Gorilla Family, Black Panthers, Bloods, and crips

EXPLAIN WHY YOU BELIEVE THE STATE IS RESPONSIBLE FOR THE DAMAGE OR INJURY
I Have No Affiliation whats so ever with any security threat Groce my c-File Past Records Do Not show or segust or Prove Im a member. No Prison Violations Im a Non-Violent Inmate. There was no Provocation or Resistance ————► over

**Ex. 113:1**

Page 1 of 2

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

## AUTOMOBILE CLAIM INFORMATION

| DOES THE CLAIM INVOLVE A STATE VEHICLE? ☐ Yes ☒ No | VEHICLE LICENSE NUMBER (if known) | STATE DRIVER NAME (if known) |
|---|---|---|
| HAS A CLAIM BEEN FILED WITH YOUR INSURANCE CARRIER? ☐ Yes ☒ No | INSURANCE CARRIER NAME | INSURANCE CLAIM NUMBER |
| HAVE YOU RECEIVED AN INSURANCE PAYMENT FOR THIS DAMAGE OR INJURY? ☐ Yes ☒ No | AMOUNT RECEIVED (if any) | AMOUNT OF DEDUCTIBLE (if any) |

## NOTICE AND SIGNATURE

I declare under penalty of perjury under the laws of the State of California that all the information I have provided is true and correct to the best of my information and belief. I further understand that if I have provided information that is false, intentionally incomplete, or misleading I may be charged with a felony punishable by up to four years in state prison and/or a fine of up to $10,000 (Penal Code section 72).

| SIGNATURE *Lawrence Brown* | PRINTED NAME *LAWRENCE BROWN* | DATE 12-04/20 |
|---|---|---|

## INSTRUCTIONS

- Include a check or money order for $25, payable to the State of California.
  - $25 filing fee is not required for amendments to existing claims.
- Confirm all sections relating to this claim are complete and the form is signed.
- Attach copies of any documentation that supports your claim. Do not submit originals.

Mail the claim form and all attachments to:
Office of Risk and Insurance Management
Government Claims Program
P.O. Box 989052, MS414
West Sacramento, CA 95798-9052

Claim forms can also be delivered to:
Office of Risk and Insurance Management
Government Claims Program
707 3rd Street, 1st Floor
West Sacramento, CA 95605
1-800-955-0045

### Department of General Services Privacy Notice on Information Collection

This notice is provided pursuant to the Information Practices Act of 1977, California Civil Code Sections 1798.17 & 1798.24 and the Federal Privacy Act (Public Law 93-579).

The Department of General Services (DGS), Office of Risk and Insurance Management (ORIM), is requesting the information specified on this form pursuant to Government Code Section 905.2(c).

The principal purpose for requesting this data is to process claims against the state The information provided will/may be disclosed to a person, or to another agency where the transfer is necessary for the transferee-agency to perform its constitutional or statutory duties, and the use is compatible with a purpose for which the information was collected and the use or transfer is accounted for in accordance with California Civil Code Section 1798.25.

Individuals should not provide personal information that is not requested.

The submission of all information requested is mandatory unless otherwise noted. If you fail to provide the information requested to DGS, or if the information provided is deemed incomplete or unreadable, this may result in a delay in processing.

**Department Privacy Policy**
The information collected by DGS is subject to the limitations in the Information Practices Act of 1977 and state policy (see State Administrative Manual 5310-5310.7). For more information on how we care for your personal information, please read the DGS Privacy Policy.

**Access to Your Information**
ORIM is responsible for maintaining collected records and retaining them for 5 years. You have a right to access records containing personal information maintained by the state entity. To request access, contact:

**DGS ORIM**
**Public Records Officer**
707 3rd St., West Sacramento, CA 95605
**(916) 376-5300**

IM A NON-Violent offenders And Inmate
I was Violenty and Verbally + Physically Assulted
I am a cccms severe Dipression Anxiety with
PTSD And this Has Me Very scared caint sleep and
IM IN PaIN and Constance fear This will Happen
again.

I Believe AGENTs from sacramento conducted Raid ON July
20,20 at 0300 hrs with NO video coverage or Documentation
or Any of AGents wearing Name TAGs was Illegal, Racist +
Digrading A Violation against my constitution Rights also
Illegal use of Physical Force without Provocation or
warrant of Any Prior History of Any GAng AFFiliation or ANy
current Gang AFFiliation or Prison Violation.

I was fast asleep when AGents violently Rushed INto my cell D-wing
05 upper very aggressive yelling and violently And Physically Snatched
me from Top BunK slamed me face Down on concret floor, Verbally
Threating to Fuck Me up IF I moved, I clearly and Verbally said Im
Not Resisting why are you Hurting me I Didn't Do Anything why are you
asulting Me AGENT Violently Drag me out of my cell on my belly
continuing yelling Shout the Fuck up SHut your Fucking mouth
IF you move I'll Fuck you up Placed His Knee using All His
weight INto my lower back Putting Plastic Restraints so tight
cutting cerculating to my Hands I screamed out your Hurting me

**Ex. 113:3**